**MARTIN MARIETTA MATERIALS, INC., Plaintiff,**

v.

**VULCAN MATERIALS COMPANY, Defendant.**

Civil Action No. 7102–CS.

Court of Chancery of Delaware.

Submitted: April 13, 2012.
Decided: May 4, 2012.

---

37. *Id.*

38. *Id.* at *3.

Robert S. Saunders, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Robert E. Zimet, Esquire, James A. Keyte, Esquire, Susan L. Saltzstein, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; Eric J. Gorman, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois, Attorneys for Plaintiff.

Collins J. Seitz, Jr., Esquire, David E. Ross, Esquire, Garrett B. Moritz, Esquire, Eric D. Selden, Esquire, Anthony A. Rickey, Esquire, Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; Kenneth B. Forrest, Esquire, William Savitt, Esquire, Theodore N. Mirvis, Esquire, Vincent G. Levy, Esquire, Adam S. Hobson, Esquire, Olivia A. Maginley, Esquire, Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Defendant.

OPINION

STRINE, Chancellor.

### I. *Introduction*

This case presents interesting questions regarding the meaning of confidentiality agreements entered into by two industry rivals at a time when both were intrigued by the possibility of a friendly merger and when neither wished to be the subject of an unsolicited offer by the other or a third-party industry rival.

May one of the parties—especially the one who evinced the most concern for confidentiality and who most feared having its willingness to enter into merger discussions become public—decide that evolving market circumstances make it comfortable enough to make a hostile bid for the other and then without consequence freely use and disclose publicly all the information that it had adamantly insisted be kept confidential? In this decision, I conclude that the answer to that question is no and that, consistent with Delaware's pro-contractarian public policy, the parties' agreement that the victim of any breach of the confidentiality agreements should be entitled to specific performance and injunctive relief should be respected.

Here, I find that, although the confidentiality agreements did not include an express standstill, they did bar either party from:

- Using the broad class of "evaluation material" defined by the confidentiality agreements except for the consideration of a contractually negotiated business combination transaction between the parties, and not for a combination that was to be effected by hostile, unsolicited activity of one of the parties;
- Disclosing either the fact that the parties had merger discussions or any evaluation material shared under the confidentiality agreements unless the

party was legally required to disclose because: (i) it had received "oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process"[1]; and (ii) its legal counsel had, after giving the other party notice and the chance for it to comment on the extent of disclosure required, limited disclosure to the minimum necessary to satisfy the requirements of law; or

- Disclosing information protected from disclosure by the confidentiality agreements through press releases, investor conference calls, and communications with journalists that were in no way required by law.

The breaching party engaged in each of these contractually impermissible courses of conduct. Because the victim of the breach has sought a temporally reasonable injunction tailored to the minimum period of time that the breaching party was precluded by the confidentiality agreements from misusing the information it had received or making disclosures that were not legally required in the sense defined in the confidentiality agreements, I grant the non-breaching party's request, which has the effect of putting off the breaching party's proxy contest and exchange offer for a period of four months.

## II. *Factual Background*

As the introduction indicates, this is an M & A case that turns on the meaning of confidentiality agreements between the parties. The plaintiff and counterclaim-defendant in this case is Martin Marietta Materials, Inc., a North Carolina corporation headquartered in Raleigh. Martin

Marietta is the second largest domestic participant in the aggregates industry. That industry mines large rocks and similar materials, and processes them into materials for roads, buildings, and other infrastructure. The defendant and counterclaim-plaintiff is Vulcan Materials Company, the largest domestic aggregates business. Vulcan is a New Jersey corporation headquartered in Birmingham, Alabama.

On December 12, 2011, Martin Marietta launched an unsolicited exchange offer in which it seeks to purchase all of Vulcan's outstanding shares (the "Exchange Offer"). The Exchange Offer is conditioned on the receipt of tenders from 80% of the Vulcan shareholders,[2] and contains a waivable condition that "Vulcan ... have entered into a definitive merger agreement with Martin Marietta with respect to the proposed transaction that is reasonably satisfactory to Martin Marietta and Vulcan"[3] (the "Merger Condition"). Martin Marietta is offering 0.5 of a Martin Marietta share for each Vulcan share, which was a premium of 18% to the average exchange ratio based on closing share prices for Martin Marietta and Vulcan for the 30–day period ended December 9, 2011.[4] To create a Vulcan board more receptive of its offer, Martin Marietta also launched a proxy contest, seeking to elect four new members to Vulcan's classified board at Vulcan's upcoming annual meeting, which is scheduled to occur on June 1, 2012 (the "Proxy Contest").

Vulcan's board did not react enthusiastically to Martin Marietta's overture and made clear that it believed that Martin Marietta's conduct violated confidentiality

1. JX 1 (Letter Agreement (May 3, 2010)) ("NDA") ¶ 4.

2. The 80% tender condition is subject to the outcome of pending litigation between the parties in New Jersey. *See* Martin Marietta

Materials, Inc., Registration Statement (Form S–4), Am. No. 3 at 9 (Mar. 19, 2012).

3. *Id.* at 60.

4. *Id.* at 3.

agreements between the companies. On the same day that it launched its hostile bid, Martin Marietta brought this suit to obtain a declaration that nothing in the confidentiality agreements bars the Exchange Offer and Proxy Contest. Vulcan responded with litigation over the same issue in federal court in Alabama, where it is headquartered, despite the fact that the confidentiality agreements are governed by Delaware law and that the primary confidentiality agreement contains both a Delaware choice of law and a choice of forum provision.[5] Eventually, it was agreed that this case would proceed first, ahead of both the Alabama action and fiduciary duty and securities cases pending in New Jersey.

Thus, the plaintiff here, Martin Marietta, seeks a declaration that it is not liable. The natural plaintiff, Vulcan, is the defendant, and it has filed counterclaims seeking a determination that Martin Marietta has breached its contractual obligations to Vulcan by improperly using and publicly disclosing information in aid of the Exchange Offer and Proxy Contest and that Martin Marietta should be temporarily enjoined from proceeding with both.

As I discuss the parties' claims, I will focus on Vulcan's claims because that is the more natural way to evaluate what is in issue.

### A. A Brief Overview Of The Contractual Dispute

To make more relevant my recitation of the factual background, it is useful to frame the basic contractual dispute between the parties. In the spring of 2010, the CEOs of Martin Marietta and Vulcan began discussing a potential merger. In the interest of keeping their discussions confidential, Martin Marietta and Vulcan entered into a non-disclosure agreement, dated May 3, 2010 (the "NDA"). A few weeks later, in order to facilitate an analysis of the antitrust implications of a merger, the companies also entered into a common interest, joint defense and confidentiality agreement, effective as of May 18, 2010 (the "JDA," and together with the NDA, the "Confidentiality Agreements"). The NDA and the JDA broadly define materials subject to protection as "Evaluation Material"[6] and "Confidential Materials,"[7] respectively. In this opinion, I will refer to both as "Evaluation Material," except when it is necessary to distinguish between the two.

Vulcan argues that the terms of the Confidentiality Agreements make clear that Martin Marietta could only use Evaluation Material for the purpose of considering a "business combination transaction" that was "between" the parties.[8] Vulcan construes this phrase to mean a friendly, contractual business combination between the two companies that was negotiated between the existing boards of the two companies, and that was not the product of a proxy contest or other unsolicited pressure strategy. Relatedly, Vulcan argues that the Confidentiality Agreements precluded Martin Marietta from revealing publicly that the parties had engaged in merger discussions or revealing any of the Evaluation Material unless Martin Marietta was legally required in the sense of having received "oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process,"[9] and had given the other party prior

---

5. *See* NDA ¶ 10.

6. *Id.* at 1 (Preamble).

7. JX 2 (Common Interest, Joint Defense and Confidentiality Agreement (May 18, 2010)) ("JDA") at 1.

8. NDA at 1.

9. *Id.* ¶ 4.

notice and a chance to seek an injunction and had conducted an exacting review limiting its disclosures to the bare legal necessity. For the sake of economy, I refer to the above list of sources that constitute a legal requirement, as defined in ¶ 4 of the NDA, as an "External Demand," and I refer to the procedural requirements for prior notice and exacting review set forth in that same section as the "Notice and Vetting Process."

Vulcan contends that Martin Marietta flagrantly breached the Confidentiality Agreements by using Evaluation Material to formulate a hostile bid, which was not a proper use under the Confidentiality Agreements. In Vulcan's view, a hostile bid does not qualify as a "business combination transaction between" Vulcan and Martin Marietta because that phrase requires a contract "between" the two companies leading to a combination.

Vulcan also argues that even if Martin Marietta was free to launch a hostile bid, it could not reveal publicly its prior discussions with Vulcan or any of the Evaluation Material unless the legal requirement for it to do so came from an External Demand. Having not received any External Demand, Martin Marietta was not, according to Vulcan, permitted to disclose this information because it unilaterally chose to make the Exchange Offer, which then triggered SEC Rules requiring a party making an exchange offer to disclose "any negotiations, transactions or material contacts during the past two years between the filing person . . . and the subject company . . . concerning any . . . [m]erger" [10] and to "[d]escribe any past, present or proposed material contracts, arrangements, understandings, relationships, negotiations or transactions during the periods for which

financial statements are presented or incorporated by reference . . . between the company being acquired . . . and the registrant" [11] in the public filings accompanying an exchange offer.

Finally, Vulcan argues in the alternative that even if Martin Marietta was permitted to use the Evaluation Material to prepare a hostile bid and even if it was required to disclose that discussions between itself and Vulcan had occurred under applicable SEC Rules, Martin Marietta went much further than was legally required and larded its S–4 in support of the Exchange Offer and its proxy statement in support of the Proxy Contest with broad, selective, and slanted discussions of Evaluation Material and the history of its negotiations with Vulcan that cannot be justified as legally required. As problematic, Martin Marietta disclosed this information in communications that it does not even seek to justify as legally required, such as investor conference calls and communications to the press.

In response, Martin Marietta argues that Vulcan is attempting to read a standstill into the Confidentiality Agreements, which Vulcan admits contain no explicit standstill. According to Martin Marietta, the Confidentiality Agreements allowed either side to use the Evaluation Material for the consideration of any business combination transaction between Vulcan and Martin Marietta, regardless of whether that combination is effected through a friendly, negotiated merger or a back-end merger consummated after a successful hostile Exchange Offer and Proxy Contest. Contrary to Vulcan, Martin Marietta says that the Confidentiality Agreements also permitted the disclosure of any discussions between the parties and any "facts with respect [to]" to those discussions,[12] includ-

10. 17 C.F.R. § 229.1005(b).

11. 17 C.F.R. § 239.25 (Item 6).

12. NDA ¶ 3.

ing the substance of any Evaluation Material, when such disclosure was legally required. "Legally required," according to Martin Marietta, was not limited to circumstances when a party received an External Demand, but rather encompassed any time disclosure was legally required. Only in the circumstances when the legal requirement to disclose was the result of an External Demand was the party obligated to disclose required to follow the Notice and Vetting Process.

Because the legal requirements to disclose "any negotiations, transactions or material contacts ... concerning any ... [m]erger" and to "[d]escribe any ... material contracts" between Vulcan and Martin Marietta arose from Martin Marietta's own decision to launch the Exchange Offer and not from an External Demand, Martin Marietta claims it was free to determine what it was required to disclose without following the Notice and Vetting Process. Despite having blocked all inquiry into the bases on which it made its determination of what to disclose, Martin Marietta argues that it disclosed only that which its counsel advised was legally required. And although Martin Marietta admits that it made many communications disclosing Evaluation Material and other information covered by the Confidentiality Agreements that were not legally required, it claims that so long as it had previously put that information in a SEC disclosure, it was free to spread it around liberally whenever and wherever it wanted, even though it was not legally required to do so.

With that very basic sense of the parties' contending positions in mind, I now cover the events that led to the need for this decision.

B. *After Several False Starts, Vulcan And Martin Marietta Go To The Deal Dance Together*

As the two largest aggregates companies in the United States, Vulcan and Martin Marietta have been seen as a natural combination by many market observers and by their own management teams for many years. The reasons for that are obvious. In the aggregates business, a key driver of revenues is access to quarries and mines that are approved to be used for the extraction of materials that can be turned into the stuff from which roads and buildings are made. Vulcan and Martin Marietta have a lot of quarries and mines between them. Assuming that the antitrust authorities would permit them to merge without requiring them to divest too many assets, the synergies from being able to exploit the companies' combined assets with one management team and from the elimination of duplication to perform functions such as human resources, financial management, and so forth, and other economies of scale were viewed as potentially large.

Vulcan's CEO, Don James, has been CEO since 1997. In the 2000s, James reached out on several occasions to Martin Marietta's management and expressed interest in talking about a friendly merger. When he first did so, Martin Marietta's CEO was Steve Zelnak. Zelnak and James were not pals, but wary rivals with an awkward relationship. Zelnak was not warm to the idea of any transaction that might involve him not being the CEO of the resulting entity, and the idea of stepping down in favor of Zelnak did not thrill James either.

In 2006, Zelnak brought in Ward Nye, an executive with experience at another leading aggregates player, Hanson PLC, as Martin Marietta's COO. After Nye joined Martin Marietta, James approached both Zelnak and Nye about discussing a merger. Each time they were approached, Martin Marietta management eventually balked, largely over the same issue, which was that a merger would raise

questions about who would be CEO. This was of special concern to Nye. Unlike Zelnak and James, both of whom had enjoyed the chance to be the CEO of a large public company for many years, Nye ended up serving for several more years as COO of Martin Marietta than he had anticipated, because Zelnak did not step down as early as Nye had gotten the impression he would. Nye was not at all anxious to find his chance to be a CEO lost in a large synergistic merger, which was a possibility depending on the relative negotiating and financial strength of Vulcan and Martin Marietta in merger talks. Thus, during the period until Nye actually became CEO in 2010, Martin Marietta was reluctant to engage with Vulcan about a merger, despite Vulcan's desire to do so.

When Ward Nye finally replaced Steve Zelnak as CEO of Martin Marietta in 2010, James again reengaged Martin Marietta about discussing a merger. James was encouraged to do so by Vulcan's banker at Goldman, Sachs & Co., Michael Carr, who played matchmaker by separately engaging with James and Nye in early April 2010 to test out each party's interest in finally exploring a merger in earnest, after nearly a decade of empty flirtation. Carr and Nye met for dinner on April 1, 2010, during which Carr brought up the subject, and Nye indicated that he would be receptive to a renewed overture from James. Carr then had a meeting with James and his team later that month, during which they talked about a potential combination between the companies, and after that meeting Carr relayed to Nye that James would be reaching out to Nye soon. Although James was uncomfortable with Zelnak, James was happy to engage with Nye, with whom he had a better professional relationship. On April 22, 2010, James and Nye met in Washington, D.C. to start talking about a deal.

For his part, Nye was nervous and excited at the prospect of a Vulcan–Martin Marietta merger. He was nervous because he had just gotten the best office and leather chair at an aggregates company after years of pursuing them. Nye had no taste for being supplanted as a public company CEO after only months in the job. Adding to Nye's nervousness was the fact that Martin Marietta had recently been the target of a hostile takeover attempt by a European company that made its move after talks of a joint venture between it and Martin Marietta fell apart. Martin Marietta had escaped that overture only because the financial crisis cratered the bidder's financing. Nye still felt vulnerable because the recession had resulted in a decline in an industry that was a large consumer of aggregates, the housing industry, and thus Martin Marietta and companies like it, including Vulcan, were trading at a fraction of what their share prices had been during the normal business cycle.

Nye was excited at the same time. He saw real business promise in a combination with Vulcan, and communicated this to his board.

Nye had a high level of confidence in his management skills and industry experience, and felt that he could extract a high level of synergies if he were the CEO of the resulting company. Nye had worked on the integration of smaller aggregates companies and facilities into Martin Marietta and Hanson before that, and believed he could apply that experience in the context of a much larger merger of industry near-equals. Nye viewed Vulcan as a company that had outstanding assets but that was not run as leanly as Martin Marietta. He hoped to "Martinize" Vulcan and extract more stockholder value. Nye also knew that Vulcan was very strong in states hard hit by the financial crisis, such as Florida and California,[13] and that the com-

13. *See* JX 301 (JP Morgan Discussion Materials (May 5, 2011)) at MM0045573 ("Sharp

ing years would be good ones in which to merge, before those markets recovered and with it, Vulcan's financial results and stock price. Critically for Nye personally, Nye perceived, through his own understanding of James's age and through conversations with Carr, that the timing was right for a combination whereby Nye would end up as CEO. Given that James had at that time been CEO of Vulcan for 13 years, had no obvious successor at the company, and was approaching retirement age, Nye felt that this was a good moment to engage but if, and only if, he could get assurances to calm his nerves about the possibility that leaked discussions would end up putting Martin Marietta in play.

Therefore, when James and Nye met in April 2010, Nye emphasized the need for confidentiality. This need met with no resistance from James, who as a fellow CEO, was not inclined to put himself in a vulnerable position that he could not control. Although neither James nor Nye discussed the need for a standstill preventing Martin Marietta or Vulcan from proceeding against the other without consent, both agreed upon the need for a confidentiality agreement to cloak any merger discussions between the companies and any information exchanged. Indeed, the failure to discuss a standstill most likely flowed from both CEOs' evident desire for confidentiality and the shared premise that they were seeking to explore whether a friendly, consensual merger agreement could be reached. Had Nye in particular, who stressed in his notes prepared for a call with James in May 2010 that "[s]truc-turally, we think of this transaction, as I think [Vulcan does], as a modified 'merger of equals,'"[14] had the least inkling that the discussions and information exchange that were being proposed could be used in pursuit of a hostile bid by Vulcan, he would have halted any further discussions immediately.

Nye's obsession with confidentiality and in making sure that Martin Marietta did not find itself the object of an unsolicited overture finds resonance not just in James' testimony on the subject,[15] which of course might be colored by his own interests, but in less debatable evidence that buttresses the substance of James' testimony. The record is replete with evidence of Nye's expressed desire to make sure that nothing that Martin Marietta shared with Vulcan, including the very fact of discussing a merger, could be revealed publicly, because that might facilitate an unsolicited bid by an interloper. Nye also made clear that Martin Marietta was not interested in being purchased by anyone, including by Vulcan, and that the discussion had to be for the purpose of a consensual deal only. For example, in Nye's own notes he prepared for a conversation with Carr in April 2010 (before he met with James in Washington, D.C.), Nye stressed that Martin Marietta was "not for sale," and that he and his team were "interested in discussing [ ] the prospect of a merger, but not an acquisition whether by [Vulcan] or otherwise."[16] Nye also noted that he should tell Carr that "[a]s a threshold matter, it's obviously critical that for anything to happen, all of our communications, and all of

---

downturn in CA and FL markets have taken [Vulcan's] EBITDA from almost $1 [billion] in 2007 to ... [408 million] in 2010.").

**14.** JX 74 (Nye's Notes re: Project Grand Slam Call (May 11, 2010)) at MM0051051.029.

**15.** Tr. at 21 (James) ("[Nye] was very concerned that ... the fact of any discussions we had remained very confidential so that there would not be an opportunity for someone to come in ... and interrupt the transaction and make a hostile bid for one or the other of us.").

**16.** JX 33 (Notes for Project Grand Slam M. Carr Telephone Call (April 19, 2010)) at MM0051096.033.

yours with [James], be kept completely confidential—we need to trust each other on this." [17] Nye felt that if Wall Street knew that Martin Marietta was even talking to Goldman, which was known to be Vulcan's longtime banker, then that could raise a hint that Martin Marietta and Vulcan were thinking about a deal, and his notes for the call with Carr show that news that Martin Marietta was talking to Goldman had already leaked to a private equity firm, and Nye was "very concerned" about this. [18] Nye's messages to Carr were clear: (i) Martin Marietta would talk and share information about a consensual deal only, and not for purposes of facilitating an unwanted acquisition of Martin Marietta by Vulcan; and even then only if (ii) absolute confidentiality, even as to the fact of their discussions, was maintained.

What Nye told Carr, he also told his own board. When he advised the Martin Marietta board of his April 2010 conversation with Carr, Nye communicated that he had "heavily underscored [to Carr] that confidentiality is critical." [19] This evidence about Nye's confidentiality concerns is consistent with James' testimony that, from the outset, he and Nye agreed that if Vulcan and Martin Marietta "were going to have any discussions at all, they had to be kept very, very confidential . . . so that there would not be any leaks that might create unwanted activity by some of the global players." [20] The contemporaneous written evidence also makes plain that Nye was not interested in discussing or sharing information to facilitate an undesired acquisition of Martin Marietta, but rather

only to facilitate a consensual stock-for-stock merger. [21]

## C. *The Companies Enter Into The Confidentiality Agreements*

To preserve the confidentiality of the information exchanged and of the merger discussions themselves, James and Nye asked their general counsels to work together to enter into a non-disclosure agreement. Martin Marietta's general counsel, Roselyn Bar, created the first draft of the NDA, basing it on a confidentiality agreement that Martin Marietta and Vulcan previously had entered into in connection with an asset swap transaction. She then sent the draft to Vulcan's general counsel, Robert Wason, explaining that she had used the asset swap NDA as a template. Wason testified that when he received the initial draft from Bar, he compared it to the asset swap NDA to understand the changes Bar was proposing. [22]

Bar's changes were unidirectional: every one of the proposed Martin Marietta changes had the effect of making the NDA stronger in the sense of broadening the information subject to its restrictions and limiting the permissible uses and disclosures of the covered information.

The NDA, which has a term of two years ending on May 3, 2012, [23] governs the parties' exchange and treatment of Evaluation Material, which is defined as "nonpublic information furnished or communicated by the disclosing party . . . to the other party . . . and all analyses, compilations, forecasts, studies, reports, interpre-

---

**17.** *Id.*

**18.** *Id.*

**19.** JX 40 at MM0003205.

**20.** Tr. at 20 (James).

**21.** *E.g.,* JX 74 at MM0051051.029 (Martin Marietta thought of the transaction as a

"modified 'merger of equals'"); JX 33 MM0051096.033 (Martin Marietta was "not for sale").

**22.** Tr. at 574 (Wason).

**23.** NDA ¶ 5.

tations, financial statements, summaries, notes, data, records or other documents and materials prepared by the receiving party ... that contain, reflect, are based upon or are generated from any such non-public information." [24] Martin Marietta added the vast "and all analyses" language, which was not included in the original agreement on which the NDA was based.[25]

Under the NDA, "[e]ach party ... shall use the other party's Evaluation Material solely for the purpose of evaluating a Transaction." [26] A "Transaction" is defined as "a possible business combination transaction [ ] between [Martin Marietta] and [Vulcan] or one of their respective subsidiaries." [27] For simplification's sake, I omit the bracket from that phrase, which replaces a parenthetical containing the defined term Transaction, and refer to a Transaction as defined by the NDA simply as a "business combination transaction between" Vulcan and Martin Marietta. The definition of Transaction was modified by Martin Marietta from "a possible transaction ... which could take the form of a purchase, sale or exchange of businesses or assets, *involving* [Martin Marietta] and [Vulcan]." [28] Martin Marietta therefore replaced the looser term "involving" and inserted a tighter term "between" that is more easily read than "involving" to require joint agreement of the two companies themselves.

Martin Marietta also broadened the requirement to keep confidential the fact that the parties were discussing a transaction. Not satisfied with language that pre-cluded the revelation of the fact that "discussions *are* taking place concerning a Transaction," Martin Marietta added language preventing the disclosure of the fact that discussions "*have* [been] taking place." [29] In other words, Martin Marietta sought to protect from disclosure that discussions had occurred in the past, thus preventing any disclosure in the event that discussions terminated without any agreed-upon Transaction. Martin Marietta also suggested that the parties' agreement to enter into the NDA itself be kept confidential.[30]

Paragraphs (2), (3) and (4) of the NDA govern disclosure of confidential information. I will save a detailed analysis of these paragraphs for later, but because of their central importance, I will summarize them briefly here. Paragraph (2), in addition to restricting either party's use of the other party's Evaluation Material to use "for the purpose of evaluating a Transaction," prohibits disclosure of a party's Evaluation Material "for purposes other than the evaluation of a Transaction." [31] Paragraph (3) provides that, "[s]ubject to paragraph (4)," a party may not "disclose to any other person, *other than as legally required,* the fact that any Evaluation Material has been made available hereunder, that discussions or negotiations have or are taking place concerning a Transaction or any of the terms, conditions or other facts with respect thereto...." [32] In this opinion, I refer to the information covered by ¶ 3 as the "Transaction Information." Paragraph (4) establishes the Notice and Vetting Process for disclosing Evaluation

24. *Id.* at 1 (emphasis added).

25. JX 50 (Redline of Draft Letter Agreement between Vulcan and Martin Marietta) at 1.

26. NDA ¶ 2.

27. *Id.* at 1.

28. JX 50 at 1.

29. *Id.* at 2 (emphasis added).

30. *Id.* at 2.

31. NDA ¶ 2.

32. *Id.* ¶ 3 (emphasis added).

Material and Transaction Information that would otherwise be confidential under the NDA in circumstances when a party is "required" to do so in the sense that the party had received an External Demand.[33] The words "[s]ubject to paragraph (4)" were added to ¶ 3 of the NDA at the request of Martin Marietta.[34] Those words are a center of the parties' dispute over whether the External Demand qualifier to the term "required" in ¶ 4 also qualifies the term "legally required" in ¶ 3. What is not disputable is that by adding words making ¶ 3 expressly subject to ¶ 4, ¶ 4 could only become more important and not less important for purposes of making sense of the NDA as a whole.

Martin Marietta and Vulcan did not stop at the NDA. Because they were the top two rock stars in the aggregates industry, any transaction between Martin Marietta and Vulcan would be subject to the scrutiny of antitrust regulators, and any sharing of competitively sensitive information had to be for a legitimate purpose (such as exploring a merger) and not for an illegitimate purpose (such as limiting competitive pricing). One of the critical determinants of whether a merger would make business sense was whether the divestitures that the Department of Justice might require before approving a Vulcan–Martin Marietta merger would be so substantial that it would make a combination unattractive even in light of the synergies that might be recognized. To put it in clear terms, the costs in future cash flow resulting from required antitrust divestitures had to be considered along with the increases in expected cash flows from synergies in order to assess the overall utility of a merger of the companies.

To permit Vulcan and Martin Marietta to develop freely a joint assessment of the potential antitrust implications of a "Transaction" between them, the companies entered into the JDA, which addressed information sharing about antitrust issues. Outside antitrust counsel for the companies drafted the JDA. The "Transaction" is defined in the JDA as "a potential transaction being discussed by Vulcan and Martin Marietta ... involving the combination or acquisition of all or certain of their assets or stock"[35]—a somewhat different formulation than was used in the NDA. The JDA then goes on to require that "Confidential Materials," which include "[a]ll factual information, documents, opinions, strategies or other materials exchanged or communicated by whatever means" between the parties "pursuant to" the JDA, be used "solely for purposes of pursuing and completing *the* Transaction."[36] Repeatedly throughout the JDA, it is made clear that Confidential Materials can only be used in aid of "*the* Transaction."[37] The JDA was entered into after the NDA and states that "[n]either the existence of nor any provision contained in this Agreement [*i.e.*, the JDA] shall affect or limit any other confidentiality agreements, or rights or obligations created thereunder, between [Martin Marietta and Vulcan] in connection with the Transaction."[38]

At no time in the process of drafting either the NDA or the JDA did Martin Marietta or Vulcan discuss the inclusion of a standstill provision, which explicitly would have prevented them from making an unsolicited tender or exchange offer. But, at the same time, at no time did

33. *Id.* ¶ 4.

34. JX 50 at 2.

35. JDA at 1 (Preamble).

36. *Id.* ¶¶ 1, 4 (emphasis added).

37. *E.g., id.* ¶¶ 2, 4, 6, 7, 8, 12, 14 (emphasis added).

38. *Id.* ¶ 12.

either party indicate any desire to use the Evaluation Material for a hostile purpose, and both parties engaged in communications and conduct evincing an understanding and desire that the information to be exchanged could only be used for purposes of considering a consensual, contractual business combination and that neither party had the contractual right to reveal even the existence of the NDA itself or the fact of the parties' discussions, much less their substance.

D. *Vulcan And Martin Marietta Exchange Information And Martin Marietta Gets More Confident About The Benefits Of A Merger*

For purposes of the current decision, the use made by Martin Marietta and its advisors of information and documents that they received during the merger discussions between the companies is a central issue. I have considered the vast record about the information shared by Vulcan and Martin Marietta and will attempt to set forth with relative concision the factual conclusions I reach.

To frame this discussion, I begin by summarizing the parties' contending positions regarding the merger discussions and the Evaluation Material that was exchanged during that process. For its part, Vulcan says that each company had important concerns about whether a combination would be beneficial for their stockholders and that each took especially seriously the discussions around two related subjects implicating the Confidentiality Agreements: antitrust and synergies. As mentioned, these subjects are related because if the required divestitures were too high, the loss of earnings from divested assets would undermine the strategic rationale for the deal, because without those earnings, a higher level of synergies would be necessary for the deal to make sense, especially if one party was expected to pay a premium to the other.

By contrast, Martin Marietta says that the information sharing between the parties was just a way to convince a reluctant Vulcan to do a deal that a highly confident Martin Marietta management team already knew made sense. On the antitrust side, Martin Marietta claims that it needed no information from Vulcan and that it always had adequate information to conclude that the antitrust risk was acceptable. On the synergies front, Martin Marietta claims that it already knew that the level of annualized synergies that could be achieved in a combination were more than $250 million, and that it was using the information sharing and joint synergy calculation exercise solely to convince Vulcan that higher synergies were achievable. Because the Evaluation Material shared with Martin Marietta was therefore immaterial to it, Martin Marietta argues that it did not even consider it in formulating and deciding to launch the Exchange Offer and Proxy Contest.

As we shall see, I do not embrace Martin Marietta's version of events. Without casting doubt on anyone's subjective honesty, I find that Martin Marietta's newfound confidence more reflects its current litigation posture and evolving market conditions than an objective and credible rendition of what its management believed and did in real time.

To explain why I reach this conclusion, it helps to underscore why discussions between Vulcan and Martin Marietta about antitrust and synergies ensued and what the market conditions were at that time.

From Martin Marietta's rendition of events, it was always an avid suitor, anxious to do an obviously sensible merger. But that is not the case. James of Vulcan had reached out to Martin Marietta for years, and Martin Marietta was reluctant to engage. Even in 2010, Nye was nervous for the reasons I explained. Nye also had an additional reason to be insecure.

His predecessor Zelnak had not left the scene; rather, Zelnak went from CEO to the sidewalk superintendent role of Chairman, keeping a watchful eye on his successor. When Nye embarked on merger discussions with James, Zelnak told Nye that he was "betting his job" as a new CEO on accurately estimating the synergies that could be achieved by a merger.[39] Furthermore, when Nye decided to engage with Vulcan, the relative market values of the companies were not as favorable to Martin Marietta as they would later be. Indeed, as the early discussions proceeded, Martin Marietta's working assumption was that Vulcan would be the acquirer in any merger and that Martin Marietta would receive a premium.[40] Although Nye hoped and insisted that he would end up as CEO of the resulting entity, he was anxious about that, especially if Vulcan was paying a premium, and he also wanted to make sure that the economic value that would result from a combination was sufficiently sure that he could justify the deal to his board. To that end, Nye and his management team, I conclude, had a genuine interest in learning more about Vulcan's operations and the costs and benefits of a merger.

The information sharing between the companies started most intensively by addressing a subject that could be a deal ender: antitrust. Absent a determination by both parties that a merger could be effected without materially damaging asset divestitures, there was little utility in engaging about synergies and other sensitive subjects.

Thus, antitrust counsel for Martin Marietta, a team from McDermott, Will & Emery led by Ray Jacobsen, and antitrust counsel for Vulcan, a team from Wachtell, Lipton, Rosen & Katz led by Joe Larson, met on two occasions in May 2010 to work on an antitrust analysis. At these meetings, which were held in New York at Wachtell's offices, Vulcan's attorneys shared nonpublic information about Vulcan's markets and Vulcan's legal opinions regarding likely divestitures. Both sides brought maps to the meetings identifying quarries and yards in the areas where the companies competed. Vulcan's maps were prepared from Vulcan's proprietary database and included confidential information about the production tonnage of individual Vulcan facilities, as well as estimated production figures for Vulcan's competitors (including Martin Marietta) generated by software that Vulcan has developed to track other industry players.[41] According to Larson, his colleagues from McDermott examined his maps and the information on them.[42] But Jacobsen denies ever looking

39. Zelnak Dep. at 116.

40. *See, e.g.,* JX 33 at MM 0051096.035 (Nye's notes for a call with Carr in April 2010 include as a discussion point that Martin Marietta expected "a premium ... in an all-stock transaction"); JX 784 (handwritten notes of Rich Thomas) at LAZ 017489 (in his notes on an April 13, 2010 meeting with Martin Marietta, one of Martin Marietta's bankers at Lazard writes, "Michael Carr understands it would be stock for stock [with] premium."); *id.* at LAZ017498 ("This transaction deserves a premium"); JX 139 (handwritten notes of Anne Lloyd (June 28, 2010)) at MM0051158.002 (Martin Marietta CFO Anne Lloyd's notes from a call with Vulcan's CFO reflect that Martin Marietta would require a

"meaningful premium" if Vulcan was not flexible on social issues such as the composition of the senior management and the headquarters location, and that as a "quid pro quo" the parties could negotiate over the "premium" versus "a longer period of control").

41. *See* JX 32 (U.S. Aggregates Shipments Maps (Apr. 17, 2010)) (showing 2006–07 estimated tonnage for Vulcan at various Vulcan sites); *see also* Tr. at 239–40 (Larson) (discussing Vulcan's proprietary database and the "production figures" included on Vulcan's maps).

42. Tr. at 231 (Larson).

at the Vulcan maps, despite otherwise having very little recollection of a meeting that he traveled to New York to have.[43] On this point, I find Larson's testimony more convincing, and more in keeping with the purpose of the meeting and the course of analysis that followed it. It is undisputed, however, that the parties did not exchange maps at the end of the meeting.[44]

Working off of their maps, the lawyers discussed the likelihood of divestitures for each quarry, and after their second meeting on May 24, 2010, Larson sent a chart to the lawyers at McDermott summarizing Wachtell's analysis, based on the recent meetings, of the relative likelihood of divestitures in each geographic area where Vulcan and Martin Marietta overlapped, which Wachtell divided into "A" (high risk), "B" (medium risk) and "C" (low risk) categories.[45] On June 2, 2010, McDermott sent to Wachtell its comments on the "A," "B" and "C" chart, telling Wachtell that "we have … made mostly organization changes and some substantive changes. Generally, we adopted almost all of your 'A' categorizations, moved several to the ['B'] category, and moved others to the 'C' category, which we did not include in this iteration."[46] In addition to dropping the list of divestitures in the "C" category, McDermott changed the chart so that it was color-coded, with red for high-risk divestitures and yellow for medium-risk divestitures. The lawyers then exchanged emails about the chart, and Wachtell commented on McDermott's version of the chart by suggesting that a particular market not be classified as at a high risk of divestiture, because that would be "a significant issue" for its client.[47] Wachtell was concerned about classifying that market as high risk because a quarry critical to Vulcan supplied it and Vulcan believed that a certain Martin Marietta quarry also supplied that market. Consistent with its approach of not being as forthcoming as it could have been in the antitrust discussions, McDermott agreed to downgrade the risk but did not reveal the reason, which was that Vulcan was mistaken about the Martin Marietta quarry in question—it actually did not supply that region.[48]

Wachtell then drafted a final version of the chart reflecting it and McDermott's joint analysis, which Larson circulated to the McDermott team. McDermott sent this joint analysis to Bar of Martin Marietta on June 4, 2010, explaining that it "pairs up quarries in each of the overlap areas."[49] McDermott also attached the chart that it had sent to Wachtell on June 2, 2010 in response to Wachtell's initial version, describing that June 2 chart as McDermott's "internal analysis."[50] In addition to some disagreements on how to characterize particular divestitures, the main difference between the joint analysis

43. *Id.* at 321 (Jacobsen); *id.* at 334–35 (Jacobsen—Cross).

44. *Id.* at 245 (Larson); *id.* at 321 (Jacobsen).

45. JX 107 (Email from Joe Larson to Ray Jacobsen, attaching Divestiture Chart (May 24, 2010)) at MWE0000164.

46. JX 123 (Email from Stefan Meisner to Joe Larson, attaching Divestiture Charts (June 2, 2010)) at MWE0000183.

47. JX 124 (Email from Ray Jacobsen to Joe Larson re: Suggestions to Divestiture Chart (June 2, 2010)) at MWE0000197; *see also* Tr. at 242, 248 (Larson).

48. *See* Tr. at 378–79 (Jacobsen—Cross).

49. JX 131 (Email from Stefan Meisner to Roselyn Bar, attaching Divestiture Charts (June 4, 2010)) at MWE0087335.

50. *Id.* The June 2, 2010 chart and the "internal analysis" chart are identical. *Compare* JX 123 at MWE 0000185–88 *with* JX 131 at MWE 0087336–39.

and McDermott's internal analysis was that Wachtell paired divestitures "based on all divested assets being put into [a] Spinco, which would be a self-sufficient business."[51] In other words, Wachtell's divestiture analysis assumed that divested quarries would be spun off into a single separate business, while McDermott was open to considering divestitures to a variety of third party buyers.[52] Wachtell and McDermott did not confer on antitrust issues after June 2010.

Another major topic of discussion was synergies, and that became the focal point of much of the companies' interaction during the remainder of 2010 and in early 2011. Although much divides the parties on this topic, there are a few areas of basic agreement.

The first is that Vulcan does not deny that Martin Marietta's management team took a more optimistic view of the synergies that could be achieved from a combination of the companies than did Vulcan's management team, and also used a less exacting analytical approach to get to its initial estimates.

When merger discussions with Vulcan first began, Martin Marietta's management team thought that annualized synergies from a merger would be high. Their optimism was in part due to Martin Mar-

ietta's view of itself as a "much more cost-effective company" than Vulcan,[53] as reflected by their comparative selling, general and administrative expense, or "SG & A" percentages. Martin Marietta was confident that if its management was handed the reins of the combined company, it could "Martinize" Vulcan's supposedly more inflated cost structure and make the tough choices to drive costs out that it felt Vulcan had not been able to do.[54] In early April 2010, before Martin Marietta and Vulcan agreed to exchange nonpublic information, Martin Marietta CFO Anne Lloyd estimated annual synergies at $165 to $250 million, based on certain top-down assumptions.[55] Lloyd sent the lower estimate—$165 million—to Lazard Frères & Co., one of the banks advising Martin Marietta.[56] In the following months, the banks advising Martin Marietta—Lazard and Deutsche Bank Securities—pegged synergies at $200 million, which not coincidentally was a figure that Lloyd, too, settled upon.[57] Although Martin Marietta now proclaims that larger annual figures were harbored by some on its side—such as a claim that Zelnak thought the synergies were at minimum a quarter billion dollars a year—there is no written evidence to back that up, and the totality of all the evidence contradicts that self-serving claim.[58] Rather, the internal deliberative

---

**51.** JX 130 (Email from Stefan Meisner to Ray Jacobsen (June 4, 2010)) at MWE0076980.

**52.** *See id.*

**53.** *E.g.,* Tr. at 1045 (Zelnak).

**54.** *E.g., id.* at 1045 (Zelnak); *id.* at 613 (Lloyd) (describing her view of "Martinizing" as "taking the Martin Marietta structure process and laying it over a target."); *id.* at 693 (describing her synergy estimate as an attempt to "Martinize" Vulcan).

**55.** JX 30 (Draft Notes re: Potential Synergies for Project Grand Slam (April 15, 2010)).

**56.** JX 26 (Email from Anne Lloyd to Rich Thomas, attaching Potential Synergies Analysis (April 15, 2010)) at MM0001807.

**57.** *See, e.g.,* JX 189 (Email from Anne Lloyd to Rich Thomas (Jan. 21, 2011)) at MM00033489.

**58.** *See* Tr. at 1062–64 (Zelnak—Cross) ("Q. You never put any of the synergies numbers you've talked about, the 250 million plus or the 300 million, you've never put that down in writing; is that correct? A. I don't recall ever writing it down, no."). In a no doubt rehearsed direct examination, Zelnak went through a synergies analysis at trial that supposedly reflected an internal-to-his-own-brain,

record within Martin Marietta shows that their team was using $200 million as the most solid estimate of possible synergies, and that Martin Marietta was hoping to learn more information about Vulcan in order to identify more precisely the synergies that could be achieved.

For its part, Vulcan took a more conservative approach to estimating synergies from the get-go, and desired to assess the level of synergies that could be achieved by an exacting process that focused specifically on the operations of each company, to identify where redundancies existed and other types of efficiencies could be had. There is not a great deal of dispute that Vulcan's CEO James was more conservative about synergies than Vulcan's CFO, Dan Sansone, who was assigned by James to engage with Martin Marietta on the synergy estimation process.

What is disputed is whether that process was a charade whereby a Martin Marietta team already convinced of the huge synergies to be gained was going through the motions of looking in detail at Vulcan's nonpublic information and determining based on a close analysis what specific synergies could be achieved, or whether Martin Marietta was also itself interested in that information to test its own more rote, back-of-the envelope estimates. The reality, I find, is much closer to the one argued by Vulcan than by Martin Marietta. I have no doubt that part of the exercise was to see if a more detailed examination of synergies based on the companies' nonpublic information would persuade Vulcan that synergies at the level Martin Marietta believed achievable were possible. This would encourage Vulcan, which Martin Marietta wanted to pay a premium, to consider doing so. But the other part of Martin Marietta's story, which is that it had already come to a firm conclusion about synergy values and had no genuine interest in examining that subject more precisely, is one that I find unconvincing and inconsistent with the conduct and internal writings of Martin Marietta's own management team.

Although abundant record evidence supports that conclusion,[59] the most economical way to prove the point is to focus on a critical meeting that occurred between Martin Marietta's CFO, Anne Lloyd, and Dan Sansone, her counterpart at Vulcan, in March 2011. Before that meeting, Lloyd and Sansone had met on several occasions to discuss synergies. Between meetings, the financial teams at Martin Marietta and Vulcan traded calls and

---

unwritten analysis he made at some unspecified time in 2010 calculating synergies at a minimum of $250 million. *Id.* at 1035–40 (Zelnak). In Martin Marietta's trial briefs, this analysis is broken down into a chart. Martin Marietta Post–Tr. Op. Br. at 9–10 n.9. But like Bear, Delaware or the original apparition, the Oakland of Gertrude Stein's memory, there is no there there to Martin Marietta's evidence on this point. Zelnak's testimony about his confident projection of at least $250 million in synergies is belied by his own advice to Nye to be careful in this area, the lack of any scrap of paper supporting that he performed the categorical analysis set forth in Martin Marietta's trial briefs, the fact that Martin Marietta's internal estimates were lower until it received nonpublic information

from Vulcan in a March 2011 meeting, and Zelnak's own reaction to the information from that meeting and his understanding that it generated higher synergies than estimated. All in all, I conclude that Zelnak's recollection is mistaken.

59. *E.g.*, JX 151 (Memo from Ward Nye to Martin Marietta Board of Directors re: Various Updates (Oct. 1, 2010)) (informing the Martin Marietta board that "[Sansone] and Anne [Lloyd] have scheduled an October meeting to more precisely quantify the probable synergies of a business combination."); JX 784 at LAZ017520 (Lazard banker notes in 2010 that Lloyd "wants to have clarity that there will be enough synergies to make sure [a merger with Vulcan] makes sense.").

emails. But the process was frustrating to Lloyd, who believed that Vulcan had not been as forthcoming with information as it should have been and was begrudging about recognizing potential synergies.

That all changed at an in-person meeting on March 8, 2011. The meeting was lengthy, and Vulcan shared specific information about headcount, revenue, and profit centers that was not publicly available. Vulcan also provided nonpublic information about its "ERP" conversion to a new enterprise software platform that provided real promise for more efficient management of Vulcan's operations and that had the flexibility to handle a combined entity, which could obviate an expensive upgrade or conversion that Martin Marietta needed to do on its own enterprise software.[60] During the meeting, Lloyd and Sansone were also able to reach accord, through a detailed exercise in comparing confidential data about the companies' specific operations, about a higher level of synergies than Sansone had ever embraced. Although Lloyd did not convince Sansone to embrace an even higher number based on looser assumptions— which called for adding on what Sansone called a "plug number" of approximately $48 million—the two did detail approximately $125 million of gross synergies.[61]

Lloyd left the meeting pumped up. She flew back home and stayed up until 3:30 in the morning to write Nye a memo about the meeting. In that memo, Lloyd made a point to contrast favorably the level of information provided by and the level of engagement of Vulcan management in the just-finished meeting with prior meetings.[62] Some of that information Lloyd found "stun[ning]," specifically the function-by-function and facility-by-facility information she had received about employee headcount and numbers.[63] In her memo to Nye, she outlined specific information from the meeting that convinced her that her prior synergy estimates were too conservative. Much of that information centered on specific examples of functions that she believed were supported by too many employees. Lloyd also focused on the synergies that could result from the capacity of a combined entity to utilize Vulcan's ERP upgrade and its legal right to do so based on Vulcan's license agreement. Detailed information about Vulcan's ERP upgrade and the effect it would have on synergies was nonpublic. Indeed, Vulcan's license agreement has a confidentiality clause.[64]

After detailing what she had learned, Lloyd then translated it into a new estimate of synergies, stating:

> Total synergies, including the amount needed to reach a 33% reduction in SG & A, are preliminarily estimated at $166 million to $171 million. However, based on our understanding and application of

---

60. JX 233 (Draft Synergy Discussion Memo (Mar. 9, 2011)) at MM0031605.

61. JX 662 (Email from Anne Lloyd to Dan Sansone attaching Synergy Evaluation (Mar. 11, 2011)) at 3; *see also* Tr. at 152–53 (Sansone).

62. JX 233 at MM0031605 ("The meeting could be characterized as open, candid and cooperative. Unlike previous meetings, the Vulcan representatives came fully prepared to discuss [SG & A] synergies, including full disclosure of headcount and cost structure.").

63. The day after the March 8 meeting, Lloyd and Nye had a phone call with their bankers at Lazard. One of the bankers took notes on the call, in which he wrote, "Lloyd 'stunned' by headcount, [higher number] in [Vulcan] headquarters versus [Martin Marietta] [lower number]." JX 783 at LAZ017480; *see also* Tr. at 709 (Lloyd—Cross) (discussing Lloyd's use of the word "stunned"). Based on all the evidence, I harbor no doubt that the notes accurately reflect Lloyd's reaction to the precise issue they address.

64. Vulcan Post–Tr. Supp. Mem. at 1.

the efficiencies that are achieved post-ERP integration, the utilization of outsourcing for non-core functions, the rationalization of operations and technical services, among other things, we believe that we could synergize an additional $75 million to $125 million in costs.... *Total synergy value could range from $240 million to $300 million* [65]

The top end of this estimate was *$100 million more annually* than Lloyd's previous mid-range estimate of $200 million, which meant potential cost savings of $1 billion over a ten year term that had not yet been baked into Martin Marietta's deal analysis. A stoked Lloyd quickly spread the word about this revelation. The very next day, Lloyd told Martin Marietta's bankers at Lazard that there were "more synergies than realized" and that its baseline synergy estimate should move up to $300 million.[66] Deutsche Bank also updated its analysis to use $300 million as its baseline synergies estimate.[67]

Perhaps most important, Nye worked with Lloyd to convert her post closing time memo to him into a formal communication to the Martin Marietta board. Nye sent the board an update memo on March 11, 2011, which expanded on the specific headcount and functional data that Lloyd found to support higher synergies and gave specific information comparing Vulcan headcount to Martin Marietta headcount as to particular functions. The Nye memo also referred specifically to the ERP license

and capacity information as a synergy driver.[68]

Nye then wrote to his board that "[b]ased on the foregoing"—*i.e.*, the specific data outlined in the memo that was learned at the March 8 meeting—he was endorsing the proposition that synergies of $300 million annually could be attained.[69] His analysis was taken virtually verbatim from Lloyd's prior email.[70]

At post-trial argument, counsel for Martin Marietta disavowed any notion that Nye was attempting to mislead his board. I accept that disavowal, but that has rather important consequences. Nowhere in the Nye memo is there any indication that the March 8 meeting did not provide Martin Marietta management with important new information bearing on the synergies that could be achieved. To the contrary, the memo plainly states that specific, non-public information was learned at the meeting that supported a higher estimate of synergies than Martin Marietta had been projecting internally. Devoid from the memo is anything that supports Martin Marietta's assertion that the information exchange and synergy estimation process being engaged in with Vulcan was just a negotiation exercise that had no utility for Martin Marietta's own assessment of what synergies were achievable. If that were the case, then Nye did not tell the truth to his board.

Martin Marietta's story on this account is also inconsistent with its own, unambig-

---

**65.** JX 233 at MM 0031606 (emphasis added).

**66.** JX 783 at LAZ017480–LAZ017481; *see also* Tr. at 708–09, 711 (Lloyd—Cross); JX 782 (Project Grand Slam—Summary of Key Transaction Terms with Don Fawcett handwritten notes (Mar. 18, 2011)) at LAZ017437.

**67.** JX 284 (Project Geo—Draft Alternative Structuring Ideas (Mar. 30, 2011)) at MM0031368.

**68.** JX 245 (Memo from Ward Nye to Martin Marietta Board of Directors re: Various Updates (Mar. 11, 2011)) at MM0003152.

**69.** *Id.* at MM0003153

**70.** *See* JX 233 at MM 0031606.

uous internal documents and those of its bankers, and inconsistent with its own conduct. After the March 8 meeting, Martin Marietta's financial advisors were instructed to and did move their synergy assumption up by $100 million annually in their models. This was not coincidental and reflected the increased confidence that Martin Marietta management had that synergies could be achieved, because they had received important nonpublic information about Vulcan's actual operations.[71]

But the road to true love seldom runs smooth, even for companies that make paving materials. Although Lloyd took heart that Sansone had come to acknowledge a higher level of synergies than previously, Sansone was nowhere near the lofty levels of Martin Marietta's newly raised estimates, and he was not even at its previous base case estimate.

Nor had Sansone convinced James that the $125 million estimate from the March 8 meeting that Sansone had been able to settle on was achievable. Although I do not credit the notion advanced by Martin Marietta that James would only acknowledge synergies of $50 million annually,[72] I do believe he was more skeptical than Sansone.

In addition, both James and Sansone had an important categorical disagreement with Martin Marietta's management team. Vulcan already had in mind plans to obtain costs savings from its ERP upgrade and other initiatives.[73] Martin Marietta encouraged Vulcan to hold off on these initiatives so that they could be counted as synergies in the transaction when they were savings Vulcan was intent on achieving regardless of any merger.[74] Vulcan did not view these as deal synergies.[75] Nye and Lloyd wanted to count them.[76]

---

71. Martin Marietta has remained confident about synergies. In response to an analyst question concerning Martin Marietta's confidence in the $200–$250 million synergies that it was then publicly forecasting in its S–4 in support of the Exchange Offer, Nye responded in part: "[A]s I look at the synergies, if there are questions that we have here, and there are very few, this is not one that I have any degree of discomfort at all; we are very comfortable with that." JX 491 (Investor Conference Call (Jan. 10, 2012)) at 9.

72. *E.g.*, Tr. at 1044 (Zelnak).

73. *See* JX 784 at LAZ17523 (Lazard banker's notes on a May 25, 2010 "[m]eeting [with] Anne [Lloyd] and Dan [Sansone] include that Vulcan "[e]xpect[s] to have legacy Vulcan converted to new [name of ERP vendor] by end of 2010."); JX 544 (handwritten notes of Anne Lloyd) at MM0051350.052 (Lloyd's notes on a May 24, 2010 meeting with Sansone show that Vulcan's ERP upgrade was discussed); *see also* Tr. at 137 (Sansone) (explaining that "Vulcan was engaged and still is engaged in the investment and roll-out of a complete new [ERP] systems platform"); *id.* at 38 (James) (Vulcan was independently undertaking cost reductions).

74. JX 786 (handwritten notes of Rich Thomas) at LAZ017539 (Lazard banker's notes on call with Nye note that "Ward [Nye] made point [to James] that restructuring will require cuts and better to do that together."); *see also* Tr. at 38 (James) ("[A]t one point [during the merger discussions] ... I told [Nye] ... [Vulcan was] moving forward with some cost reductions. And Mr. Nye said, 'Why don't you hold those so we can count those as synergies in the transaction.' ").

75. *E.g.*, Tr. at 36 (James) (describing that his view that the relevant synergy numbers "would not include cost savings that either company could achieve on its own.").

76. *See* JX 786 at LAZ017538 (Lazard banker's notes on an October 10, 2010 call with Nye, Lloyd and Bar note that "[n]ext year will be tough," "[b]oth companies need to cut costs," and "[i]f both companies do it independently, they will rob the transaction of synergies"); *see also* JX 301 at 1 (Banker presentation to Martin Marietta in May 2011 notes that "[s]ynergies could be less if [Vulcan] improves SG & A structure and operations on its own.").

Perhaps more important than anything is a reality that both parties have to some extent slighted, but that James' testimony supports and that is consistent with stock market realities. When this love story started, it was Vulcan who was pursuing Martin Marietta, seeking to entice a nervous wallflower to go to the dance, after years of flirtation, but ultimate rejection. At that stage in 2010, Vulcan was seen as the natural acquirer that would pay a premium.

By spring 2011, Vulcan's concentration in markets affected by the burst housing bubble and other factors (among which Martin Marietta would say was an excessive cost structure) had resulted in decreased profits and a depressed stock price.[77] As a result, the value of a share of Vulcan stock in comparison to a share of Martin Marietta stock had declined in a way that persisted over time. This meant that if Vulcan were to be the acquirer as originally contemplated, its stockholders · would endure greater dilution and a very high level of synergies would be required to not result in a decline in earnings per share for several years.[78] On the other hand, it also meant that if the tables were turned and Vulcan was going to be the acquired company, Vulcan would be selling low, not high.

Vulcan's management thus cooled to the idea of a combination, in part because the company was in a comparatively weaker condition than when the deal dance started. This factor came together with a more tempered view of synergies, and a great

skepticism that the synergies actually attributable to a merged enterprise, rather than to cost-savings Vulcan could undertake itself, would be worth the asset divestitures and other costs of a large strategic merger.

When the original suitor cooled its ardor, the once-reluctant dance date became more enamored. As indicated, Martin Marietta's stock price had risen in comparison to Vulcan's. This made the threat that Martin Marietta would be seen as the low-priced industry target ripe for hostile taking less substantial, and it gave Martin Marietta more power in its dealings with its suitor, Vulcan. Rather than worrying about receiving a premium from Vulcan to merge, Martin Marietta began contemplating being the dominant partner itself by using its own now relatively more valuable currency—its own stock—to buy Vulcan at a premium. In that calculus, the increased synergy estimates coming out of the March 8, 2011 meeting were critical, because they provided a basis to conclude that Martin Marietta could offer Vulcan stockholders a premium in a stock-for-stock exchange, and still justify the deal to Martin Marietta's stockholders as one that would not reduce earnings per share and that would produce powerful long-term benefits in the form of higher profits per share. Thus, in April 2011, Martin Marietta management and their financial advisors began noodling over scenarios where Martin Marietta would be the acquirer and pay in stock. As an internal email sent on March 10, 2011 from Zelnak to Lloyd

**77.** When merger discussions began on April 22, 2010, Vulcan was trading at $55.95 per share and Martin Marietta at $95.94 per share. On March 8, 2011, the closing price of Vulcan stock was down to $44 per share, and Martin Marietta was trading at $86.06 per share. Although both stock prices declined, the relative movement favored Martin Marietta. Whereas Martin Marietta's stock price declined by 10%, Vulcan's stock price declined by 21% over the same time period, or over twice as much in percentage terms.

**78.** For example, on April 22, 2010, Vulcan would have had to pay approximately 1.71 of its shares for each Martin Marietta share. By March 8, 2011, this ratio had increased by over 14% in Martin Marietta's favor to approximately 1.95 per share.

reacting to such a possibility plainly stated: "[w]ith increased synergies *per your meeting* and a lesser premium, if that is what it takes, [an acquisition of Vulcan by Martin Marietta] may work." [79]

The conflicting desires of Martin Marietta and Vulcan played out in a typically awkward way. Rather than flat out call things off, Vulcan management became distant and uncommunicative. The parties did not build on the progress on synergies made at the March meeting. James never embraced the synergy levels that even Sansone had—perhaps for tactical reasons as I have suggested already—and certainly not lofty numbers like the $300 million Martin Marietta had come to embrace.

Important issues regarding the management team and headquarters of the combined entity did not get resolved. Martin Marietta, consistent with its theme, argues that James wanted to hang on as CEO and wanted to have the headquarters in Birmingham because he was focused on his own personal good, and not that of Vulcan's stockholders. By contrast, Nye's own desire to be CEO and to have the headquarters in Raleigh was simply a selfless manifestation of his and Lloyd's obviously superior management approach and the undisputed fact that an aggregates

company should be closer to ACC basketball than SEC football. [80]

These situations are common, and although I do not view them as cynically as many rational commentators do, I do not buy into Martin Marietta's self-delusions. The reality is that Nye emerges in the record as being preoccupied with his own future as a public company CEO as much as, if not more than, James. Nye did not want to be demoted, even during a transition period, and evinced a willingness to forego a 20% premium for Martin Marietta stockholders in the exchange ratio to ensure he was slotted as CEO right away. [81] That being said, I do not begrudge Martin Marietta management, or their board, their view that their own approach to running a company was superior and that the combined entity should be "Martinized." But I also see no basis to perceive that Vulcan came to the decision not to go further because James—who evinced a willingness to phase out of a key management role at various times in the negotiations, is 61 years old, and had served as a CEO for 14 years as of 2011—wanted to remain as CEO indefinitely. And the debate about headquarters is one that was likely felt passionately on both sides for reasons of loyalty to employees and community that I have no intent to ridicule, lacking the confidence to conclude that the

---

**79.** JX 240 (Email from Steve Zelnak to Anne Lloyd (Mar. 10, 2011)). At trial, Zelnak confirmed that he was referring to a Martin Marietta acquisition of Vulcan in this email. Tr. at 1073 (Zelnak—Cross).

**80.** The Chinese concept of face is a good one for effective negotiators and public figures to keep in mind. Nye and Lloyd seemed to have had the same grasp of that concept as the self-engraved chosen one.

**81.** *See* JX 784 at LAZ 017499 (Lazard banker's notes on "Feedback from call from M. Carr" include: "Economics—if CEO, then nil to zero, else up to 20%); JX 33 at MM 0051096 (handwritten notes on top of typed-

up notes for call between Nye and Carr say "CEO = 0/ 20% = Nye" next to a discussion point reminding Nye to tell Carr that "we expect a premium for [Martin Marietta] in an all-stock transaction"); *see also* JX 139 (Lloyd's notes from a call with Sansone reflect that Martin Marietta would require a "meaningful premium" if Vulcan was not flexible on social issues, and that as a "quid pro quo" the parties could negotiate over the "premium" versus "a longer period of control"); JX 786 at LAZ017539 (Lazard banker's notes on October 8, 2010 call with Nye note that the options are "[p]remium and succession or no premium and [Nye] as CEO.").

company-specific investments employees, states, and local governments may have made in Martin Marietta and Vulcan might have had some small part to play in the success of those corporations and the returns received by their equity investors.

What seems more probable in this instance than any purely selfish factor causing a breakdown were more proper considerations about the relative attractiveness of a deal. Evolving market and company conditions had led Vulcan to have legitimate grounds for its management and board to believe that a merger was not in its best interests. The transaction had become less attractive to Vulcan as the exchange ratio of Vulcan shares for Martin Marietta shares had moved "well above where [the companies] had started in [their discussions]." [82] Those same conditions led Martin Marietta to want the merger more. Because the fundamental economic utility of a merger was not even agreed upon, the parties never even turned seriously to the precise working out of who would occupy the corner office(s) and in what Southern cit(ies) they would be, even though it would not likely have been an easy negotiation, given the tenor of the prior discussions touching on social issues.

As the relationship context itself would predict, the friendly deal dance did not end in an agonizing sharing of internal feelings. Responding to Martin Marietta's continued inquiries, James met Nye on June 27, 2011 at the Atlanta airport and told him that Vulcan was no longer interested in a merger, but would reach out if its views changed. At some point after this, Carr, Vulcan's banker, confirmed to Nye on the phone that James was just not that into the idea of a merger anymore.

E. *With Vulcan's Evaluation Material In Mind, If Not Always In Hand, Martin Marietta Decides To Go Hostile*

Even before June 2011, Martin Marietta had begun to consider alternatives to a friendly deal.[83] From the time it began to do so, Martin Marietta evinced uncertainty whether it could proceed with an unfriendly offer after signing the Confidentiality Agreements. In March 2011, Martin Marietta's advisors at Deutsche Bank emailed Martin Marietta requesting a copy of the NDA, explaining that it "would like to understand any limitations [the agreement] presents." [84] Discussion materials prepared by Deutsche Bank in advance of an April 5, 2011 meeting between James and Nye describe "[t]actical alternatives if it becomes 4th down" and note in a section entitled "[u]nderstanding the constraints" that the NDA "restrict[ed] [Martin Marietta's] ability to disclose to non-'Representatives' that discussions took place." [85]

Despite any concerns about the Confidentiality Agreements that may have existed, the Martin Marietta board authorized management to consider alternatives to a negotiated deal at a board meeting held on August 16–17, 2011. The minutes of this meeting are careful to note that Nye "reviewed with the [b]oard management's calculations and estimates of potential cost synergies and savings resulting from a

82. Tr. at 50 (James).

83. *E.g.*, JX 542 (handwritten notes of Anne Lloyd) at MM0051156.004 (in her notes on an October 1, 2010 call with Martin Marietta's public relations advisors, Lloyd writes: "Should we move on a bear hug or cub hug? Once the genie is out of the bottle the activists *will not* allow it to be put back."); JX 756 (Project Discussion Materials (Apr. 5, 2011)) at MM0051268 (Deutsche Bank presentation discussing alternatives to a friendly merger).

84. JX 288 (Email from Anne Lloyd to Ward Nye re: Confidentiality Agreement (Mar. 30, 2011)).

85. JX 756 at MM0051268.

*business combination transaction* with [Vulcan], based on *publicly available information* and [Martin Marietta's] own cost-control platform."[86] This odd locution is not, I daresay, inadvertent.

Martin Marietta has cloaked much of its decision-making process in secrecy. At trial, Nye would not answer key questions about what informed his or his board's decisions about key issues because he said he could not do so without disclosing privileged communications from counsel. This creates a gaping void in the record about what Martin Marietta's decisions and motivations were.

Despite having concealed the reasons for key business decisions from revelation because those decisions were apparently driven by legal advice, Martin Marietta has not hesitated to make the factual assertion that none of its conduct in deciding to pursue a hostile bid and none of its actions to secure approval of that bid were aided by the use of Evaluation Material it received under the Confidentiality Agreements.[87] The unusual reference in the board minutes to "publicly available information"[88] is reflective of the glimpses the paper record gives into the extent to which Martin Marietta feared that it was disabled from using Evaluation Material in aid of its consideration of a hostile bid.

But scarce as the record is, the evidence reveals that Martin Marietta did use Evaluation Material in forming its hostile bid.

As previously discussed, there is no logical explanation for the jump in Martin Marietta's synergy estimates from $200 million to $300 million other than that the information it received during the March 8, 2011 meeting justified a huge increase in Martin Marietta's base case assumptions about achievable synergies. This consequence of receiving Evaluation Material was important to Martin Marietta's decisions to consider being the premium-paying acquirer in a transaction rather than the premium-receiving target and to deliberate seriously on making an unsolicited offer to Vulcan's board. And although Martin Marietta and its advisors tried to sanitize the record and to suggest that their earlier detailed use of the Evaluation Material in estimating synergies in internal communications was irrelevant to Martin Marietta's decision, I do not find Martin Marietta's position on this score at all convincing.

Even when it tried to sanitize, it did not do so well. In late August 2011, Martin Marietta general counsel Bar asked Nye, Lloyd, and other Martin Marietta employees to give her any documents they had received from Vulcan or derived from Vulcan information. Nye does not "remember specifically" what he gave her in response to this request,[89] and discovery revealed that the box did not contain any of Nye's own documents. Bar put the documents she received in a box that she kept in her office. But, it does not appear that anyone

---

86. JX 331 (Minutes of Martin Marietta Board Meeting (Aug. 16–17, 2011)) at MM 0051955 (emphasis added).

87. *E.g.,* Martin Marietta Pre–Tr. Op. Br. at 34 ("Vulcan will be unable to prove that Martin Marietta disclosed or used 'Evaluation Material' in violation of the NDA, or [Confidential Materials] in violation of the JDA. Indeed, discovery has shown the opposite: In evaluating the Exchange Offer and in preparing its Form S–4 and other public disclosures, Martin Marietta relied exclusively on publicly available information, information available

on a nonconfidential basis, and information it had obtained or developed on its own."); Martin Marietta Post–Tr. Op. Br. at 44 ("[T]he trial record established that, in fact, Martin Marietta did *not* use Vulcan's confidential information for any purpose at all after Martin Marietta's board authorized its management to explore an unsolicited offer.").

88. JX 331 at MM 0051955.

89. Tr. at 527 (Nye—Cross).

remembered that Nye's March 11, 2011 synergies memo to the Martin Marietta board was swollen with specific nonpublic information about Vulcan that plainly constituted Evaluation Material,[90] as was Lloyd's email to Nye that served as the first draft of this board update.[91] In fact, that memo was the only formal synergies presentation to the board ever made by Nye and his team.

Martin Marietta's bankers' attempts to sequester the Evaluation Material were also less than complete. A Deutsche Bank presentation to Martin Marietta management dated August 31, 2011 expressly *included* a discussion of the prior synergies estimation process involving Vulcan.[92] One of the bankers at Deutsche Bank preparing another presentation in November 2011 consulted a spreadsheet that Lloyd had sent to Sansone summarizing the results of their March 8, 2011 meeting. The Martin Marietta team's consciousness of its precarious legal position was illustrated by the email that banker received from her senior colleague, who passed on the spreadsheet—which clearly contained Evaluation Material—with the warning *"I do not think that we can (or should) be using this information.* I am only forwarding it to you for reference purposes."[93] But she still read it in doing her work.[94]

No doubt Martin Marietta had its CFO and bankers derive a way of getting to the synergy levels in late summer 2011 that, at a technical level, did not involve use of Evaluation Material. But they were working backwards from a transaction-mo-

tivating level of synergies that had been embraced as achievable because of the confidence-enhancing and synergy-raising effects of receiving Evaluation Material. The decision that a hostile bid was economically viable was made earlier on the basis of the Evaluation Material; the later work was an attempt to rationalize the prior work by reference to public information. Notably, as was the case throughout, Martin Marietta made no attempt to use a so-called "clean team" of officers and advisors who were not thoroughly steeped in Evaluation Material, likely because they could not exclude their CEO and CFO, who were key decision-makers and whose strategic calculations were profoundly influenced by the nonpublic information they got from Vulcan.

The evidence also leads me to conclude that Martin Marietta and Vulcan's joint antitrust analysis from 2010 was used by Martin Marietta in forming its hostile bid a year later. As discussed, in May 2010, antitrust counsel for Vulcan and Martin Marietta (Wachtell and McDermott) met and shared information, some of which was not publicly available, to evaluate the antitrust risks involved in a merger. More importantly, Wachtell shared its legal opinions, which were explicitly protected under the JDA as Confidential Materials,[95] about divestitures that would likely be required by the Department of Justice. Wachtell also shared sensitive information concerning a specific divestiture that would be a "significant issue" for its client, while McDermott held back similarly sensitive information from Martin Marietta.[96]

90. *See* JX 245 at MM0003152–54

91. *See* JX 233 at MM0031605–06.

92. JX 713 (Project Geo Meeting Agenda (Aug. 31, 2011)).

93. JX 398 (internal Deutsche Bank email (Nov. 22, 2011)) at DBSI0000004616–17 (emphasis added).

94. Tr. at 942 (Ratigan).

95. JDA ¶ 1 ("Confidential Materials" include "opinions").

96. *See* Tr. 380 (Jacobsen—Cross) ("Q. You didn't tell Mr. Larson that piece of information about a source of supply because it was confidential; correct? Q. I think it was just

The McDermott lawyers' use of the joint analysis and the information gleaned at the May 2010 antitrust meetings when they "update[d]" [97] their antitrust analysis for Martin Marietta's hostile bid starting in October 2011 is less obvious than Martin Marietta management's use of the information received at the March 8, 2011 meeting between Lloyd and Sansone. It is clear that McDermott and Wachtell had different approaches to the antitrust analysis. Wachtell was set on assuming that the divested assets would be spun off into a self-sufficient company; McDermott was not. And because Martin Marietta and Vulcan never exchanged maps at their meetings, I accept that McDermott had to create new maps in the autumn of 2011, which they did and which built on maps they had created in April 2010 before receiving any Vulcan information. Jacobsen of McDermott testified at trial that when the McDermott team began working on the antitrust analysis related to Martin Marietta's hostile bid, they followed Bar's instructions not to use any of Vulcan's information and ignored their previous joint analysis of probable divestitures that came out of the May 2010 meetings.[98] Instead, Jacobsen claims that he and his colleagues relied solely on public informa-

tion about Vulcan for their "updated" analysis,[99] and that he instructed his team to do an "entirely new separate analysis." [100]

That said, I find that the evidence weighs in favor of use. Jacobsen admitted that he did not tell his colleagues to destroy or segregate the old files,[101] which included email exchanges with Wachtell about the joint analysis chart and drafts of the chart, and contemporaneous emails between members of the McDermott team working on the new analysis show that the lawyers were reading the 2010 files.[102] Although I have little doubt that the skilled and experienced Jacobsen could have come up with an independent and responsible antitrust analysis had he never met with Wachtell, the reality is that he had. Once things are learned and done, it is difficult to unlearn and undo them, especially when the old information is still being circulated.

Furthermore, the record indicates that, in at least one identifiable way, McDermott's internal analysis was influenced by Confidential Materials. McDermott prepared a memo to Bar in April 2010 (before the antitrust meetings with Wachtell), in which it identified a particular market as being at a high risk for divestitures.[103] When Bar commented on the memo, she

particularly sensitive to the client.... At that point it was something they didn't want me to disclose."); JX 84 (Email from Roselyn Bar to Ray Jacobsen (May 17, 2010)) at MWE0047310 (email from Bar to lawyers at McDermott attaches materials "regarding competitive landscape in" a particular geographic region which "indicate more competition than Ward [Nye] and I thought" and notes that "[t]hese [materials] can never under any circumstances be given to [Vulcan]").

97. JX 715 (internal McDermott emails (Oct. 20–24, 2011)).

98. Tr. at 337 (Jacobsen); 342–43 (Jacobsen—Cross).

99. *Id.* at 347–48.

100. *Id.* at 343.

101. *Id.* ("Q. You didn't tell them to take the 2010 files and put them away somewhere where they couldn't get them; right? A. We didn't discuss the files.").

102. *See, e.g.,* JX 379 (internal McDermott email (Oct. 24, 2011)); JX 380 (internal McDermott email (Oct. 24, 2011)).

103. JX 59 (Memo from McDermott to Roselyn Bar re: Project Grand Slam—Preliminary Overlap Analysis) at MWE 0077017. I have not identified that market so that I do not inadvertently influence any future regulatory dynamic.

did not recommend a change in McDermott's analysis of that specific market.[104] The day after the May 24, 2010 meeting with Wachtell, one of the lawyers on the McDermott team emailed Jacobsen, writing "I would put [that market] into the [low-risk] category, rather than the [medium-risk category]. I thought that was what we had agreed upon yesterday." [105] This change was then reflected in both the final version of the joint analysis prepared by Wachtell and in McDermott's own charts.[106] In the "updated" November 9, 2011 memo that McDermott sent to Bar, reflecting its (according to Martin Marietta) new, uninfluenced antitrust analysis, McDermott did not include that market as being at risk for divestitures.[107] It is hard to square Jacobsen and Martin Marietta's litigation-driven arguments with the written evidence, and I cannot conclude that McDermott's 2011 analysis was completely uninfluenced by the 2010 discussions with Wachtell.

The continuing use of Evaluation Material during Martin Marietta's consideration of a hostile bid was unsurprising given its failure to use any clean teams. Such efforts as Martin Marietta and its advisors took to try to put the Evaluation Material aside were awkward and incomplete.

Martin Marietta was also tripping over itself as to whether the Confidentiality Agreements allowed it to go public with a hostile at all. It contemplated sending a private bear hug letter that expressly contained the words: "In committing this proposal to writing, *but in keeping it confi-*

*dential and consistent with the terms and conditions of the [NDA] we entered into with you,* it is our hope that you and your Board will carefully evaluate the financial and operational benefits [of a merger]." [108] But Martin Marietta's M & A advisors wanted to put pressure on Vulcan publicly.[109] These advisors not only included investment bankers and lawyers, but also public relations advisors. These public relations advisors were a part of the core team advising Nye and his board how to go forward. Despite the Confidentiality Agreements, no effort was made to shield these advisors from receiving Evaluation Material or information relating to James and Nye's negotiations. To the contrary, it is plain that the public relations advisors were given a blow-by-blow of Nye's and Lloyd's view of the negotiations with Vulcan and access to other Evaluation Material, and they advised Martin Marietta management how the process and substance of information sharing and negotiation could be translated into a public communications strategy that would exert pressure on Vulcan to accept an unsolicited bid from Martin Marietta.

### F. *Martin Marietta Blindsides Vulcan And Spews Confidential Information Into The Public Domain*

Eventually, Martin Marietta decided to launch the Exchange Offer accompanied by the Proxy Contest, which it announced by sending Vulcan a public bear hug letter on December 12, 2011. On the same day, Martin Marietta filed an S–4 with the SEC in connection with the Exchange Offer,

**104.** *See* JX 72 (Email from Roselyn Bar to Andrew Hoh) at MWE 0077093.

**105.** JX 117 (email from Stefan Meisner to Ray Jacobsen (May 25, 2010)).

**106.** JX 131 at MWE0087338–39, MWE0087343.

**107.** JX 397 (Memo from McDermott to Roselyn Bar re: Project Geo—Preliminary Overlap Analysis (Nov. 9, 2011)) at MWE0083516.

**108.** JX 353 (Draft Mountain Letter with Kekst comments (Sept. 1, 2011)) at DBSI0000018708 (emphasis added).

**109.** *Compare id. with* JX 440 (Martin Marietta Press Release (Dec. 12, 2011)) at 3.

and on January 24, 2012, Martin Marietta filed a proxy statement in connection with the Proxy Contest.

Martin Marietta bypassed the Notice and Vetting Process set forth in the Confidentiality Agreements and discussed the history of its negotiations with Vulcan at length in its SEC filings in a one-sided manner that does not suggest that Martin Marietta was making an effort to present an unbiased account to Vulcan's shareholders. In addition to discussing the history of negotiations, the S-4 included a host of details that constitute Evaluation Material under the Confidentiality Agreements, such as:

- The fact that Martin Marietta anticipates annual cost synergies from a merger with Vulcan of $200 million to $250 million; [110]
- James' estimation of achievable synergies from a merger at various stages of the merger discussions, including his belief as of June 2010 that "a combination of the companies would result in approximately $100 million in synergies" and not "synergies at the $175 million to $200 million levels that Mr.

Nye believed were achievable," [111] and his supposed belief at the time merger discussions ended that "the cost synergies to be achieved in a combination would [not] be greater than $50 million;" [112]

- James' view of alternative deal structures designed to minimize tax leakage; [113]
- James' conclusion, based on the merger discussions, that the "potential tax leakage (*i.e.*, taxes arising from the sale or other disposition of certain assets that may be required in order to obtain regulatory approvals) and the ability to divest overlap businesses were significant impediments to a transaction;" [114] and
- The fact that the "legal teams did not identify any significant impediments to a business combination transaction" at their antitrust meeting on May 19, 2010.[115]

Nye admitted at trial that the disclosures Martin Marietta made to the SEC were not begrudging, but rather a tactical decision influenced by its flacks,[116] and the influence of these public relations advisors

---

110. JX 508 (Martin Marietta Amendment No. 2 to Form S-4 (Feb. 10, 2012)) at 41. Martin Marietta's current estimation of synergies is an "analy[sis] that "reflect[s]" Vulcan's "nonpublic information" NDA at 1, and is thus Evaluation Material within the meaning of the NDA. For the reasons I have explained, Martin Marietta's assertion in the S-4 that its current synergies estimates are "based on publicly available information and the Company's experience and judgment," JX 508 at 41, do not convince me that such estimates are uninfluenced by confidential information shared by Vulcan at the March 8, 2011 synergies meeting.

111. *Id.* at 30.

112. *Id.* at 32.

113. *Id.* at 29.

114. *Id.* at 32–33.

115. *Id.* at 30. Many of these disclosures appeared in the original S-4 that Martin Marietta filed with the SEC on December 12, 2011 and thus were not disclosed in response to any SEC comments. *See* JX 429 (Martin Marietta Form S-4 (Dec. 12, 2011)) at 26, 27, 29. Martin Marietta's further dwelling on Vulcan's philosophy towards synergies was disclosed in response to an SEC question concerning Martin Marietta's original disclosure that "Vulcan did not share Martin Marietta's views as to the level of synergies." *Id.* at 29. *See* JX 844 (SEC Comment Letter (Dec. 21, 2011)) ¶ 15 ("Please provide further context to *each* discussion in which 'synergies' were referenced to describe the basis for the assumptions regarding ... why Messrs. Nye and James held divergent views on realizable synergies at various stages.").

116. Tr. at 555–56(Nye).

is evident in the detailed, argumentative S-4 filed by Martin Marietta. For example, the S-4 portrays James as an obstinate CEO blocking a deal because he wants to stay in power [117] and Nye as the rightful occupier of the CEO seat, backed by his board who had "confidence in its current management team" and viewed "Mr. Nye's appointment as the [CEO] of the combined company" as an "important term of any transaction to be considered by the Martin Marietta board." [118] But, Martin Marietta did not disclose Nye's willingness to trade a 20% premium to the Martin Marietta shareholders for the CEO position at the combined company. Similarly, the S-4 discloses that James made merger overtures to Martin Marietta throughout most of the first decade of the 21st century and that no agreement resulted. By contrast with its focus on James' supposed desire to remain as CEO after a merger in 2011, however, the S-4 does not mention Zelnak's and Nye's reluctance to talk seriously about a merger for a period spanning over nearly a decade, which was at least in part driven by a desire to keep their managerial positions and in particular by Nye's desire to take over as CEO of Martin Marietta before any merger was considered.

The S-4 also includes other one-sided disclosures that appear driven to put Vulcan on the defensive. For example, it states: "Martin Marietta believed that, in contrast to the strategies undertaken by Martin Marietta with respect to its operation and SG & A cost management, Vulcan was unwilling to consider significant actions to create more meaningful savings." [119] The S-4 omits the reality that Martin Marietta wanted to count as synergies the cost-savings Vulcan was going to realize when it fully rolled out its planned ERP upgrade. These are just some illustrations of an approach to disclosure that seems more designed to impugn the motives of Vulcan management than to address a topic in a balanced way.

Martin Marietta claims that all its disclosures are required by law and thus not in breach of the Confidentiality Agreements, and seeks a declaration to that effect. But its witnesses refused to give testimony on the precise reason any particular disclosure was made in the S-4, claiming that to do so would require the revelation of privileged information.

Not limiting itself to disclosures in formal SEC documents, Martin Marietta has disclosed Evaluation Material and other information shielded by the Confidentiality Agreements in numerous investor calls and presentations. These communications include a detailed history of the "discussions [and] negotiations that have [taken] place concerning the Transaction," [120]

---

117. *See* JX 508 at 32 ("Mr. James told Mr. Nye that Vulcan would only be interested in a business combination with Martin Marietta ... in which Mr. James would be chairman of the board of directors and chief executive officer, with a majority of senior management positions held by Vulcan personnel for a transition period.").

118. *Id.* at 30; *see also id.* at 32 ("[T]he Martin Marietta board of directors would be opposed to any structural impediments that would prevent the Martin Marietta management team from achieving projected synergies," referring to James' proposal to manage the combined company).

119. *Id.* at 32.

120. NDA ¶ 3. *See, e.g.,* JX 440 at 2 (reproducing the language from the public bear hug letter stating that "[m]ore than a year and a half ago, you and I (and, on several occasions, members of our senior management teams) began to explore the financial and strategic merits and potential terms of a business combination of Vulcan [] and Martin Marietta []," and that "[d]espite Martin Marietta's clear, continuing interest, some months ago Vulcan disengaged from discussions"); JX 489 (Investor Presentation (Jan. 10, 2012)) at 19 (arguing that "Vulcan management unwilling to consider more significant actions to

along with references revealing the "opinions," [121] "analyses" [122] and the "nonpublic information" [123] of Vulcan as to issues like required antitrust divestitures and synergies.[124]

Thus, another way in which Martin Marietta has clearly used Evaluation Material in pursuit of its hostile bid is by selectively using that Material and portraying it in a way designed to cast Vulcan's management and board in a bad light, to make Martin Marietta's own offer look attractive, and to put pressure on Vulcan's board to accept a

deal on Martin Marietta's terms. This tactical use is clear and not the subject of any reasonable dispute, despite Martin Marietta's implausible protestations to the contrary.[125]

### III. *Legal Analysis*

The resolution of the factual issue of use, which was a major focus at trial, clarifies the remaining legal issues. For the reasons set forth in my discussion of the facts, to the extent that this litigation turns on the question of whether Martin

create more meaningful savings."); JX 491 (Investor Conference Call (Jan. 1, 2012)) at 3 (referencing the market exchange ratios of the two companies for the trading dates preceding meetings between James and Nye "since discussions recommenced in the Spring of 2010"); JX 749 (Investor Presentation (Feb. 21, 2012)) at 12 (where presentation stated that "Vulcan wants its shareholders to ignore the facts," which was that "Vulcan management was unwilling to engage during prior *discussions on realistic synergy levels.*"); JX 436 (Investor Presentation (Dec. 12, 2011)) at 2 ("Since these initial discussions [in 2002], both companies have had periodic conversations, which intensified in early 2010; unfortunately *the dialogue has recently broken down.*").

121. JDA ¶ 1.

122. NDA at 1.

123. *Id.*

124. As to synergies, *see, e.g.,* JX 489 at 19 (stating that the a minimum of $125–$150 million in synergies was "jointly *identified* by CFOs," a reference to the synergies identified by Lloyd and Sansone in the March 8, 2011 meeting based on Vulcan's nonpublic headcount information); JX 491 at 4 ("In our earlier discussions with Vulcan, the management teams of both companies concluded that $125 million to $150 million was an achievable synergy range."); JX 749 at 7 (quoting the S–4's language that "Mr. James also stated that he did not believe that the cost synergies to be achieved in a combination would be greater than $50 million."). Martin Marietta has also repeatedly disclosed its synergies estimate of $200–$250 million, an "analys[i]s"

"prepared by" Martin Marietta "that contain[s], reflect[s], [is] based upon or [is] generated from" Vulcan's "nonpublic" headcount information exchanged in the March 8, 2011 meeting" covered by the NDA as Evaluation Material. *E.g.,* JX 440 at 2; JX 450 (Investor Conference Call (Dec. 13, 2011)) at 5; JX 489 at 19.

As to antitrust-related disclosures, *see, e.g.,* JX 491 at 5 ("There is simply no way that Vulcan—or Martin Marietta for that matter—would have continued discussions for one day, let alone for a year, if either company believed that the properties ['at risk of divestiture['] represented anywhere near the level of the combined company's shipments or cash gross profits implied by Vulcan in slide 35."); *id.* at 6–7 (Nye responding to a market analyst to "keep in mind [that] the agreement that we [Vulcan and Martin Marietta] came to back in 2010, when we said we could move forward, actually had those sites [that had since been swapped for those of another company] in the [antitrust] analysis. So, things have only gotten better since then.").

125. Martin Marietta even discussed the Confidentiality Agreements in a slanted way. Although it requested that the fact of the NDA be itself kept confidential, Martin Marietta disclosed it, and stated that it "did not contain a standstill provision." JX 508 at 29. That tidbit was not accompanied by any discussion of Bar's substantial tightening of the NDA template, or of Nye's insistence that Martin Marietta would talk to and share information with Vulcan only for the purpose of a negotiated merger because Martin Marietta was "not for sale" to Vulcan or anyone else. JX 33 at MM0051096.033.

Marietta used Vulcan's Evaluation Material to decide to launch, formulate the terms of, and help convince Vulcan stockholders to accede to the Exchange Offer and Proxy Contest, Martin Marietta loses because it used Evaluation Material as defined in the NDA and Confidential Materials as defined in the JDA for each of those purposes. With that factual defense resolved, I will focus on the rest of Vulcan's contract claims, which call on me to answer a series of questions regarding the meaning of the Confidentiality Agreements.

Vulcan argues that Martin Marietta has breached the Confidentiality Agreements in four key ways, and that any of these breaches entitles Vulcan to an injunction remedying the breach. The four ways follow:

- First, Vulcan contends that Martin Marietta was not free to use Evaluation Material in aid of a hostile attempt to acquire control of Vulcan, because the Confidentiality Agreements limited Martin Marietta to using such information only for a business combination transaction between Vulcan and Martin Marietta in the sense of one that was the product of a voluntary contractual decision between the governing boards of the companies, and not one that resulted because one of the parties first used the Evaluation Material to engage in an unsolicited exchange or tender offer to the other party's stockholders.

- Second, Vulcan argues that even if Martin Marietta was free to use the Evaluation Material to consider whether to launch a hostile offer per ¶ 3 of the NDA, it was not permitted to disclose that information or the fact of the companies' merger discussions (which I call Transaction Information) publicly. In Vulcan's view, the exception in the Confidentiality Agreements

permitting "legally required" disclosures only applied when a party received an External Demand.[126] Martin Marietta's decision to engage in a hostile Exchange Offer and voluntarily impose upon itself a requirement to disclose certain information that it had itself demanded be kept confidential did not fall within this contractual definition of "legally required" and therefore its broad disclosure of Transaction Information and Evaluation Material, and its failure to follow the contractually prescribed Notice and Vetting Process, was an unexcused breach of contract.

- Third, Vulcan argues that even if Martin Marietta was legally required for purposes of ¶ 3 of the NDA to disclose certain information by SEC Rules, Martin Marietta went well beyond any legal requirement under those Rules to disclose and based its disclosures on what was tactically advantageous to itself rather than upon the contractual standard, which limited disclosures to the bare legal necessity. According to Vulcan, Martin Marietta's argumentative, one-sided recitation of Transaction Information and Evaluation Material was in no way compelled by the applicable SEC Rules, which would have been satisfied by terse and summary information about the parties' negotiations.

- Finally, Vulcan notes the undisputed fact that Martin Marietta has filled a variety of push pieces, investor calls, and entreaties to journalists with a dog's breakfast of Transaction Information and Evaluation Material. Martin Marietta was admittedly not legally required to make any of these communications, and therefore should be held responsible for breach of contract for

126. NDA ¶ 4.

this conduct, irrespective of whether much of the information had been previously disclosed in formal SEC filings required of a party making an exchange offer or prosecuting a proxy contest.

These are the four remaining issues on which turn the conclusive resolution of Vulcan's counterclaims for breach of the Confidentiality Agreements and the mirror image claims of Martin Marietta for a declaration that it has not breached those Agreements. Each of these four remaining issues implicates both the NDA and the JDA. Because the parties have focused most of their attention on language of the NDA, I will address each of those questions first in the context of the NDA, and second in the context of the JDA.

A. *Was Martin Marietta Allowed To Use Vulcan's Evaluation Material For The Purpose Of Undertaking A Hostile, Unsolicited Bid?*

Vulcan's first contention is that Martin Marietta's use of Evaluation Material for purposes of its hostile Exchange Offer and Proxy Contest was not a proper one under the Confidentiality Agreements.

Reviewing the precise structure of the Exchange Offer is the best way to begin

evaluating that argument. Martin Marietta is offering 0.5 of a Martin Marietta share for each Vulcan share, and its Offer is subject to a number of waivable conditions. First, the Exchange Offer is conditioned on the receipt of tenders from 80% of the Vulcan shareholders.[127] Second, the Exchange Offer is subject to the condition that "Vulcan ... have entered into a definitive merger agreement with Martin Marietta with respect to the proposed transaction that is reasonably satisfactory to Martin Marietta and Vulcan." [128] Although Martin Marietta has relied on this "Merger Condition" to buttress several of its legal arguments, and has represented to this court in a letter submission that it will not waive it,[129] its operative S–4 still maintains that "Martin Marietta reserves the right, in its sole discretion ... to waive any conditions to the offer or otherwise amend the offer in any respect." [130] Likewise, although the Exchange Offer is set to expire on May 18, 2012, Martin Marietta reserves the right to extend it.[131]

Returning to the issue of improper use, Vulcan grounds its argument in the "use" restrictions set forth in the Confidentiality Agreements.[132] Under the NDA, Martin Marietta was obligated to "use" Evaluation Material "*solely* for the purpose of evaluating a *Transaction*." [133] Similarly, the JDA restricts Martin Marietta's "use" of Confi-

---

**127.** *See* Martin Marietta Materials, Inc., Registration Statement (Form S–4), Am. No. 3 at 9 (Mar. 19, 2012). Martin Marietta will lower this tender condition to 50% if it prevails in separate litigation against Vulcan in New Jersey related to Vulcan's "fair price" provision in its certificate of incorporation, which would require the vote of 80% of non-interested stockholders to approve a back-end merger with an interested stockholder unless certain conditions are met. *Id.* at 74.

**128.** *Id.* at 60.

**129.** Martin Marietta Post–Tr. Supp. Mem. at 5.

**130.** Martin Marietta Materials, Inc., Registration Statement (Form S–4), Am. No. 3 at 10 (Mar. 19, 2012).

**131.** *Id.* at 9.

**132.** As the M & A treatises note, drafting a narrow "use" provision can serve as a " 'backdoor' way to impose a standstill on the buyer.... If the buyer makes an offer to acquire the seller, or purchase its securities in the market, the seller can argue that the buyer improperly used the confidential information in so doing." Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 9.02, at 9–5 to 9–6 n.8.1 (2001).

**133.** NDA ¶ 2 (emphasis added).

dential Materials to one that is "*solely* for purposes of pursuing and completing *the Transaction*."[134] Vulcan argues that the Exchange Offer and Proxy Contest do not qualify as "a Transaction" under the NDA or "the Transaction" under the JDA and, therefore, Martin Marietta was prohibited from "us[ing]" the Evaluation Material and Confidential Materials in furtherance of them.

Vulcan's argument turns on the meaning of "Transaction" as it is defined in each Agreement. The NDA uses the phrase "a Transaction," and defines it as "a possible business combination transaction between [Martin Marietta] and [Vulcan] or one of their respective subsidiaries."[135] In slight contrast, the JDA uses the phrase "the Transaction," and defines it as "a potential transaction *being discussed by* Vulcan and Martin Marietta or one or more of their divisions, subsidiaries, or related companies, involving the combination or acquisition of all or certain of their assets or stock."[136]

According to Vulcan, both of these definitions exclude the Exchange Offer and Proxy Contest because: (i) neither is a "business combination transaction" that is "between" Martin Marietta and Vulcan for purposes of the NDA in the sense that the sitting board of Vulcan has not contracted to consummate the transaction; and (ii) the only transaction "being discussed" by the parties was a consensual, contractual merger of equals and thus the Exchange Offer and Proxy Contest are not "the Transaction" referred to throughout the JDA.

Martin Marietta counters that its Exchange Offer and Proxy Contest constitute a business combination transaction under the NDA for either of two proposed reasons: (i) they are transactions that qualify as a "business combination" under usages of that term in certain legal contexts, like the securities regulation context; or, (ii) in the alternative, they are related transactions designed to give Martin Marietta the power to ultimately cause an integration of Vulcan and Martin Marietta. Furthermore, according to Martin Marietta, the Exchange Offer and Proxy Contest are business combination transactions "between" Martin Marietta and Vulcan in the sense that an ultimate combination of the businesses will be "between" the two companies. In terms of the JDA, Martin Marietta's position is similarly two-fold. First, Martin Marietta disputes as an evidentiary matter that the only transaction "being discussed" was a friendly one. Second, Martin Marietta argues that even if the JDA provides a narrower definition of "Transaction" than the NDA does, the NDA definition would prevail because the JDA includes a provision providing that the terms of the JDA shall not "affect or limit" the NDA.[137]

With this basic recitation of the parties' arguments in mind, I turn to resolving the interpretative question at hand. Considering the NDA first, I focus on the linguistics of the key phrase "business combination transaction between" as applied to the Exchange Offer and Proxy Contest. In focusing on the words, I apply the well-settled principles of contract interpretation that require this court to enforce the plain and unambiguous terms of a contract as the binding expression of the parties' intent.[138] But, if words in the contract are ambiguous, then I must look to extrinsic evidence to determine the par-

134. JDA ¶ 4 (emphasis added).

135. NDA at 1.

136. JDA at 1 (emphasis added).

137. *Id.* ¶ 12.

138. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.2006).

ties' intent.[139] Most relevant here, I consider how the drafting history of the NDA, Martin Marietta's own conduct, and the interpretative gloss provided by the JDA bear on the interpretative question. I then turn to the JDA and use the same approach to determine whether the Exchange Offer and Proxy Contest fall within the ambit of "the Transaction" as it is used in that Agreement.

### 1. A Textual Analysis Of The NDA, Followed By A Look At The Extrinsic Evidence

#### a. Does The Phrase "Business Combination Transaction Between" Vulcan And Martin Marietta In The NDA Have One Unambiguous Meaning?

■ A Transaction is defined in the NDA as a "possible business combination transaction between" Vulcan and Martin Marietta.[140] In examining whether this usage has only one clear meaning or is susceptible to different reasonable ones, I personally find it helpful to break down the concepts into their component parts.

Before doing that, I will surface at least this reader's first blush impression of the term, which is that on an initial reading the contractual language seems most naturally to refer to a contractual agreement between the two companies, through their governing boards, to consummate a transaction combining the two companies' assets, in whole or in part. This reading, of course, is the one Vulcan embraces. I do not rush to conclude it is the correct one. But it is no small thing that the most immediate impression given by the specific

words of the NDA suggest to me that the words were designed to address any contractual arrangement reached "between" the two companies to combine their assets.[141] After all, the most important guide to the meaning of a contract is what the words most naturally convey.

That does not mean, however, that I am confident that my most immediate impression of what the words intended to convey constitutes the only possible meaning of those words. To test whether that is so, it is helpful to me to examine important parts of the key contractual phrase in isolation and then together, and only then conclude whether the language is clear and unambiguous.

#### i. The Many Meanings Of Business Combination Transaction

I will begin with the term business combination transaction, considering it without reference to the key word "between" that follows it. As I will explain, these words have an elastic quality, and cover a narrower or broader range of transactions in different legal contexts. Consistent with the plastic nature of the words, the parties divide on what the words mean in the NDA.

For its part, in its briefing and at trial, Vulcan argued that the term business combination transaction must be interpreted in accordance with the narrowest uses of the term "business combination" in certain legal contexts, such as in Delaware's anti-takeover statute, which defines a "business combination" in part to mean a formal statutory merger.[142] Consistent with its

**139.** *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).

**140.** NDA at 1.

**141.** *See* 11 *Williston on Contracts* § 31:9 (4th ed.1999) (under the objective theory of contracts, a court first looks to the "the ordinary meaning of the writing to parties of the kind who contracted at the time and place where

the contract was made, and with such circumstances as surrounded its making").

**142.** 8 *Del. C.* § 203(c)(3)(i). The other types of "business combinations" for purposes of 8 *Del. C.* § 203, in cursory review, include the following: (ii) "[a]ny sale, lease, exchange, mortgage, pledge, transfer or other disposition ... of assets of the corporation ... which

argument that a business combination could only refer to the formal steps undertaken to combine two businesses, Vulcan originally took the position that even if the parties had agreed to merge by way of a front-end exchange offer followed by a back-end merger, the front-end exchange offer would not formally fall within the meaning of a "business combination transaction" because the exchange offer would only effect a redistribution of ownership of Vulcan's shares.[143] Upon questioning by the court, Vulcan maintained that if it and Martin Marietta had agreed to such a transaction form—one that is commonly used by parties that agree to carry out an ultimate merger—then Martin Marietta would have had to seek a waiver from Vulcan in order to effect that portion of the deal because it would not be in formal compliance with the terms of the NDA.[144]

By contrast, Martin Marietta contends that Vulcan defines the term business combination transaction too narrowly, and advances two alternate definitions. First, Martin Marietta argues that the term must be interpreted in accordance with the broadest uses of the term that appear in other legal contexts, such as in the SEC Rules,[145] which consider "business combination transactions" to include those transactions that when looked at in isolation only involve the transfer of ownership of shares of stock (or other securities) and not the ultimate transaction that merges the two companies, although those transactions are included in the definition as well.[146] On this view, Martin Marietta's Exchange Offer standing alone would qualify as a business combination transaction because an "exchange offer" is expressly considered a "business combination transaction" under SEC Rule 165.[147] To be candid, it is less clear how Martin Marietta defends its Proxy Contest as a business combination transaction under this definition. Arguably, however, the Proxy Contest is an undertaking that facilitates the occurrence of certain of those "business combination transactions" identified by the SEC Rules by seeking to install directors who, shall we say, are more receptive to a formal consolidation of the companies.

---

assets have an aggregate market value equal to 10% or more of . . . the aggregate market value of all the assets of the corporation . . ."; (iii) "[a]ny transaction which results in the issuance . . . by the corporation . . . of any stock of the corporation or of such subsidiary to the interested stockholder . . ."; (iv) "[a]ny transaction involving the corporation . . . which has the effect . . . of increasing the proportionate share of the stock . . . of the corporation . . . which is owned by the interested stockholder . . ."; or (v) "[a]ny receipt by the interested stockholder of the benefit . . . of any loans, advances, guarantees, pledges or other financial benefits . . . provided by or through the corporation. . . ."

143. *E.g.*, Vulcan Post–Tr. Op. Br. at 44–45; Vulcan Post–Tr. Ans. Br. at 26–27.

144. *E.g.*, Post–Tr. Tr. at 58–59.

145. *E.g.*, Martin Marietta Post–Tr. Op. Br. at 47.

146. According to SEC Rule 165, "[a] business combination transaction means any transaction specified in [Rule 145(a)] or exchange offer." 17 C.F.R. § 230.165. Rule 145(a) in turn covers "an offer, offer to sell, offer for sale, or sale" when "there is submitted for the vote or consent of such security holders a plan or agreement" for, among other transactions, "reclassifications," a "statutory merger or consolidation, or similar plan or acquisition in which securities of such corporation or other person held by such security holders will become or be exchanged for securities of any person," or a "transfer of assets of such corporation or other person, to another person in consideration of the issuance of securities of such other person or any of its affiliates," if certain conditions are met. 17 C.F.R. § 230.145(a).

147. *E.g.*, Martin Marietta Post–Tr. Op. Br. at 47.

Secondarily, Martin Marietta argues that a business combination transaction refers to any related series of steps or measures that has as its ultimate purpose the combination of the assets of two companies.[148] That is, so long as the party performing the undertaking at issue has as its ultimate purpose a mingling of the assets of the two companies, such as through a back-end merger, then any of the predicate steps taken to achieve that ultimate purpose qualifies as a business combination transaction. Here, Martin Marietta argues that the purpose of the Exchange Offer and Proxy Contest is to facilitate the ultimate integration of the two companies. In this regard, Martin Marietta places a great deal of weight on the waivable Merger Condition as evidence of its intent to cause an eventual amalgamation of Martin Marietta's and Vulcan's businesses. Indeed, Martin Marietta argues that it for the moment has conditioned closing the Exchange Offer on the prior signing of a contractual merger agreement with Vulcan's board. At the same time, Martin Marietta is seeking to change the composition of the Vulcan board by its hostile Proxy Contest or, because Vulcan has a staggered board, multiple proxy contests. In a move that is cute in a non-Zooey Deschanel way, Martin Marietta asserts that because it has currently said it would only close its Exchange Offer if the Vulcan board signs a merger agreement with it, the business combination transaction it proposes is actually one consistent with Vulcan's own reading, even though the Vulcan board that would sign this "consensual" agreement would be one that has been changed by Martin Marietta's Proxy Contest.

Despite their starkly different views of what the term business combination transaction means, both parties of course agree that the words are unambiguous.

At post-trial oral argument, I engaged with both parties regarding the meaning of the term business combination transaction. During argument, Vulcan narrowed its argument in a fundamental way. It abandoned the part of its argument that was based on the requirement that a business combination transaction take the form of a one-step statutory merger. Acknowledging that many consensual, negotiated merger agreements call for the first step to consist of an exchange or tender offer, Vulcan abandoned any argument that an exchange or tender offer could not form a component part of a business combination transaction.[149]

Instead, Vulcan embraced an interpretation that more closely resembles Martin Marietta's second argument. That is, Vulcan now argues that the term business combination transaction covers any transaction form designed to effect the ultimate integration of two businesses as long as the transaction was approved by a contract negotiated by the companies in advance that contemplated an ultimate combination of assets, such as through a back-end merger.[150] Vulcan's concession would, I daresay, acknowledge that even a merger would not be necessary in all cases, such as when a holding company sells a wholly-owned subsidiary to another business in a pure stock sale. That is because what became clear is that Vulcan's key argument focuses on the operative effect of the word "between."[151] Vulcan now contends that "between" is the critical word that precludes Martin Marietta from launching

---

148. *E.g.,* Martin Marietta Post–Tr. Op. Br. at 48.

149. *See* Post–Tr. Tr. at 105–06.

150. *See id.* at 105, 111.

151. *See id.* at 112.

the Exchange Offer, because an exchange offer that is not part of a contractually negotiated path toward a business combination is not "between" the parties, rather than because an exchange offer intended to bring about a later combination of the assets is automatically disqualified from being a business combination transaction.[152] Likewise, for obvious reasons, Martin Marietta's Proxy Contest is not part of a contractually negotiated path "between" the parties, because it is a transaction that seeks to bypass the requirement that a Transaction be agreed between the parties, by replacing Vulcan's negotiators with ones hand-picked by Martin Marietta itself.

Vulcan's narrowing of its argument was helpful, and makes sense in view of the requirement that the court give words their common meaning "within the setting in which they are employed." [153] In their arguments, both sides wrenched usages of the loose term business combination transaction out of context and put them in front of me and asked me to apply them to a different context—that of a confidentiality agreement between two industry rivals exploring a combination. By way of example, Vulcan's reference to 8 *Del. C.* § 203, Delaware's anti-takeover statute, was quite strained.

The purpose of 8 *Del. C.* § 203's definition of "business combination" and its exclusion of a tender or exchange offer is to distinguish precisely between a front-end tender or exchange offer and a back-end merger effected without the support of the target's sitting board. This precision is used because the anti-takeover statute addresses the limits on an offeror who proceeds without either board support or a certain level of stockholder approval. If the offeror proceeds with a tender offer or exchange offer without board approval or support from 85% of the target's stockholders, then the offeror cannot do a business combination transaction as defined in § 203—such as a back-end merger—for 3 years.[154] The purpose of this separation is to freeze a would-be acquirer in place if it makes an offer directly to the target's shareholders unless it negotiates a deal with the target's board or gets support from 85% of the shareholders.

Although this precision is a sensible one in the context of anti-takeover statutes, it is not as readily sensible in the context of a confidentiality agreement between parties considering an M & A deal. It is common for negotiated merger transactions to involve a merger agreement calling for a front-end tender offer or exchange offer meeting certain conditions to be followed by a back-end merger if those conditions are satisfied. The precise route that parties to a negotiated merger agreement choose to get to the ultimate merger is often the subject of later negotiations. As a result, unlike in the § 203 context, drafters of confidentiality agreements are more likely to use the term business combination transaction in a broad way that would be capacious enough in scope to cover the various mechanics of how the parties might ultimately wish to combine the assets of the companies.

But, Martin Marietta's reference to the SEC Rules was similarly strained. The broad interpretation of the term "business combination" called for in the securities regulation context makes sense in that set-

---

**152.** *See id.* at 113.

**153.** *Sun–Times Media Group, Inc. v. Black,* 954 A.2d 380, 394 (Del.Ch.2008); *see also McDonald v. Schweiker,* 726 F.2d 311, 313 (7th Cir.1983) ("Context may disambiguate ... In this case we have only context, or stated otherwise purpose inferable from context, to guide us.").

**154.** 8 *Del. C.* § 203(a).

ting because the regulators are attempting to address all exchange offers in one rule, without distinguishing whether they are a step toward an actual business combination. But, that usage would include transactions that do not as sensibly fit into the context of a negotiated confidentiality agreement preceding a possible merger, such as an exchange offer for 20% of a company's stock, which would be a "business combination transaction" under SEC Rule 165.[155]

Our context is a different one, and neither the narrow concept of "business combination" as in 8 *Del. C.* § 203 nor the broad concept of "business combination transaction" in the SEC Rules fits easily. The narrow § 203 concept that would read out techniques like tender offers altogether ignores the role such offers often play in bringing about negotiated mergers. By contrast, the broad SEC Rules concept would capture exchanges or purchases of shares that are not intended to result in an ultimate combination of businesses, or even a change in corporate control, and therefore is not a good fit linguistically or contextually. Notably, the fact that cash tender offers—which are often a first step in a negotiated merger—are not defined as a "business combination transaction" un-

der the SEC Rules to which Martin Marietta points tends to further weaken Martin Marietta's attempt to deploy that SEC definition in the context of determining the meaning of a "business combination transaction" in a confidentiality agreement preceding a possible merger agreement.

Rather, in the context of confidentiality agreements drafted by business lawyers and entered into preceding M & A negotiations, a more balanced, middle ground meaning has surfaced, albeit one that still lacks a lot of precision and clarity. In this context, contract drafters often seem to use the term "business combination transaction" as a way of capturing within one term all of the various transactional routes that might be taken or ultimately lead to a combination or integration of all or some of the assets of two companies,[156] which is in some sense in accord with Martin Marietta's second argument. Notably, the Model Confidentiality Agreement published by the ABA instructs transactional lawyers that the term "business combination" is appropriate when the parties wish to maintain a level of generality as to the "form" or the structure that an M & A transaction may take.[157] Other M & A treatises and model agreements use the term "business combination" in a similarly

---

**155.** Although Martin Marietta does not cite the accounting rules, the same overbreadth issue arises, because the accounting rules capture acquisition of control that do not involve an actual combination of assets. FASB Statement No. 41(R) at i ("This Statement applies to all transactions or other events in which an entity (the acquirer) obtains control of one or more businesses (the acquiree), including those sometimes referred to as 'true mergers' or 'mergers of equals' and combinations achieved without the transfer of consideration, for example, by contract alone or through the lapse of minority veto rights.").

**156.** The working draft of the ABA's Dictionary of M & A Terms Proposed Definitions primarily defines "business combination" as a "general term used to cover the acquisition of one business by another or the consolidation of two or more businesses, whether by merg-

er, stock sale, asset sale, or other method." M & A Dictionary Task Force Committee, ABA, Dictionary of M & A Terms: Proposed Definitions 23 (Mar. 17, 2010) (working draft not for publication, cited with permission of the Committee Chairperson). Under the ABA's working definition, a front-end exchange offer would likely be an "other method" of effecting "the acquisition of one business by another." As evidenced by the "working draft" designation, the dictionary is not ready for publication, but still provides useful evidence as to M & A practitioners' usage of the term.

**157.** *See* ABA *Model Confidentiality Agreement* 345 (2011) (noting that "an alternative" to the phrase "a possible negotiated transaction" that "would provide some greater definition of the subject matter *without any commitment as to the form of or consideration for the*

flexible fashion.[158] None of these intimate to transaction lawyers that using the term "business combination transaction" limits the parties to using the confidential information covered by the agreement solely for the purpose of pursuing a one-step merger. As mentioned, one common form of business combination would be a sale of a wholly-owned subsidiary by way of a stock sale, another would be an asset sale. The generality of the term "business combination transaction" reflects the context in which M & A confidentiality agreements are entered.[159] These are agreements that are negotiated at the preliminary stages of merger discussions, typically long before the parties tease out which deal structure would make the most economic sense.[160] The parties may, for example, need time to figure out which transaction structure will be the most tax-efficient. As a result, "confidentiality agreements typically do not describe the type of transaction that may result in any detail."[161] Moreover, parties entering these agreements try not to imply that they have reached a binding agreement to enter into a deal, which may give rise to a specific performance remedy, or a duty to negotiate, if one party backs away from the talks, so they are reluctant to specify particular terms of a deal up-front.[162]

Although these usages are in accord with Martin Marietta's preferred reading in one way, they are in tension in another important sense. The flexibility that the treatises and models refer to is all in aid of giving the parties the ability to choose the route to a combination that is most economically efficient. Consistent with my first blush reading of the term, the treatises and models all have a heavily contractual flavor in the sense of addressing the ability of the parties who entered into the confidentiality agreement to reach an ultimate agreement on a transaction to combine their businesses, in whole or in part, and leaving to them the flexibility to contract about the how.[163] In this regard, I

---

*transaction* would be to refer to a 'mutually beneficial *business combination*' or to use some other *generally descriptive phrase.*") (emphasis added).

158. *E.g.*, Igor Kirman, *M & A and Private Equity Confidentiality Agreements Line by Line* 7 (2008) ("Most confidentiality agreements arise in the context of typical commercial activity.... A subsection of these agreements arise in the mergers and acquisitions (M & A) context, in connection with potential mergers, sales, divestitures, investments, *and other business combination transactions.*") (emphasis added); *cf.* Arthur Fleischer, Jr. & Alexander R. Sussman, Form of Confidentiality and Standstill, Ex. 80 (defining "Transaction" as "a possible transaction, involving a financing or sale of the Company, securities of the Company or all or a portion of its assets, between us.").

159. The word "combination" is a loose term in common parlance. *See Webster's Ninth New Collegiate Dictionary* 262 (1988) (defining "combination" primarily as "a result or product of combining," especially "an alli-

ance of ... corporations ... united to achieve a[n] ... economic end," and defining "combine" primarily as "to bring into such close relationship as to obscure individual characters: merge").

160. *See, e.g.*, ABA *Model Confidentiality Agreement* 341 (2011) ("A confidentiality agreement ... is usually the first agreement entered into between the parties to a potential transaction.... [T]he discussions are frequently at an early stage, with neither party being committed to pursuing a transaction.").

161. *Id.* at 345.

162. *Id.; see also* Kirman, *supra* note 158, at 12 ("Note that the Transaction is described as *possible* transaction to avoid the implication that there is an agreement to do the deal....").

163. *See* Samuel C. Thompson, Jr., *Mergers, Acquisitions and Tender Offers* § 3:1, at 3–3 (2011) ("The purpose of these [confidentiality] agreements is to permit the parties to confidentially examine non-public information re-

think that the word "transaction" in the phase "business combination transaction," when used in the NDA and other confidentiality agreements, has some interpretative relevance. Although Martin Marietta might say that its only relevance is to make sure that the party uses the information only for an M & A initiative fitting within the SEC Rules' definition of a "business combination transaction," such as a tender or exchange offer for a majority of shares, thus distinguishing it from a context where a party like Martin Marietta would use sensitive information to compete with Vulcan in the market place as a competitor, another possibility is as or more plausible. The term "transaction" could also be used because it signifies that the goal of the parties was to use information to see whether they could reach agreement on a particular kind of contractual transaction, one involving a business combination. That is, the use of the term transaction can be sensibly read to signal that there would be an agreement on the how of the combination.[164] In this sense, the breadth of the term business combination is simply a way of giving the two companies that would be the parties to the transaction flexibility as to the means by which they achieve the ultimate contractual end—a combination of businesses.

This contractual gloss finds further support in ¶ 7 of the NDA, which states that "[e]ach party agrees that unless and until a *definitive agreement between the parties with respect to a Transaction* [a business combination transaction between Vulcan and Marietta] has been executed and delivered, neither party will be under any legal obligation of any kind whatsoever with respect to such a Transaction … except for the matters specifically agreed to in this letter agreement."[165] The language of ¶ 7 is standard confidentiality agreement language that is "intended to forestall any argument that the parties have already reached an *agreement* regarding a transaction … or that either party is under an obligation to reach such an *agreement*, or even to negotiate."[166] These references to an "agreement" as a necessary precondition to giving legal effect to the "transaction" tend to suggest that parties to such confidentiality agreements intend the hoped-for "transaction" to be accomplished by way of contract. In this way, ¶ 7 supports the contractual flavor of the word "transaction" in the phrase business combination transaction by indicating that Martin Marietta and Vulcan would have to enter an agreement in order to carry out a "transaction," but without tying the parties to any specific *route* to get there. Thus, taken in the context of the NDA as a whole, ¶ 7 makes it more rather than less likely that the parties assumed that if a "business combination transaction" between Martin Marietta and Vulcan was actually reached, it would be memorialized in a contractual agreement between the parties.

garding the other party prior to entering into an *agreement*.") (emphasis added); ABA *Model Confidentiality Agreement* 345 (2011).

164. *See Black's Law Dictionary* 1535 (8th ed.2004) (defining "transaction" first as "[t]he act or an instance of conducting business or other dealings; *esp., the formation, performance, or discharge of a contract*," and second as "[s]omething performed or carried out; a business agreement or exchange.") (emphasis added); *Webster's Ninth New Colle-giate Dictionary* 1252 (1988) (defining "transaction" first as "something transacted," especially "a business deal," and second as "an act, process, or instance of transacting" and "a communicative action or activity involving two parties or things that reciprocally affect or influence each other.").

165. NDA ¶ 7 (emphasis added).

166. ABA *Model Confidentiality Agreement* 364 (2011) (emphasis added).

A consideration of all of these factors leads me to conclude that one cannot confidently say that the term business combination transaction has a single, clear meaning. The usages in analogous contexts are too varied, in my view, to conclude that the term as used in the NDA means one thing and one thing only. But, a consideration of these factors does suggest that "business combination transaction" as it is used in the NDA could encompass an exchange offer if that offer was part of a contractually negotiated plan for combining the assets of Vulcan and Martin Marietta. But what is not clear to me, for the reasons indicated, is whether an exchange offer that was not part of a transaction agreement that ultimately leads to a combination of assets, such as through a merger, would qualify as a business combination transaction.

Even more difficult to fit within any contextually-appropriate reading of the term "business combination transaction" is a proxy contest. Unlike an exchange offer, a proxy contest is not an initiative that has (I will take a risk here) *ever* been undertaken as a part of an agreed-upon transaction the ultimate purpose of which is the combination of the companies' assets. Rather, a proxy contest is the antithesis of a component part of a voluntary contract to combine businesses. A proxy contest is used to unseat the other side's negotiators, installing a new governing board that will do the deal that the hostile bidder could not secure at the negotiating table. Unlike a front-end tender or exchange offer that one party is required to make as a part of a negotiated merger agreement and is thus a contractually-contemplated step towards a business combination transaction, a proxy contest is a non-contractual effort to secure power over the target by ousting its bargaining team. Although such a power move may be instrumental to creating a dynamic where a business combination transaction could result, it is not a component to such a contractual transaction in the way that a front-end exchange offer, for example, can be.

But, for the reasons set forth above, I cannot conclude based on a plain meaning analysis whether the term business combination transaction is unambiguous in its meaning and capacious enough to encompass Martin Marietta's Exchange Offer. I also reserve judgment on these questions regarding the Proxy Contest, despite the awkward definitional and contextual problems that it presents. Thus, I continue with my text-based analysis, and in doing so I move to examining whether the word "between" in the phrase "business combination transaction between" Vulcan and Martin Marietta helps to resolve the textual ambiguity presented by the preceding words "business combination transaction."

### ii. Does Between Only Mean One Thing?

The broad scope of the term business combination transaction, as conceded by Vulcan at the post-trial oral argument in this case, places the onus on the word "between" to exclude, by its plain meaning, the Exchange Offer and Proxy Contest from the definition of Transaction. Regrettably, as a matter of facial construction, "between" cannot take the full weight that Vulcan seeks to put on it.

Vulcan argues that the use of the word "between" narrows the set of potential "business combination transactions" that fall within the NDA's definition of a Transaction to those that are "between" Martin Marietta and Vulcan in the sense that the transaction is a product of the joint determination of the governing boards of the companies at the outset through a contract. For example, a front-end exchange offer followed by a back-end merger would be "between" the companies as long as the companies entered into a negotiated acqui-

sition agreement that anticipated the exchange offer's launch. By contrast, Martin Marietta's hostile Exchange Offer is not "between" the boards of Vulcan and Martin Marietta—rather, the transaction is precisely designed to *bypass* the Vulcan board and take the offer directly to Vulcan's shareholders without the Vulcan board's consent. Likewise, the Proxy Contest can hardly be said to be "between" the boards of the companies, as it is aimed at Vulcan's shareholders and is designed to change the composition of the Vulcan board with the objective of obtaining the new board's consent to Martin Marietta's proposed business combination.

Vulcan has persuaded me that its interpretation of "between" is a reasonable one. "Between," in the context of the NDA, can be read to necessitate reciprocal action on the part of both Vulcan and Martin Marietta, a requirement that is not met by an exchange offer made to Vulcan's shareholders without the prior consent of the Vulcan board and is not met by a proxy fight that has as its goal the circumvention of the current Vulcan board's consent. Vulcan's position is supported by a standard dictionary definition of "between," which is "involving the reciprocal action of: involving as participants: jointly engaging." [167] A similar definition of "between" was cited by the Ontario Superior Court of Justice in its well-known 2009 *Certicom* decision [168] to support that Court's conclusion that the parties' use of the word "between" in certain confidentiality agreements operated to block the unsolicited takeover bid of one party for the other. [169] In *Certicom*, the Court permanently enjoined RIM's hostile bid for Certicom because the bid had been assessed and prepared using confidential information disclosed by Certicom under two confidentiality agreements with RIM, and the confidentiality agreements did not allow use of such information for a hostile purpose. The Court held that, "[b]ased on the ordinary and usual meaning and dictionary definition of the word 'between' and the manner in which the word is used in the [confidentiality agreements], a takeover bid would in my view only amount to a business combination *between* the parties if Certicom consented to, or endorsed, the transaction and in that manner participated with RIM in RIM's bid." [170] Although *Certicom* is to some extent distinguishable from this case in that the confidentiality agreements at issue in *Certicom* contained contextual language informing the court's interpretation of "between" that do not exist in the NDA, [171] and is only persuasive

167. *Webster's Third New International Dictionary* 209 (1976); *American Heritage College Dictionary* 132 (3d ed.1993) (defining "between" as "[a]ssociating or uniting in a reciprocal action or relationship"); *see also Oxford Dictionaries Online* (defining "between" as "combining the resources or actions of two or more people or other entities), *available at* http://oxforddictionaries.com/definition/between?region=us&q=between.

168. *Certicom Corp. v. Research in Motion Ltd.* (2009) 94 O.R.3d 511 (Can.Ont.Sup.Ct. J.).

169. *See id.*, para. 51 (citing *The Shorter Oxford English Dictionary* (1973), which defines "between" as "[e]xpressing reciprocal action or relation between two agents").

170. *Id.*, para. 53 (emphasis in original).

171. For example, one of the agreements considered by the *Certicom* court stated its "Purpose" as "assessing the desirability or viability of establishing or furthering a business or contractual relationship between the Parties which may include, without limitation, some form of business combination between the Parties." *Id.*, para. 41. This statement of "Purpose," which applied to one of the contracts at issue in *Certicom* and was arguably incorporated by reference into the second contract at issue in *Certicom*, provides a gloss on the Ontario Court's interpretation of "between" as necessitating the target party's consent.

authority for purposes of this decision, that respected Court's facial interpretation of the word "between" supports Vulcan's reading.

The dictionary definition of "between" as involving "reciprocal action" and the holding of the *Certicom* court find resonance in the standard definition of a "Transaction" set forth in the ABA's Model Confidentiality Agreement. The Model Confidentiality Agreement defines a "Transaction" as "a possible negotiated transaction."[172] Notably, the word "between" is not included in this definition. This omission is important because it suggests that "between" and "negotiated" are equivalent terms. In other words, use of "between" as a qualifier is unnecessary in the model definition of "Transaction" because the word "negotiated" is already used, and if the parties include "negotiated," they do not need to use the alternative "between." This lends further plausibility to Vulcan's argument that "between" has a unique narrowing meaning in this context.

In further support of Vulcan's position, the word "between" in the NDA immediately follows and qualifies the word "transaction," not the words "business combination." This placement would suggest that there must be a *transaction* between Martin Marietta and Vulcan, which would involve affirmative participation on the part of both companies, and would not seem to encompass an exchange offer directed at Vulcan's stockholders, accompanied by a proxy fight, that will be followed by an business combination when and if Vulcan is

forced to surrender to Martin Marietta's takeover.

For these reasons, I find that Vulcan has advanced a plausible reading of the word "between" as it is used in the NDA's definition of a Transaction. But, Martin Marietta's reading of "between" is also one that I find plausible.

Martin Marietta contends that a business combination transaction "between" Vulcan and Martin Marietta cannot be read as requiring some sort of agency or reciprocal action on the part of both companies, but rather functions as a simple word of connection. In support of this position, Martin Marietta offers alternative dictionary definitions of "between" such as "linking," "connecting," and "intermediate to."[173] Martin Marietta's argument is that the need for a transaction to be "between" is satisfied so long as what ultimately happens is a combination of the assets of Martin Marietta, Vulcan or their subsidiaries, because in that case the necessary "linkage" or "connection" exists.

Martin Marietta also argues that if "between" did mean "negotiated," it would effectively create a standstill, which the parties could have done but chose not to do. In support of this argument, Martin Marietta points to the principle that "Delaware law will not create contract rights and obligations that were not part of the original bargain, especially [ ] where . . . the contract could easily have been drafted to expressly provide for them."[174] According to Martin Marietta, if Vulcan wanted to require that the Transaction be

**172.** ABA *Model Confidentiality Agreement* 345 (2011).

**173.** Martin Marietta Ans. Post–Tr. Br. at 11–12 (citing *Oxford American Dictionary* 58 (1980); *Random House Compact Unabridged Dictionary* 200 (2d. ed.1996)); *see also Webster's Ninth New Collegiate Dictionary* 146 (1988) (defining "between" primarily as "by

the common action of: jointly engaging," and secondarily as "in the time, space or interval that separates" or "in intermediate relation to.").

**174.** *Union Oil Co. of Cal. v. Mobil Pipeline Co.*, 2006 WL 3770834, at *12 (Del.Ch. Dec. 15, 2006).

negotiated, it should have bargained for inclusion of the word "negotiated" in the definition of Transaction.

Martin Marietta goes on to argue that, to the extent that "between" Vulcan and Martin Marietta means that the companies themselves must both be involved (and not, as in the case of an exchange offer, one company and the shareholders of the other), the transaction that Martin Marietta is seeking to effect by its hostile bid will be a transaction "between" the companies when the businesses are ultimately combined under a merger agreement. In other words, "Martin Marietta's undisputed purpose is to combine the businesses of the two companies, not merely to make a successful Exchange Offer or proxy solicitation," and the Exchange Offer "is simply one method of implementing a business combination between two companies, like a long-form merger, a short-form merger, or a sale of assets."[175] Resonant of its argument on the meaning of "business combination transaction," Martin Marietta argues that if the ultimate step in a related series is the mingling of the assets of two businesses, any step in that series is "between" the companies. Furthermore, Martin Marietta places substantial weight on the Merger Condition to support an argument that the Exchange Offer is not only directed at Vulcan's shareholders but is by itself a transaction "between" the companies, because the Offer requires affirmative participation by Vulcan's board to enter into a merger agreement in order for the Merger Condition to be satisfied.

But Martin Marietta's argument that "between" is better defined in this context as "linking," "connecting," or "intermediate to"[176] seems a bit of a stretch. These are definitions of "between," that indicate spatial relationships (*i.e.,* "between a rock and a hard place"). Martin Marietta muddles the difference between a contract that is between A and B, and a tangible copy of a contract that is physically between A and B. To the reasonable human reader, a transaction "between" Martin Marietta and Vulcan more readily means what Vulcan says. By way of a hyberbolic example, it would be unreasonable to assume that a "transaction between A and B involving the sale of A's house" means that A can murder B to get the house.

To this point, Martin Marietta's waivable Merger Condition that it will not close its Exchange Offer unless the Vulcan board approves a merger agreement with it fails to convince me that its bid falls unambiguously within the contractual requirement that it be a business combination transaction "between" Vulcan and Martin Marietta. Rather, the obvious strain of this condition shows Martin Marietta's concern about what "between" means. Even now, Martin Marietta has not amended its Exchange Offer to make the condition non-waivable, and I continue to treat it as waivable.[177]

Moreover, if Martin Marietta was really true to its argument, it would abandon its Exchange Offer, as that Offer is in a sense illusory. The Exchange Offer is not really a final offer at all but a pressure ploy, along with the Proxy Contest, the latter being the tool by which Martin Marietta hopes to replace Vulcan's negotiators with

**175.** Martin Marietta Post–Tr. Op. Br. at 48.

**176.** *Oxford American Dictionary* 58 (1980); *Random House Compact Unabridged Dictionary* 200 (2d ed.1996).

**177.** *Compare TW Servs., Inc. v. SWT Acq. Corp.,* 1989 WL 20290, at *11 (Del.Ch. Mar. 2, 1989) (Allen, C.) (refusing to accept a party's hedgy and unclear waiver of a condition to a tender offer that the target's board negotiate a merger agreement for purposes of determining whether the target board's decision not to lift its poison pill was subject to *Unocal* review).

ones who will assent to Martin Marietta's bargaining terms. · Many conquerors in history have caused their new subjects to sign up terms of peace, but few, disinterested minds would confuse such agreements with a treaty entered between two independent nations, none of which is signing at pain of death. The waivable condition that Vulcan sign up such a peace treaty serves to illustrate how far from a voluntary, negotiated business combination transaction between Vulcan and Martin Marietta are the measures Martin Marietta is taking to secure control of Vulcan.

By contrast, a comparative strength of Martin Marietta's argument, as a matter of facial construction, is that the parties could have used the word "negotiated" if they meant to provide that Evaluation Material could only be used in furtherance of a negotiated transaction. Even after *Certicom*, the relevant treatises and models do not uniformly suggest that "between" is a safe way for parties to limit the usage of information to consideration of a "negotiated" business combination transaction.[178] The treatises and models do indicate that there are other words that can serve to preclude hostile moves even if the parties to a confidentiality agreement do not agree to an explicit standstill provision, in the way that, according to Vulcan "between" does. For example, the parties could have

qualified the definition of Transaction by adding the words "negotiated" or "mutually agreeable," [179] or specifying that the receiving party could not use the Evaluation Material "in any way detrimental" to the disclosing party.[180] Vulcan did not bargain for these clearer qualifiers. Absent any explicit requirement that the transaction be negotiated, the word "between" can be read, as Martin Marietta would have me do, as simply requiring that the eventual outcome of the Transaction involve the mingling of Vulcan and Martin Marietta's assets.

b. *The Extrinsic Evidence Supports Vulcan's Interpretation Of The Contractual Meaning Of The Term Business Combination Transaction Between Vulcan and Martin Marietta*

Having determined that both Vulcan and Martin Marietta's interpretations of the phrase "business combination transaction between" Vulcan and Martin Marietta are reasonable, I turn to extrinsic evidence to resolve the dispute. For the following reasons, the relevant extrinsic evidence convinces me that Vulcan has the better of the argument here.

First, I consider the parties' negotiating history and the objective manifestations of their intent when entering into the NDA. On the evidence, I am persuaded that Nye would never have agreed to exchange con-

178. *But see* Samuel C. Thompson, *Mergers, Acquisitions and Tender Offers* § 3.2, at 3–18 (2011) ("In addition, the Canadian court decision in [*Certicom*] illustrates that even if a confidentiality agreement does not have a standstill prohibiting a hostile offer, the court may find that the general use prohibitions in such an agreement may prohibit the use of confidential information in making a hostile bid.").

179. *See* ABA *Model Confidentiality Agreement* 345 (2011) (where the model definition of a "Transaction" is a "possible *negotiated* transaction") (emphasis added); Kirman, *supra* note 158, at 37, 42 ("Sometimes Seller uses

'mutually agreeable,' which is intended to have the same effect [as 'negotiated']. When taken together with the covenant not to use Evaluation Material for any purpose other than evaluation a 'Transaction,' this arguably has the effect of a backdoor standstill provision.").

180. Kirman, *supra* note 158, at 27–28 (discussing the formulation that prohibits use "in any way detrimental" to the disclosing party and noting that "the phraseology is broad enough for [the receiving party] to be concerned that it might be used as a backdoor to other obligations, such as a standstill, nonsolicit, or even a non-compete.").

fidential information if he thought that one of the parties to the NDA was free to launch an unsolicited exchange or tender offer or a proxy contest under the terms of the Agreement. In May 2010, when Martin Marietta and Vulcan entered into the NDA, Martin Marietta anticipated that any transaction between the companies, if accomplished, would be some version of a consensual merger of equals. Nye's notes for a May 11, 2010 phone call with James explicitly state, "[s]tructurally, we think of this transaction, as I think you do, as a modified 'merger of equals,' " [181] Moreover, when the companies first entered into merger discussions Nye stressed to Vulcan's banker Carr that Martin Marietta was "not for sale." [182] A major impetus for entering into the confidentiality agreements, as discussed, was that Martin Marietta did not want to put itself in play. And Martin Marietta was not just concerned about unsolicited bids from third parties. It also did not want to be acquired by Vulcan. Critically, Nye's notes for his April 2010 conversation with Carr make clear, Nye and his team were *"interested in discussing ... the prospect of a merger, but not an acquisition whether by [Vulcan] or otherwise...."* [183] As a condition of engaging in information sharing and negotiations, Nye put the kibosh on, vetoed, emphatically ruled out, and declared way out of bounds exactly what Martin Marietta is now doing and desired the NDA to protect that pre-condition.

Nye then gave marching orders to Martin Marietta general counsel Bar, who was tasked with drafting the NDA. Although she did not add the word "negotiated," all of Bar's changes to the NDA had the effect of strengthening the protections afforded by it rather than weakening them. For example, Bar made the following edits to the definition of "Transaction":

> In connection with considering a possible *business combination* transaction ("Transaction"), which could take the form of a purchase sale or exchange of businesses or assets, involving [Martin Marietta] and [Vulcan] ... *between [Vulcan] and [Martin Marietta or one of their respective subsidiaries....*

In addition to modifying the word "transaction" by adding the preceding words "business combination," Bar took the looser term "involving," which is defined as "draw[ing] in as a participant," "obliging to become associated," "to have within or as a part of itself," or "to have an effect on: concern directly" [184] and replaced it with "between," which to the reasonable human reader connotes a requirement of reciprocal action between the parties in this context, not a forced invasion of one party by the other. I also have no doubt that Bar, an experienced and accomplished attorney, was aware in May 2010 of the widely-commented upon Canadian Court's 2009 decision in *Certicom* and its implications on the use of the word "between" in confidentiality agreements.[185]

181. JX 74 at MM0051051.029.

182. JX 33 at MM0051096.033.

183. *Id.* (emphasis added).

184. *Webster's Third New International Dictionary* 1191 (1976); *see also American Heritage College Dictionary* 716 (3rd ed.1993) (defining "involving" as "[t]o contain as a part; include," "[t]o engage as a participant," "to influence or affect.").

185. *Certicom* was widely commented on in law firm memoranda, practitioner journals and widely circulated publications like the *Wall Street Journal. E.g.,* Stuart Weinberg, *Research In Motion Drops Certicom Bid,* Wall St. J., Jan. 20, 2009; James Cole, Jr., Richard J. Grossman & Keith Pagnani, *Doing Deals 2010: The Art of M & A Transactional Practice: It's A Hostile World: Responding to Unsolicited Take–Over Proposals,* 1797 PLI/Corp. 169, 175 (March 2010); Trevor S. Norwitz & Erica Mitnick Klein, *Blackberry Case Sends Long–Distance Message: Use Restrictions in*

Furthermore, Martin Marietta's own conduct in the months leading up to the launch of its hostile bid supports Vulcan's reading of a "business combination transaction between" because its conduct reveals an understanding of the use restrictions imposed by the Confidentiality Agreements that is at odds with the one it advances here.[186] When Martin Marietta decided to go hostile, it and its advisors took actions that evinced a belief that, under the terms of the Confidentiality Agreements, Martin Marietta should not be using Vulcan's Evaluation Material for purposes of formulating, deciding upon, and selling its hostile bid, and at all relevant times Martin Marietta behaved as if it were trying to conceal its use of Vulcan's Evaluation Material.[187] Bar made a clunky attempt to gather up all the Evaluation Material in the possession of Martin Marietta management and put in a sealed box that she kept in her office. She also told Martin Marietta's legal and financial advisors not to use any Evaluation Materi-

al, and the advisors themselves expressed concern about the import of the Confidentiality Agreements. When the Martin Marietta board approved consideration of alternatives to a friendly deal in August 2010, the board minutes of that meeting were careful to reflect that the board had come to that decision based on "publicly available information." [188] Indeed, Martin Marietta's initial drafts of the bear hug letter that it made public on December 12, 2011 originally contemplated a private, confidential bear hug "*consistent with the terms and conditions*" of the NDA.[189] Martin Marietta and its advisors' contemporaneous concern about use of the Evaluation Material directly contradicts Martin Marietta's current, litigation-driven position that use of the Evaluation Material was unambiguously permitted by the Confidentiality Agreements.[190]

Finally, the definition of "the Transaction" in the JDA provides a gloss on what Vulcan and Martin Marietta meant by the words "business combination transaction between" when they earlier entered into the NDA [191] and supports a finding in Vul-

---

*NDAs Can Limit a Bidder's Freedom to Roam*, The M & A Lawyer, Thomson Reuters, Apr. 2009, at 7, 9; Robert E. Spatt, *The Four Ring Circus—Round Thirteen; A Further Updated View of the Mating Dance Among Announced Merger Partners and an Unsolicited Second or Third Bidder*, 1740 PLI/Corp. 883, 913–14 (2009); Jay M. Hoffman & Virginia Huang, *Certicom v. RIM: Impact of a Confidentiality Covenant on an Unsolicited Takeover Bid* (MillerThomson, Oct. 9, 2009); *Implications of the Certicom Decision for Confidentiality Agreements* (Goodmans LLP, Jan. 23, 2009).

**186.** *See Restatement (Second) of Contracts* § 202 cmt. g (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."); *id.* § 202 ("[A]ny course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

**187.** *See id.* § 202. ("In such cases [where the only evidence is the action of one party only] the conduct of a party may be evidence against him that he had knowledge or reason

to know of the other party's meaning, but self-serving conduct is not entitled to weight."); 17A C.J.S. *Contracts* § 427 ("A party's conduct may be evidence of its intent ... so long as that conduct evinces an interpretation contrary to that party's interest.").

**188.** JX 331 at MM 0051955 (emphasis added).

**189.** JX 353 at DBSI0000018708 (emphasis added).

**190.** *See* 5 *Corbin on Contracts* § 24.16 (Supp. 2011) ("Practical construction of a contract by one party has special weight when it is against his own interest.") (citing *Natco Corp. v. United States*, 240 F.2d 398, 403 (3d Cir. 1956)).

**191.** *See U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir.1991) ("evidence of [the parties'] conversations, negotiations, and agreements prior to or contemporaneous with the execution" of their written contract may explain the ambiguities therein);

can's favor. Vulcan and Martin Marietta agree that the JDA and the NDA are interrelated agreements that relate to the same course of commercial activity and so should be read together and harmonized despite the two week time difference between their effective dates.[192]

The JDA defines the Transaction as "a potential transaction being discussed by Vulcan and Martin Marietta ... involving the combination or acquisition of all or certain of their assets or stock."[193] In her comments on the draft JDA, which were accepted by Vulcan, Bar changed the language in the definition of "Transaction" from "transaction contemplated by Vulcan and Martin Marietta" to "potential transaction being discussed by Vulcan and Martin Marietta."[194] Again, Bar's change evidences a desire on Martin Marietta's part to tighten the language of the Confidentiality Agreements, a position that is squarely at odds with the one Martin Marietta adopts in this litigation. And the record makes clear that the only transaction that was "being discussed" at the time the parties entered into the JDA was a negotiated merger. Bar made this change to the JDA at the same time that Martin

Marietta was operating under an assumption of friendliness.

The fact that the parties refer to *"the* Transaction" throughout the JDA further demonstrates that the definition of "Transaction" in the JDA does not include a hostile bid or a business combination that is effected by a pressure strategy. "The," a definite article, makes clear that there was only one transaction under discussion at the time. Martin Marietta cannot reasonably argue that the parties—especially Nye—contemplated a business combination transaction, but the combination contemplated could be effected by any means, including a hostile proxy contest and exchange offer, so long as it resulted in an eventual amalgamation of the businesses, and still satisfy the definition of "Transaction" under the Confidentiality Agreements. The NDA's references to *"a* Transaction" give Martin Marietta some wiggle room to make this argument, but the JDA's references to *"the* Transaction" do not. There is no question that the one Transaction being discussed by the parties when they entered into the JDA was a negotiated one.

In light of all the extrinsic evidence, it is clear that Martin Marietta, at the time

*Crown Books Corp. v. Bookstop, Inc.,* 1990 WL 26166, at *1 (Del.Ch. Jan. 16, 1990) ("[I]t is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters.").

192. *See* Vulcan Post–Tr. Op. Br. at 47; Martin Marietta Post–Tr. Op. Br. at 50. *See Restatement (Second) of Contracts* § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."); 17A C.J.S. *Contracts* § 315, at 337 (1999) ("In the absence of anything to indicate a contrary intention, writings executed at the same time and *relating to the same transaction* are construed together as a single contract, as though they were as much one in form as they are in

substance, in order to determine the intent, rights, and interests of the parties.") (emphasis added); 11 *Williston on Contracts* § 30:26 (4th ed. 1999) ("[I]nstruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other."); *Restatement (Second) of Contracts* § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

193. JDA at 1.

194. JX 119 (Email from Ray Jacobsen to Joe Larson, attaching Revised Grand Slam JDA (May 26, 2010)) at MWE0000816.

that it entered into the Confidentiality Agreements, demanded and understood that any business combination transaction that was between the parties would be a transaction signed up by the sitting boards of Martin Marietta and Vulcan. The last thing that Martin Marietta would have wanted to allow would be a gunpoint transaction entered into after an unsolicited exchange offer and proxy contest. Looking at the context of the words at issue it is impossible to accept the meaning of them that is now advocated by Martin Marietta.

Thus, as clarified by the extrinsic evidence, a business combination transaction between Vulcan and Martin Marietta means any step or related series of steps leading to a formal mingling of the two companies' assets that is contractually agreed upon, or consented to, by the sitting boards of both companies at the outset of those steps being taken.[195]

2. *Neither Martin Marietta's Exchange Offer Nor Its Proxy Contest Qualify As A Transaction Under The NDA And Thus Martin Marietta Breached The NDA By Using Evaluation Material In Furtherance Of Them*

■ To satisfy the terms of the NDA, Martin Marietta was obligated to use Vulcan's Evaluation Material "solely" for the purpose of "evaluating" a "Transaction," in the sense the parties defined it.[196]

For reasons that should be clear now, I find that the Exchange Offer and Proxy Contest both fail the NDA's definition of a Transaction. Neither is a "business combination transaction" that is "between" Vulcan and Martin Marietta because neither was a step taken as a component part of a contractual, transactional agreement between Martin Marietta and Vulcan to effect a business combination.

In light of my factual finding that Martin Marietta's used Evaluation Material in deciding upon, formulating, and selling its Exchange Offer and Proxy Contest, I find that Martin Marietta breached the limitations on use of Evaluation Material under the NDA.

3. *Martin Marietta's Exchange Offer And Proxy Contest Are Not Covered By The Plain Meaning Of "The Transaction" As It Is Used In The JDA And Thus Martin Marietta Also Breached The JDA By Using Confidential Materials In Furtherance Of Them*

■ I now turn to the plain meaning of "the Transaction" as it is used in the JDA.

Within the particular subset of information covered by the JDA, I conclude without resorting to extrinsic evidence that the JDA was breached by Martin Marietta's use of Confidential Materials in preparing the antitrust analysis related to its hostile bid. As discussed above, neither Martin Marietta's Exchange offer nor its Proxy Contest fit within the JDA's definition of Transaction, because neither was "the" transaction that was "being discussed" at the time that the JDA was negotiated.[197]

My conclusion that the JDA was separately breached is not affected by ¶ 12 of the JDA, which provides that "[n]either the existence of nor any provision contained in this Agreement shall affect or limit any other confidentiality agreements, or rights or obligations created thereunder, between the parties in connection

---

**195.** That this is what the parties intended is, by no means, novel. *See* Meryl S. Rosenblatt, *Letters of Intent and Exclusivity, Confidentiality and Standstill Agreements,* 1459 PLI/Corp. 215, 237 (2004) ("[A] confidentiality agreement without a standstill affords some protection to the target because the 'permitted use' of information will not include using information to make a hostile acquisition.").

**196.** NDA ¶ 2.

**197.** JDA at 1.

with the Transaction." [198] Martin Marietta argues that the JDA is subservient to the NDA and thus the definition of a Transaction in the NDA controls, even for breaches with respect to use of Confidential Materials used for antitrust analysis purposes. I reject Martin Marietta's argument. Even if Martin Marietta's use of Evaluation Material were permissible under the terms of the NDA, which it is not, there would still be a use violation under the JDA with respect to the antitrust-related materials used by Martin Marietta. Paragraph 12 of the JDA does not have the force that Martin Marietta seeks to give it; although ¶ 12 establishes that nothing in the JDA can weaken the protection given to confidential information by the NDA, it does not prevent the JDA, which is a more particular agreement designed to apply to information shared for a particular, defined purpose, from strengthening the protection afforded to nonpublic information shared for that purpose.

Thus, for these reasons, Martin Marietta's use of the Confidential Materials for antitrust purposes was not in furtherance of "the Transaction," and Martin Marietta has separately breached the JDA.

B. *Was Martin Marietta Contractually Entitled To Launch An Exchange Offer, Impose On Itself Certain Legal Disclosure Obligations, And Use Those Obligations As An Excuse To Reveal Publicly Information It Had Promised to Keep Confidential?*

Vulcan's next argument is that even if Martin Marietta was permitted to deliberate privately upon Evaluation Material in deciding to launch the Exchange Offer, it was clearly barred by the NDA from disclosing that information publicly. Having promised Vulcan that it would keep certain information private, Martin Marietta could not take discretionary action that had the effect of subjecting it to a legal requirement to disclose because the NDA did not define such a circumstance as one within the precise definition of "legally required" used in the NDA as a safety valve. Important to Vulcan's argument is its view that ¶ 4 of the NDA contains a definition of "legally required" that operates in concert with all the relevant paragraphs addressing the obligations of the parties to keep certain information confidential and that Martin Marietta's voluntary decision to take discretionary action triggering a disclosure obligation was not within that definition. And Vulcan notes that the primacy of that definition was suggested by Martin Marietta itself, which added words to the contract emphasizing the supremacy of ¶ 4 in addressing when the parties' negotiations could be disclosed because of a legal requirement.

By contrast, Martin Marietta argues that the term "legally required" has two meanings. When a party to the contract faces an externally driven legal requirement to disclose in the sense of receiving a subpoena or other similar process—what I have called an External Demand—that party is subject to the tight restrictions of ¶ 4. But when a party who promised to keep the Evaluation Material and the Transaction Information confidential takes discretionary action that triggers a disclosure obligation, Martin Marietta says that the Notice and Vetting Process set forth in ¶ 4 of the NDA is of no relevance. In that circumstance, the disclosing party can make its own determination of what disclosure is required, not engage in prior consultation or notice to the other party, and shield its evaluation process about disclosure from the other side. Consistent with that argument, Martin Marietta says that when it decided to launch the Exchange Offer, it subjected itself to certain disclo-

198. *Id.* ¶ 12.

sure requirements under the SEC Rules that required it to disclose: (i) the fact that Martin Marietta and Vulcan had entered into negotiations concerning the Transaction; and (ii) the substance of Vulcan's Evaluation Material. Martin Marietta points primarily to Item 1005(b) of the SEC's Regulation M–A, which directs disclosure of "any negotiations, transactions or material contacts during the past two years between the filing person ... and the subject company ... concerning any ... [m]erger," [199] and Item 6 of Form S–4, which requires a description of "any past, present or proposed material contracts, arrangements, understandings, relationships, negotiations or transactions during the periods for which financial statements are presented or incorporated by reference ... between the company being acquired ... and the registrant" [200] in the public filings accompanying an exchange offer, as well as the general anti-fraud provisions that prohibit materially misleading disclosures, as sources of the legal requirement for the information it disclosed in its S–4 related to its negotiations with Vulcan and the analyses held by Vulcan management about the benefits achievable by a combination of the companies.

Resolving this question requires parsing the language governing Martin Marietta's non-disclosure obligations as provided in the NDA. I turn now to that task.

### 1. *The Relevant Contract Language*

As is required, I must first determine whether the language of the NDA unambiguously supports the position of either party. As I will now explain, I believe it can be read in two ways, although only in the way Martin Marietta suggests with some substantial strain.

To explain why this is so, one must consider how ¶¶ 2, 3 and 4 of the NDA operate together to create a framework to govern the parties' non-disclosure obligations, both as to the substance of the disclosing party's Evaluation Material, and as to the Transaction Information. Paragraph (2), entitled "Use of Evaluation Material," provides that "the disclosing party's Evaluation Material will be kept confidential and each party ... will not disclose or use for purposes other than the evaluation of a Transaction any of the other party's Evaluation Material in any manner whatsoever...." [201] The reader may remember that Evaluation Material is defined in the NDA as "any nonpublic information furnished or communicated by the disclosing party ... to the other party ... and all analyses, compilations, forecasts, studies, reports, interpretations, financial statements, summaries, notes, data, records or other documents and materials prepared by the receiving party or its Representatives that contain, reflect, are based upon or are generated from any such nonpublic information...." [202]

Paragraph (3), entitled "Non–Disclosure of Discussions; Communications," provides for the non-disclosure of Transaction Information. It reads: *"Subject to paragraph (4),* each party agrees that ... it ... will not disclose to any other person, *other than as legally required,* the fact that any Evaluation Material has been made available hereunder, that discussions or negotiations have or are taking place concerning a Transaction or any of the terms, conditions or other facts with respect thereto (including the status thereof or that this letter agreement exists)" [203] Finally, ¶ 4, which is entitled "Required Disclosure," provides as follows:

---

**199.** 17 C.F.R. § 229.1005(b).

**200.** 17 C.F.R. § 239.25 (Item 6).

**201.** NDA ¶ 2.

**202.** *Id.* at 1.

**203.** *Id.* ¶ 3 (emphasis added).

*In the event that a party … [is] requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the other party's Evaluation Material or any of the facts, the disclosure of which is prohibited under paragraph (3) of this letter agreement,* the party requested or required to make the disclosure shall provide the other party with *prompt notice of any such request or requirement* …. If, in the absence of … the receipt of a waiver by such other party, the party requested or required to make the disclosure … should nonetheless, in the opinion of such party's … counsel, be legally required to make the disclosure, such party … may, without liability hereunder, disclose *only that portion of the other party's Evaluation Material which such counsel which such counsel advises is legally required to be disclosed.* …" [204]

The precise issue before me is whether the parenthetical in ¶ 4, which narrows the definition of "required" to those disclosures made in response to an External Demand, provides a singular definition of legally required for purposes of the NDA as a whole that operates in concert with ¶ 3 (and ¶ 2), or whether ¶ 4 operates as an island unto itself. In other words, is a disclosure "legally required" for purposes of ¶ 3's restriction on disclosing Transaction Information if the legal requirement giving rise to that disclosure is not one that is imposed by External Demand?" Or does ¶ 4 provide a definition of "required" that works together with ¶¶ 2 and 3 to narrow the circumstances when a

party may disclose information and, even when that narrow definition is met, subject the party facing an arguable disclosure requirement to go through a rigorous Notice and Vetting Process involving the other party so as to limit disclosure to the bare legal minimum?

When the relevant language of the NDA is read as a whole, which it must be,[205] Vulcan's argument that the narrow definition of required in ¶ 4 applies for purposes of considering whether information protected from disclosure by ¶ 3—*e.g.*, Transaction Information—may be disclosed emerges as a reasonable reading of the contract for several reasons. To begin with, Vulcan notes that the very first sentence of ¶ 3 makes clear that ¶ 3 is "subject to" ¶ 4, a usage that makes clear that ¶ 3 is subordinate to ¶ 4. Because ¶ 4 defines with precision what "requested or required" disclosures mean and ¶ 3 is subject to ¶ 4, the definition of the relevant term in the superior paragraph governs the meaning in the subordinate paragraph. That is, the ability of a party to disclose the information covered by ¶ 3 turns on whether it faces a requirement within the meaning of ¶ 4. If it does not, it is not legally required in the contractual sense and may not use that exception to justify disclosure. According to Vulcan, the contract would otherwise not make sense in light of the parties' reasonable expectations, because "[t]he upshot of Martin's position is that disclosure of the parties' discussions is permitted when there is no legal process, without notice," [206] and it is not commercially reasonable that the parties intended to have a notice regime in place for disclosures required by External Demand and not for disclosures made because of the discretionary actions of one

---

204. *Id.* ¶ 4 (emphasis added).

205. *See Achaian, Inc. v. Leemon Family LLC,* 25 A.3d 800, 802 (Del.Ch.2011).

206. Vulcan Post–Tr. Ans. Br. at 43.

party, especially one making a hostile bid. Why would there be "different treatment for disclosure of the same facts depending on the 'legal requirement' precipitating the disclosure?"[207] Indeed, according to Vulcan, it makes no sense that in the situation when there is the most time for the party facing a legal requirement to comply with the Notice and Vetting Process, the other party is given none of the protections that exist when the party facing a potential legal requirement to disclose is under the compulsion of an External Demand with a deadline for response.

The text of the contract also provides support for this argument. To the extent that Martin Marietta is arguing that it only had to comply with ¶ 4 if the legal requirement emerged from an External Demand, it has to address the precise text of ¶ 4. Had the drafters of ¶ 4 placed the key qualifying parenthetical after the word "requested," Vulcan's argument would be weaker. If that were the case, the term requested would be used to indicate those circumstances that were triggered by an External Demand, and the term required would cover any other circumstance where despite Demand, a party believed it was obliged to disclose information it was otherwise required to keep confidential. But as Martin Marietta admits, the key qualifying parenthetical referring to an External Demand clearly applies to the term required and defines it, at least for purposes of ¶ 4. When the definition of "requested or required" as set forth in ¶ 4 is interpreted in the way Vulcan suggests, it implements all of the NDA in an easy way as "required" has one consistent meaning. By contrast, if what "legally required" means in the context of ¶ 3 does not encompass situations when information is requested or required by External Demand in the narrower sense of ¶ 4, then it would have made more sense to have not used the word "required" at all in ¶ 4 before the parenthetical and to have only used the word "requested." When information was then requested in the sense identified in the qualifying parenthetical, the process to determine the extent to which the information requested was in fact "legally required" to be disclosed would begin. But, by clearly qualifying "required" as well as "requested" by the qualifying parenthetical, ¶ 4 seems to be setting forth a definition of requirement that has more pervasive, contract-wide import in narrowing the definition of "legally required" and subjecting all disclosures that might be legally required to the Notice and Vetting Process that ¶ 4 articulates.

Another textual reality links up with the choice of the drafters to qualify the definition of "required" and not just the definition of "requested" in ¶ 4. Paragraph (2) of the NDA broadly defines the term Evaluation Material and strictly limits disclosure of such material. Paragraph (3) deals with a narrower information set, the Transaction Information. If Martin Marietta's interpretation of the NDA is right, then Evaluation Material may only be disclosed if legally required in the more narrow sense defined in ¶ 4 because, unlike ¶ 3, ¶ 2 does not by its own terms have an out for legally required disclosures. By contrast, the Transaction Information protected by ¶ 3 may be disclosed if a party takes discretionary action that has the effect of imposing on it a disclosure requirement. Thus, as read by Martin Marietta, two different definitions of legally required apply in related contexts. Martin Marietta addresses this problem by arguing that the substance of any Evaluation Material may be disclosed irrespective of ¶¶ 2 and 4, because ¶ 3 uses the words "facts with respect [to]" the Transaction. In Martin Marietta's view, the incidental words "facts with respect [to]" operate to cover the

207. *Id.*

substance of all Evaluation Material and eliminate the broad protection that would otherwise apply against disclosure because of ¶¶ 2 and 4. This stretch of the phrase "facts with respect [to]" actually works against Martin Marietta's argument and buttresses Vulcan's argument. The notion that the critical protection that ¶ 2 seemingly provides is actually illusory if the disclosing party can argue that the substance of the Evaluation Material, all of which was of course provided to facilitate the parties' consideration of a merger, was disclosable as a "fact[ ] with respect [to]" the Transaction is one that renders Vulcan's position more reasonable, and Martin Marietta's less.[208]

Thus, taken all together, Vulcan's reading of the NDA is one that harmonizes all the relevant provisions of the agreement by coming up with a single, workable scheme that addresses both the Evaluation Material covered by ¶ 2 and the Transaction Information covered by ¶ 3.[209] If the word "required" as defined in ¶ 4 applies in all relevant circumstances, it prevents any party from taking discretionary action to self-impose a disclosure requirement and even in the case of an External Demand puts all the sensitive information the parties agreed would not be disclosed publicly through the Notice and Vetting Process.

That said, Martin Marietta has also advanced a position that I cannot exclude as being a facially unreasonable reading of the contract. That position starts from the premise that "legally required" in ¶ 3 broadly refers to any disclosure that would be required by law, regardless of the source of the requirement. As Martin Marietta points out, ¶ 3, unlike ¶ 2, itself contains an exception to non-disclosure when such disclosure is "legally required," and Martin Marietta argues that the term "legally required" within ¶ 3 includes any disclosure requirements found in the securities laws or any positive law, regardless of whether "required" in the narrower sense of ¶ 4.

From there, Martin Marietta goes on to suggest that ¶ 4 never had any role with respect to the disclosure of Transaction Information under ¶ 3, and "legally required" as a substantive term in ¶ 3 is not informed at all by ¶ 4. Rather, it asserts that ¶ 3 is only "subject to" ¶ 4 in that when the *source* of the legal requirement is an External Demand described in ¶ 4, the parties must follow the Notice and Vetting Process. But the parties are free to make disclosures under ¶ 3, without complying with ¶ 4's Notice and Vetting Process, as long as a "legally required" disclosure (such as disclosures required by the SEC Rules) is not preceded by an External Demand. In other words, ¶ 3 is "subject to" ¶ 4 in that ¶ 4 trumps ¶ 3 only in the specific area of responding to an External Demand for disclosures relating to both ¶ 2 (Evaluation Material) and ¶ 3 (Transaction Information), and ¶ 4 merely specifies that if the source of the legal requirement is an External Demand, then the procedural obligations set forth in ¶ 4 come into play. But, Martin Marietta says, ¶ 4 does not work to read a definition of "legally required" back into ¶ 3. Martin Marietta reasons that if ¶ 3 of the NDA had the meaning claimed by Vulcan, the

---

**208.** *See Restatement (Second) of Contracts* § 203 (1981) ("[A]n interpretation which gives a reasonable and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable or of no effect."); 11 *Williston on Contracts* § 32:11 (4th ed. 1999) (citing same principle).

**209.** *See Council of Dorset Condo. Apts. v. Gordon,* 801 A.2d 1, 7 (Del.2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.").

phrase "other than as legally required" in ¶ 3 would have no meaning. Why say it twice, when if the term legally required was absent from ¶ 3 altogether, then the only circumstance in which ¶ 3 information could be disclosed would have been if the prerequisites to disclosure in ¶ 4 were met? In other words, Martin Marietta says that only by giving the term "legally required" in ¶ 3 a broader scope than in ¶ 4 can you avoid reading those words as surplusage and violating a traditional canon of construction.[210]

As Martin Marietta sees it, the NDA set up two independent regimes. One regime is triggered by an External Demand within the meaning of ¶ 4. "In the event that" an External Demand is made, the party subject to the potential disclosure obligation must satisfy the Notice and Vetting Process of ¶ 4. The second regime is when a party does not face an External Demand, but takes unilateral action that it concludes triggers a legal requirement to disclose. In that circumstance, the party who self-imposed the legal requirement may not only disclose Transaction Information but also the substance of any Evaluation Material because such Evaluation Material constitutes "facts with respect [to]" the Transaction within the meaning of ¶ 3.

Because ¶ 3 does contain a reference to "legally required" that is arguably redundant if the NDA is read as Vulcan suggests, I do not rule out Martin Marietta's reading as facially unreasonable, although I do not view it as the most natural way to read the NDA as a whole and it produces an odd scheme. Under Martin Marietta's reading, the exception in ¶ 3 provides a party with a free license to disclose using only its own subjective judgment in the circumstances when the opportunity for prior consultation with the other party is greatest and the exigency to disclose rapidly is at its nadir. Under Martin Marietta's reading, the broad protection against the disclosure of Evaluation Material is rendered useless because in that situation a party who decides to take unilateral action and voluntarily subject itself to a disclosure requirement can then disclose the substance of any Evaluation Material as "facts with respect [to]" the Transaction. Given the NDA's capacious definitions of what was to be considered confidential and the evident purpose of the parties as reflected in the Agreement's overall terms, Martin Marietta's interpretation is an odd one. Nonetheless, I accept it as plausible, and turn to the extrinsic evidence to resolve the ambiguity.[211]

210. See O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del.2001) ("Delaware courts have consistently held that an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive."); but see U.S. W., Inc. v. Time Warner Inc., 1996 WL 307445, at *15 (Del.Ch. June 6, 1996) ("While redundancy is sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy.").

211. In determining that the NDA is ambiguous, I did not ignore ¶ 6 of the NDA, which is entitled "Securities Laws." I did not find that paragraph to offer any material interpretative

help. Paragraph 6 acknowledges the securities law and provides that "the parties agree that they will not use or cause any third party to use any Evaluation Material in contravention of the United States securities laws," and that "applicable United States securities laws would prohibit any person who has material nonpublic information about a company from purchasing or selling securities of such company." NDA ¶ 6. That is, a party in possession of material nonpublic information "must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir.2001) (citing

## 2. The Extrinsic Evidence Supports Vulcan's Position

Here, the drafting history of the NDA, in light of the business context in which it was drafted and the expressed expectations of both Nye and James, makes clear that Vulcan's interpretation of the NDA is correct.[212] To be more pointed, the extrinsic evidence convinces me that Martin Marietta is seeking to read the NDA in precisely the way that its general counsel Bar feared that the initial draft of the NDA would allow; fear that motivated Bar to make a key change to the NDA designed to ensure that ¶ 3 of the NDA could not be read as a way to bypass the restrictive definition of legally required in ¶ 4 and the Notice and Vetting Process that had to proceed any disclosure of information that was arguably legally required in the sense set forth in that paragraph.

In opinions, as in contracts, redundancy sometimes adds clarity. Thus, it is useful to set forth the precise changes to ¶ 3 that Bar proposed and Vulcan accepted: [213]

(Each *Subject to paragraph (4), each* party agrees that, without the prior written consent of the other party, it and its Representatives will not disclose to any other person, other (than employees of the Department of Justice (the "DOJ") or as otherwise *as* legally required, the fact that any Evaluation Material has been made available hereunder, that discussions or negotiations *have or* are taking place concerning a Transaction or any of the terms conditions or other facts with respect thereto (including the status thereof *or that this letter agreement exists* ). . . . [214]

As can be seen, these changes tighten ¶ 3 in several ways, including by requiring that even the fact of moribund discussions

*Chiarella v. United States,* 445 U.S. 222, 230, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)).

The fact that Martin Marietta and Vulcan acknowledged that they were aware of the disclose or abstain rule does not tip the scales in favor of either of the party's interpretation. The evident purpose of ¶ 6 is to protect the other party if a party receiving confidential, non-public information then hauled off and traded on the basis of it. Paragraph 6 does this by saying in essence that if a party is going to seek to trade in the securities of the other party, that party must disclose the material inside information, but if the party seeking to trade is prevented from making such disclosures because of a fiduciary or contractual relationship, then that party must refrain from trading. *See* Kling & Nugent, *supra* note 132, § 9.05, at 9–14 ("A bidder in a tender offer who is found to possess such [confidential] information must disclose it or refrain from trading. If that bidder is bound not to disclose such information by virtue of a confidentiality agreement with or other fiduciary obligation to the target, he will be caught between the 'proverbial rock and hard place,' particularly since a court may well grant injunctive relief rather than allow such a bidder to disclose the sensitive information publicly."). The crucial question here is

whether there was a contractual obligation on the part of Martin Marietta not to disclose Vulcans confidential information (the Transaction Information and the Evaluation Material) in the circumstances presented by this case. Paragraph 6 does not help answer that question; rather, the answer to questions like the one I must answer now might be relevant in determining whether a party has violated ¶ 6.

212. *E.g., Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1233 (Del.1997) (considering communications between the parties as relevant extrinsic evidence in the context of a bilateral, negotiated agreement); *Bell Atl. Meridian Sys. v. Octel Communications Corp.,* 1995 WL 707916, at *6 (Del.Ch. Nov. 28, 1995) (in interpreting ambiguous contract language, a court may consider "objective extrinsic evidence," including "the overt statements and acts of the parties").

213. *See Julian v. Julian,* 2010 WL 1068192, at *6–7 (Del.Ch. Mar. 22, 2010) (examining drafting history and proposed amendments to construe stockholder agreement).

214. JX 50 at 2.

had to be kept confidential as did the existence of the NDA itself. Most important, by adding the words "[s]ubject to paragraph (4)," Bar expressly drew a link between ¶ 3 and ¶ 4 that did not previously exist. Although Martin Marietta argues that Vulcan's reading of the NDA makes the reference to "legally required" in ¶ 3 redundant, it is essentially faulting its own drafter for implementing her intentions in a clear way that resulted in some arguable redundancy. Sure, Bar could have struck the words "other than as legally required" altogether from ¶ 3, and made clear in that way that you had to look to ¶ 4 to find the definition of legally required and the circumstances in which required disclosures were permitted. But she chose another effective and contextually clear approach: she made plain that ¶ 4 had dominion over ¶ 3.

Of course, Martin Marietta now contends that all Bar was making clear was that ¶ 4 would rule in a particular context, namely one when a party was "requested or required" by External Demand in the way defined in ¶ 4, but not when a party was required to make a disclosure because it made a unilateral, discretionary decision to impose upon itself a requirement to disclose. But that contention, if accepted, would mean that Bar sought to leave open the very window she was seeking to slam and nail shut.

As Martin Marietta's general counsel, Bar's objective was to protect the objectives set by her nervous boss Nye. To that end, all of Bar's changes to the NDA made that document a stronger rather than weaker protection against any right on Vulcan's part to use and disclose the Transaction Information and any Evaluation Material provided by Martin Marietta. Therefore, Bar narrowed the language governing the permissible uses of information; Bar broadened the definitions of

what constitutes Evaluation Material in the NDA and Confidential Materials in the JDA; and Bar added additional categories of information to the bar on disclosure in ¶ 3. Read in context with all these changes, Bar's move to make ¶ 3 expressly "subject to" ¶ 4 cannot be reasonably read to have been intended to give Vulcan a blank check to reveal that the parties had agreed to the NDA, had engaged in negotiations, and to disclose any Evaluation Material that constituted "facts with respect [to]" the Transaction if Vulcan concluded that it wished to make an unsolicited tender or exchange offer and that the SEC required disclosures of information of that kind.

Rather, Bar's addition of "[s]ubject to paragraph (4)" is most obviously read as being designed to prevent any reading of ¶ 3 that would permit escape from ¶ 4's narrow definition of legally required and ¶ 4's rigorous Notice and Vetting Process. But, Martin Marietta argues that the original "other than as legally required" language in ¶ 3 would have had the effect that Vulcan wanted absent the "[s]ubject to" introductory clause.[215] That is, absent the addition of the "[s]ubject to" language to ¶ 3, Vulcan would be right and "legally required" for purposes of ¶ 3 would have been defined as in ¶ 4. Martin Marietta therefore contends that Bar was intending to broaden the right of a party to disclose under ¶ 3 by her addition of these key words.

I cannot accept that argument for two reasons. First, I see no reasonable way of concluding that the addition of words expressly subjecting ¶ 3 to ¶ 4 made ¶ 4's scope narrower and its effect weaker than previously. The only reasonable way to read the addition is that it was making ¶ 4 more powerful than ¶ 3 and subordinating ¶ 3 to ¶ 4.

215. *E.g.,* Martin Marietta Ans. Post–Tr. Br. at 35.

Second, reading Bar's change in the way suggested by Vulcan is the only sensible interpretation in light of her boss Nye's own objectives, which she was seeking to achieve. Bar's changes to the NDA were made after Nye relayed to her his conversation with James in April 2010. Nye, in particular, was adamant that the fact that Martin Marietta and Vulcan were even discussing a potential deal remain confidential in order to protect against interloper risk. Nye had just become Martin Marietta's CEO, and he was not interested in ceding that position to anyone else. To that end, Nye repeatedly expressed his concern for "maximum confidentiality" before the NDA was inked.[216] Nye stressed the importance of confidentiality in his talks with Vulcan's financial advisor at Goldman Sachs, Michael Carr, relaying that "it's obviously critical" that "all of our communications, and all of yours with [James], be kept completely confidential,"[217] and directing Carr to "tell [James] that maximum confidentiality needs to be maintained."[218] Nye was so hypersensitive to confidentiality that, as a threshold matter before moving forward with speaking to James, Nye complained to Carr that a private equity shop had made known to Nye that it knew that Martin Marietta had been speaking to Goldman. Nye was "very concerned" about this, because "even the hint that [Goldman], who has represented [Vulcan] for years, [is] talking to us raises questions."[219]

Nye then expressed his concern for confidentiality to James in their pre-NDA discussions. As James testified, he and Nye agreed that "if [they] were going to have any discussions at all, they had to be kept very, very confidential, not only outside [their] companies but within [their] companies so that there would not be any leaks that might create unwanted activity by some of the global players,"[220] and that Nye had "exactly the same concerns that . . . Vulcan had, that the fact of these negotiations be kept absolutely confidential."[221] This was the reason why Nye and James asked their general counsels to prepare a confidentiality agreement. Thus, when Bar revised the template agreement used for the NDA, she did so with the understanding that Nye wanted the fact of Martin Marietta's negotiations with Vulcan to be kept strictly confidential because he did not want word of their talks to leak into the market—an understanding that Nye had made explicit to James, to Carr, to his board, and to Bar herself.

Equally important, Nye had made clear to James and Carr that Martin Marietta was not for sale to anyone, including Vulcan. The notion that Nye's obsessive concern with confidentiality did not extend to a situation when Vulcan itself would decide to launch a hostile bid, impose on itself an arguable legal requirement to disclose, and use that as a blank check to dump in the public domain the broad classes of information that Martin Marietta had itself asked to be treated as confidential under the NDA is one that a rational, disinterested mind could not accept as plausible.

Rather, this extrinsic evidence about Nye's expressed intent adds clarity to all of Bar's unidirectional drafting revisions to the NDA. Put simply, all of her revisions were designed to reflect Nye's concern that the parties' nonpublic information, and, critically, the fact that the parties were even in negotiations, be kept strictly

216. *E.g.,* JX 33 at MM0051096.033; JX 40 at MM0003205.

217. JX 33 at MM0051096.033.

218. *Id.*

219. *Id.*

220. Tr. at 20 (James).

221. *Id.* at 67.

confidential.[222] In fact, the record suggests that Nye was equally, if not more, concerned about maintaining the confidentiality of the Transaction Information as he was about the parties' actual Evaluation Material, and had made his concerns known to Vulcan, which shared his concerns. In this regard, although not wholly unreasonable as a purely textual matter, Martin Marietta's reading of the NDA conflicts with the negotiating history of the parties and Martin Marietta's own expressed intent. That is, Martin Marietta's reading of the NDA would provide very weak to no protection to the Transaction Information, which, if not "requested or required" in the specific manner described by ¶ 4, would not be subject to *any* procedural or notice obligation upon a party's ginning up of its own legal requirement upon which it would ground its disclosure. This was the very type of situation that Nye most feared, where either Vulcan would directly put Martin Marietta in play by an unsolicited bid or where word of Martin Marietta's negotiations with Vulcan would leak into the market and put Martin Marietta in play with other bidders. It would contradict Martin Marietta's own contractual negotiating position and the shared objectives of both parties to read

the NDA as permitting disclosure of precisely the information that Nye wanted kept secret, and achieving the exact result that Nye desperately sought to avoid, without the benefit of any notice from which to seek an injunction or protective order against the disclosure.[223]

Rather, the only reasonable way to interpret ¶ 3 and ¶ 4 in light of the extrinsic evidence is that the circumstances under which a party is permitted to make "Required Disclosure[s]" under ¶ 4 are the only circumstances under which a party is allowed to make "legally required" disclosures under ¶ 3. In other words, the "[s]ubject to paragraph (4)" introductory clause in ¶ 3 serves to qualify and narrow the definition of "legally required" disclosures permitted under ¶ 3.[224]

As previously suggested, Martin Marietta's reading of the NDA would also force a strained interpretation of the NDA in another way, in that it would require two separate definitions of "legally required" when there is no extrinsic evidence suggesting that that was intended. The lack of one consistent definition of "legally required" would raise a variety of textual questions to be reconciled. For starters, why is the parenthetical in ¶ 4 next to the word "required" and not next to the word

222. *Cf. Shore Investments, Inc. v. Bhole, Inc.*, 2011 WL 5967253, at *6 (Del.Super. Nov. 28, 2011) (where the court found it "ironic that the paragraphs of the [contract] that the defendants now argue are immaterial are exactly the same ones that *they* wanted to modify because they stood squarely in the way of their plans. If they were immaterial, then why bother to try to amend them[?]") (emphasis added).

223. Imagine for a moment a reversal of roles in this case. Assuming that it was Vulcan that launched the hostile bid for Martin Marietta and disclosed the details of their negotiations, Nye would be crying out that Vulcan understood that the NDA was designed to strengthen the protections afforded to Martin Marietta upon attempted disclosure of the

Transaction Information. Because the market dynamics flipped, and Martin Marietta realized that it could afford to acquire Vulcan rather than the other way around, it is with some ill grace that Martin Marietta seeks to disclaim all of the confidentiality concerns that *it* had and that *it* made known when it entered into negotiations with Vulcan and which motivated its scrivening of the NDA.

224. And, the "in the event that" language introducing the parenthetical in ¶ 4 is thus most reasonably interpreted as saying, "if a disclosure is legally required in the only way in which something can be legally required under the NDA, this is the process that you must follow in order to disclose the information."

"requested"? The parenthetical in ¶ 4 logically defines "required" because the parenthetical immediately follows it.[225] Indeed, Martin Marietta concedes that this is so.[226] If the definition of "required" supplied by the ¶ 4 parenthetical does not apply to the term "legally required" in ¶ 3, does it also not apply to the term "legally required" used after the parenthetical definition in ¶ 4? Paragraph (4) goes on to speak in terms of "legally required" disclosures, when discussing the applicability of the Notice and Vetting Process when a party is "legally required to make the disclosure,"[227] and when discussing the alternative requirement that counsel make a determination that certain information is "legally required" to be disclosed.[228] It follows that, under Martin Marietta's reading, "legally required" could have inconsistent definitions even within a single paragraph. Finally, why is ¶ 4 broadly entitled "Required Disclosures," a term that seems to cover *all* required disclosures under the NDA, not just a subset of them? In contrast, Vulcan's reading of the NDA does not create these textual problems. Under Vulcan's reading, the ¶ 4 parenthetical is next to "required" rather than "requested" because it is defining what is legally required. "Legally required" has a consis-

tent meaning throughout the NDA and throughout ¶ 4 itself. And ¶ 4 is entitled "Required Disclosures" because it is the section of the NDA—the only section—that describes how a legal requirement to disclose might legitimately arise and how a party should deal with it without violating the terms of the Agreement.

3. *A Look At The Relevant Treatises And Practice Guides Confirms The Importance Of The Drafting History Of The NDA*

Confidentiality agreements such as the NDA are common, and they have come to increasingly utilize a standard structure.[229] In this regard, consideration of the leading M & A treatises and practice guides that are geared towards explaining to transactional lawyers the effect of certain terms used in confidentiality agreements is a useful exercise.[230] As an initial matter, the model confidentiality agreements generally recognize, and distinguish between, two sources of legal requirements: requirements generated by external legal process demands, and requirements of the securities laws and stock exchanges. Also, the model confidentiality agreements generally set up a three-tiered non-disclosure structure similar to that in the NDA, with one

225. For ease of reference, ¶ 4 reads in relevant part as follows: "In the event that a party ... [is] *requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process)* to disclose any of the other party's Evaluation Material or any of the facts, the disclosure of which is prohibited under paragraph (3) ..., the party requested or required to make the disclosure shall provide the other party with prompt notice of any such request or requirement ..." NDA ¶ 4 (emphasis added).

226. Post–Tr. Tr. at 149–50 ("Q. So then what you're saying is there's two categories of required. There's required for the purposes of paragraph (4), which you would admit is

qualified by the parenthetical. A. And a process, yes.").

227. NDA ¶ 4.

228. *Id.*

229. *See* Kling & Nugent, *supra* note 132, § 9.02, at 9–3 ("All confidentiality agreements cover certain essential matters. They identify what type of information is to be covered by the agreement and set forth the manner in which that information may be treated, its permitted recipients and the circumstances under which the information may be disclosed by the Buyer 'as required by law.' ").

230. *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011).

paragraph providing for non-disclosure of the parties' Evaluation Material (here, ¶ 2), another providing for non-disclosure of Transaction Information (here, ¶ 3), and a third establishing a notice and objection regime in favor of the non-disclosing party when the disclosing party seeks to disclose confidential information in ¶ 2 or ¶ 3 by some sort of legal requirement (here, ¶ 4).

But, upon a close review of these model agreements and other leading treatises, I cannot conclude that the use of a standard structure has led to any corresponding lack of ambiguity about important issues. Perhaps because of this, the leading authorities and practitioner-authored memoranda suggest to practitioners to be clearer in their usages.[231] Most pertinent here, I cannot conclude that a uniform approach has emerged as to whether the permitted disclosures of ¶ 3 Transaction Information is broader or equivalent to the permitted disclosures of ¶ 2 Evaluation Material, as provided in ¶ 4. By this I mean, there does not appear to be a "default" position as to whether the scope of permitted disclosures of Transaction Information is co-extensive with the scope of permitted disclosures of Evaluation Material. For example, certain practice guides suggest that Transaction Information *may only* be disclosed as provided in ¶ 4.[232] Others suggest that disclosures of Transaction Information may be permitted under a broader range of circumstances than disclosures of Evaluation Material, but that the *procedural* protections of ¶ 4 would apply in to any ¶ 3 disclosure of Transaction Information, regardless of the source of the legal requirement.[233] Others yet suggest a more tenu-

---

231. *E.g.*, Kirman, *supra* note 158, at 7, 9 (noting that "the variety of M & A transactions requires each agreement to reflect the peculiarities of the form of transaction being discussed," and that "M & A confidentiality agreements are critical pieces of the deal puzzle … where misstep at the confidentiality agreement stage can restrict a buyer's or seller's options in unintended, and possibly very significant, ways."); Andrew Gray & Patrice Walch–Watson, *M & A Defensive Tactics: Using a Confidentiality Agreement to Stop a Hostile Takeover Bid* 1 (Torys LLP, 2009) (updating transactional lawyers about the *Certicom* decision, and noting that the "ruling highlights the significance of the specific wording of a confidentiality agreement.").

232. *E.g.*, ABA *Model Confidentiality Agreement* 352 (2011) (where "each party agrees that without the prior written consent of the other party … it … will [not] disclose to any other person the fact that the Evaluation Material has been made available, the fact that discussions or negotiations concerning a Transaction may or may be taking place, or have taken place, or any of the terms, conditions, or other matters discussed with respect thereto," "except as set forth in Section 4."); *see also* Sample Confidentiality Agreement (Merger/Acquisition Context), 3 *Model Agreements for Corporate Counsel* § 30:4 (2012) (subjecting both the equivalent of ¶ 2 and ¶ 3

information to the provision stating that "in the event that you … are required by applicable law or regulation or by legal process or NASDAQ rules … to disclose any Proprietary Information or any other information concerning the Company or a Potential Transaction, you agree that you will … provide us with prompt notice of such request or requirement in order to enable use to seek an appropriate protective order or other remedy, [and] to take steps to resist or narrow the scope of such requirement. . . .").

233. *E.g.*, Kirman, *supra* note 158, at 41 (where the model ¶ 3 reads in part, "without the prior written consent of the Company, you will not … disclose to any person … the fact that … negotiations are taking place or have taken place concerning a possible Transaction, … *except that you may make any such disclosure if you determine that such disclosure is required by applicable law or stock exchange regulations, but only in accordance with the procedures set forth in paragraph [ ],*" and goes on to note that "this is intended to cross-reference the procedures set forth in the 'Disclosures Required By Law' section, to ensure that Seller has the benefit of protections set forth there," which relate to "disclosures required by regulatory or legal process" such as a "subpoena," "court order" or the like.) (emphasis added).

ous relationship between ¶ 3 and ¶ 4, where the more rigorous disclosure regime of ¶ 4 would only apply to circumstances where Evaluation Material was requested by legal process, but would allow Transaction Information to be disclosed in accordance with the broader set of legal requirements, such as those arising out of SEC Rules.[234] The subtle variety in how these model agreements structure the relationship between ¶ 3 and ¶ 4 make plain that there is no clear default, and help further explain why I did not rule out Martin Marietta's interpretation as an unreasonable one as a purely textual matter. That said, each of the model agreements subjects the disclosure of Transaction Information identified in ¶ 3 on the grounds of legal requirement to some sort of predisclosure process, but none contains an express reference to the term "legally required" in both ¶ 3 and ¶ 4, as the template agreement on which the NDA was based did. In view of Martin Marietta's expressed desires to keep Transaction Information confidential and to broaden the scope of Evaluation Material required to kept confidential, Bar's use of the phrase "[s]ubject to paragraph (4)" was plainly her way of making sure that the narrow definition of the term "legally required" in ¶ 4 governed and that any disclosure of information covered by ¶ 3 had to be in accord with the Notice and Vetting Process.

4. *The Confidentiality Agreements Prevent Martin Marietta From Making Disclosures In Connection With Its Hostile Bid*

 The provision defining "legally required" relates to the "degree of compulsion which is necessary before such disclosure is allowed."[235] Without any qualifying language, the degree of compulsion necessary for something to be "legally required" may be construed broadly, as discussed in the previous section.[236] But, where a confidentiality agreement includes language limiting the kinds of legal requirements that will permit disclosure to those no broader than the requirements set forth in ¶ 4, practitioners are advised that disclosure of confidential information in the context of a hostile bid will not be allowed, even in the absence of a standstill. In discussing this very point, a leading M & A treatise advises that:

**234.** *E.g.,* Arthur Fleischer, Jr. & Alexander R. Sussman, *Exhibit 80 Forms of Confidentiality and Standstill Agreements,* in *Takeover Defense: Mergers and Acquisitions* (2012 Supp.) (providing that a party may disclose the equivalent of ¶ 3 information if "it has received advice from legal counsel that disclosure is required to be made by it in order to avoid violating the federal securities laws or rules of a national securities exchange to which it is subject, and the requirement to make such disclosure does not arise from its breach of this Agreement [imposing a standstill]; and, provided further, that, to the extent reasonably practicable, the disclosing party will notify the other party prior to making any such disclosure," and where the more rigorous notice and disclosure regime applicable to ¶ 4 only applies to disclosure of ¶ 2 Evaluation Material arising from an externally generated request or requirement).

**235.** *See* Kling & Nugent, *supra* note 132, § 9.02, at 9–7.

**236.** *See Marine Midland Realty Credit Corp. v. LLMD of Michigan, Inc.,* 821 F.Supp. 370, 373–74 (E.D.Pa.1993) ("A legal requirement is not limited to a situation where failure to comply will result in a fine or other punitive order.... The law requires many acts where the consequence for failure to comply is not punishment per se but the denial or loss of an important right or privilege. Such acts are in reality just as much legal requirements as where punitive action may result.... Had the parties wished to define more narrowly the "required by law" exception to confidentiality ...., they could have done so.").

Sellers should be careful to draft [non-disclosure provisions in confidentiality agreements] narrowly so as to prevent the Buyer from relying on it to permit the disclosure of confidential information in the context of a hostile tender offer. *For example, a provision that limits the disclosure of information to circumstances where a party receives a subpoena, interrogatory, civil investigat[ive] demand or similar process is much better from the Seller's perspective than one which also permits disclosure "if required by applicable law.*[237]

This discussion is cited affirmatively by Martin Marietta in its briefing as an example of language that will restrict the parties' ability to make disclosures.[238] This advice is also consistent with the disjunctive treatment that the model agreements accord a requirement that is generated by a "judicial, administrative, or other legal proceeding" and one that is otherwise compelled by the "securities laws or stock exchange rules."[239] Indeed, in its papers,

Martin Marietta concedes that the "vast majority of disclosure required by the federal securities laws" is not preceded by External Demand.[240] Accordingly, even where a confidentiality agreement does not contain an express standstill provision, transactional lawyers are advised that restricting the scope of legally required disclosures to those that arise in the context of some sort of discovery obligation or affirmative legal process may have the effect of creating a backdoor standstill restriction if what is subject to that restricted definition is Transaction Information (*i.e.*, ¶ 3 information) that would need to be disclosed under Regulation M–A in the event that one of the parties to the agreement sought to pursue an unsolicited offer for the other.

Because Martin Marietta's S–4, which spilled ten single-spaced pages worth of the parties' negotiating history that was clearly information covered by ¶ 3, was not filed in response to an External Demand, Martin Marietta breached its non-disclosure obligations under the NDA when it did so.[241]

237. Kling & Nugent, *supra* note 132, § 9.02, at 9–7 n.14 (2011).

238. Martin Marietta Post–Tr. Op. Br. at 58 (arguing, however, that "neither the JDA nor the NDA includes language limiting the kinds of legal requirements that will permit disclosure.").

239. ABA *Model Confidentiality Agreement* 354 (2011) (commenting on the model provision's provision for "legally compelled" disclosures in the event that a party is "required ... by law or the rules of any securities exchange to which the Recipient ... is subject, *or* in any judicial, administrative, or other legal proceedings, or pursuant to subpoena, civil investigative demand, or other compulsory process" to make certain disclosures) (emphasis added).

240. Martin Marietta Post–Tr. Ans. Br. at 35–36.

241. Because I find that the parties dealt with Martin Marietta's own desire to keep Transaction Information strictly confidential by nar-

rowing the definition of legally required in ¶ 4 and using that definition consistently for purposes of both ¶¶ 2 and 3, I elide an interesting argument made by Vulcan. That argument is simple and goes like this. Martin Marietta unambiguously promised that it would not disclose the Evaluation Material covered by ¶ 2 and the Transaction Information covered by ¶ 3. That promise was a binding one. Having made that promise, Martin Marietta restricted itself from taking later discretionary, unilateral action that triggered a legal requirement to disclose Evaluation Material or Transaction Information. In other words, by unambiguously promising not to disclose the Evaluation Material or Transaction Information during the two-year term of the NDA, Martin Marietta was not free to embark on discretionary course of action if it knew that the course of action would trip a legal obligation to make public disclosure. Rather, the only way that Martin Marietta could have been "required" in the contractual sense is if events that it did not intentionally bring about imposed upon it a legal obligation to disclose. Vulcan cites in support of this proposition the

■ On a related note, even if Martin Marietta's disclosures were somehow required within the definition of ¶ 4 (*e.g.,* if Martin Marietta attempted to construe the subsequent SEC comment letters issued in response to Martin Marietta's preliminary S–4 and first amended S–4 as a "process" "similar" to a "civil investigative demand," which I note Martin Marietta does not do), Martin Marietta breached the NDA by failing to adhere to the Notice and Vetting Process that it would have been required to follow in advance of making any such disclosure. That Process required Martin Marietta to give Vulcan "prompt notice of any such request or requirement so that the other party may seek a protective order or other appropriate remedy,"[242] and in the absence of a protective order, the receipt of "the opinion" of Martin Marietta's "counsel" that Martin Marietta is "nonetheless" "legally required to make the disclosure," in which case Martin Marietta would have been without liability only if it had "disclose[d] only that portion of [Vulcan's] Evaluation Material which such counsel advises is legally required to be disclosed."[243]

Martin Marietta concedes that it blew through this Notice and Vetting Process,[244] and having cloaked its disclosure decisions in privilege there is no basis for the court to conclude that it only disclosed that information which counsel, on an item-by-item basis opined was the bare legal minimum that needed to be disclosed.[245] Thus, even if its disclosures were substantively permitted by the ¶ 4 parenthetical, Martin Marietta breached the procedural obligations to which it remained subject.

C. *Even If Martin Marietta's Broader Interpretation Of Legally Required Is Correct, It Breached The Confidentiality Agreements By Disclosing Evaluation Material Without Complying With The Notice And Vetting Process*

As an alternative argument, Vulcan contends that even if Martin Marietta was correct and that it could disclose Transaction Information as "legally required" under the SEC Rules, Martin Marietta still breached the NDA because Martin Marietta breached ¶ 2 by disclosing Evaluation Material without satisfying the Notice and Vetting Process set forth in ¶ 4.

There is no non-frivolous dispute that Martin Marietta disclosed Evaluation Material covered by ¶ 2 of the NDA in the S–4 it filed in aid of the Exchange Offer. For example, as discussed earlier, Martin Marietta disclosed its own synergy estimates, which were based on Vulcan's non-public information shared at the March 8, 2011 meeting between Lloyd and Sansone, as well as James' synergy estimates.[246]

---

contractual doctrine that "a legal prohibition preventing performance is not a defense if the situation leading to the prohibition is attributable to the acts of the party asserting the defense." Vulcan Pre–Tr. Op. Br. at 37 (quoting *Corbin on Contracts* § 76.11). I do not address this colorable argument because I find that the parties cut off this kind of conduct by narrowly defining the term required in ¶ 4.

**242.** NDA ¶ 4.

**243.** NDA ¶ 4.

**244.** *E.g.,* Post–Tr. Tr. at 145.

**245.** To the extent Martin Marietta claims that the court cannot consider its failure to produce any evidence with respect to the legal advice it received regarding its disclosures because Martin Marietta invoked the attorney-client privilege, I note this is not analogous to a Fifth Amendment invocation. Martin Marietta has affirmatively argued that it limited its disclosure to the bare legal minimum, so has put that question in contest, but has refused to provide any window that would allow a third party to determine whether Martin Marietta's argument to that effect is true.

**246.** JX 508 at 30.

These disclosures implicate core Evaluation Material.

Martin Marietta attempts to escape ¶ 4's Notice and Vetting Process by arguing that Evaluation Material is covered by ¶ 3's reference to *"any of the terms, conditions, or other facts with respect thereto."* [247] The "thereto" is in reference to "the fact that any Evaluation Material has been made available" under the NDA or that "discussions or negotiations have or are taking place concerning a Transaction," and is followed by the parenthetical "including the status thereof or that this letter agreement exists." [248] This argument does not persuade me for at least two reasons. First, Martin Marietta's reading would force a strained interpretation of the NDA, which consistently refers to Evaluation Material as a defined term when it chooses to reference it. And as previously discussed, the notion that the important protections of ¶ 2 can be swept away because Evaluation Material was shared to facilitate the discussions and negotiations concerning a Transaction and were therefore "facts with respect thereto" is not an easy one to embrace, because an incidental phrase in a paragraph focused on limiting public disclosure becomes a huge way around the rigorous protections against disclosure of Evaluation Material provided in ¶¶ 2 and 4. [249] Given that this is an outcome that seems inconsistent with the overall import of the NDA, the failure of the drafters to plainly suggest that Evaluation Material itself could be a "fact with respect thereto" cuts against Martin Marietta's reading.

So too does common usage in this context. None of the model agreements suggest that ¶ 2 Evaluation Material is somehow imported into ¶ 3 Transaction Information through the use of terminology similar to "facts with respect thereto." [250] Most naturally, ¶ 3 is read to provide for confidentiality regarding the *fact* that discussions are taking place, not regarding the substance of the Evaluation Material, which is already covered by ¶ 2, rather than to divvy up Evaluation Material up into ¶ 3 and ¶ 4 buckets depending on whether that Evaluation Material was a fact that was tied to a discussion between the parties. Therefore, Martin Marietta violated the NDA even if it was permitted to disclose Transaction Information because it went well beyond that disclosure to make public a range of Evaluation Material. That Evaluation Material could only be disclosed if legally required within the meaning of ¶ 4 and in conformity with the Notice and Vetting Process of that paragraph. Neither of those preconditions was satisfied.

■ Likewise, Martin Marietta also breached its obligation to not disclose Con-

---

**247.** NDA ¶ 3 (emphasis added).

**248.** *Id.*

**249.** *See Restatement (Second) of Contracts* § 203 (1981); 11 *Williston on Contracts* § 32:11 (4th ed.1999).

**250.** *E.g.*, ABA *Model Confidentiality Agreement* 352–53 (2011) (commenting that "Section 3 [entitled Discussions to Remain Confidential] expands the scope of required confidentiality to impose an obligation on the Recipient not to disclose the fact that any discussions are taking place are may be

taking place between the parties or that any information has been exchanged by them," even where that section contained the language "any of the terms, conditions, or other matters discussed with respect thereto."); Kirman, *supra* note 158, at 37 (providing confidentiality in the equivalent to ¶ 3, entitled 'Keeping Quiet About the Deal,' for "any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof or either party's consideration of a possible Transaction," and noting that this provision is designed *"to protect the confidentiality of the process."*) (emphasis added).

fidential Materials under the JDA, which is defined to include *"all factual information,* documents, *opinions, strategies,* or other materials *exchanged or communicated by whatever means between or among the Parties or their Counsel* pursuant to this Agreement." [251] The JDA was entered into for specific antitrust-related joint defense purposes. As discussed, Martin Marietta revealed opinions exchanged between the parties that related to the antitrust risk of a Vulcan–Martin Marietta merger.[252]

These antitrust-related opinions protected by the JDA were subject to notice and procedural requirements similar to the Notice and Vetting Process set forth in ¶ 4 of the NDA. Specifically, ¶ 2 of the JDA required that "[p]arties . . . not disclose Confidential Material to any other person or entity, without first obtaining the consent of all Parties who may be entitled to claim any privilege or confidential status with respect to such materials, as well as the consent of their Counsel." [253] Martin Marietta did not first obtain Vulcan's consent, so the terms of the JDA were breached.

D. *Even If Evaluation Material Could Be Disclosed As "Facts With Respect Thereto," Martin Marietta's Disclosures Exceeded The Scope Of What Was Legally Required*

It is undisputed that Martin Marietta bypassed ¶ 4's Notice and Vetting Process and discussed the history of its negotiations with Vulcan—clear Transaction Information—at length in its SEC filings. Even if I assume that Martin Marietta was permitted under the Confidentiality Agreements to create a legal requirement to disclose Transaction Information by triggering the SEC Rules applicable to an exchange offer and proxy contest, and then reveal such Transaction Information and Evaluation Material as those Rules require, Martin Marietta has not come close to justifying the level of broad and selective disclosure of Transaction Information and Evaluation Material that it chose to give in its S–4, let alone the disclosures that it made in its proxy statement and in its communications with investors and the press.

In justifying its disclosures as legally required, Martin Marietta relies primarily on Item 1005(b) of Regulation M–A, which requires disclosure of "any negotiations, transactions or material contacts during the past two years between the filing person . . . and the subject company . . . concerning any . . . [m]erger" in the public filings accompanying an exchange offer,[254] and Item 6 of Form S–4, which instructs the registrant to "[d]escribe any past, present or proposed material contracts, arrangements, understandings, relationships, negotiations or transactions during the periods for which financial statements are presented or incorporated by reference . . . between the company being acquired . . . and the registrant." [255] Martin Marietta also points to the following SEC requirements as additional justification for its public disclosures:

- Item 1011(a)(3) of Regulation M–A, which requires disclosure in the S–4 of "[t]he applicability of any anti-trust laws" if such information is "material to a security holder's decision whether to sell, tender or hold the securities sought in the tender offer." [256]

---

**251.** JDA ¶ 1 (emphasis added).

**252.** JX 508 at 30, 33.

**253.** JDA ¶ 2.

**254.** 17 C.F.R. § 229.1005(b).

**255.** 17 C.F.R. § 239.25 (Item 6).

**256.** 17 C.F.R. § 229.1011.

- Rule 14a–9, which provides that the proxy statement may not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." [257]

- Other securities laws that prohibit the omission of any material fact necessary in order to make the statements in a disclosure not false or misleading, such as Sections 11, 12 and 17 of the Securities Act of 1933,[258] Sections 10(b) and 14(e) of the Securities Exchange Act of 1934,[259] and SEC Rules 10b–5 and 14e–3.[260]

Martin Marietta says that all of its disclosures of Transaction Information and Evaluation Material in the S–4 were legally required because otherwise the S–4 and the proxy statement would not have provided a full and fair description of all material facts related to Martin Marietta's Exchange Offer and Proxy Contest, and argues that "if 'legally' required disclosures were limited to only the scantest possible disclosures, with the discloser contractually obligated to engage in brinkmanship with regulators, federal public policy that protects shareholders would be undermined." [261] Isn't the very purpose of disclosure to give investors all the material facts, says Martin Marietta, and not some sanitized summary? [262] Its vivid and argumentative "description" was therefore merely Martin Marietta's attempt to satisfy its legal requirement to give investors the material facts they needed to and were therefore entitled to know. And Martin Marietta says that its disclosure was clearly parsimonious, not profligate, in its approach to revealing Transaction Information and Evaluation Material because the SEC sent comment letters in response to its preliminary S–4 and its first amended S–4 requesting additional information, and the fact that the SEC followed up with comments shows that all of its disclosures were legally required.[263]

By contrast, Vulcan claims that Martin could have complied with SEC requirements with far more limited disclosure and points out that Martin Marietta could have started with a "barebones recitation" in the S–4 and waited for the SEC to ask for more.[264] I agree. Martin Marietta went beyond any definition of "legally required" by *over-disclosing* when it could have satisfied SEC requirements with a much simpler recitation of the facts in its S–4.

The SEC Rules did not require that Martin Marietta reveal more than the fact that the parties discussed a merger, that they entered into the Confidentiality Agreements, and that they ultimately could not come to terms on the utility of doing a deal. But, Martin Marietta viewed the SEC requirements as an opportunity to work with its public relations flacks on a propaganda piece in aid of the Exchange

257. 17 C.F.R. § 240.14a–9(a).

258. 15 U.S.C. §§ 77k, 77*l*, 77q.

259. 15 U.S.C. §§ 78j(b), 78n(e).

260. 17 C.F.R. §§ 240.10b–5, 240.14e–3.

261. Martin Marietta Post–Tr. Ans. Br. at 42.

262. *E.g., id.* at 40–43.

263. *See* JX 844 (SEC Comment Letter (Dec. 21, 2011)); JX 846 (SEC Comment Letter (Jan. 30, 2012)); JX 848 (SEC Comment Letter (Feb. 23, 2012)).

264. Vulcan Post–Tr. Op. Br. at 60.

*Offer.* Despite being obliged under the Confidentiality Agreements to take a begrudging, minimal approach to disclosing Transaction Information and Evaluation Material, Martin Marietta did the opposite.

Although Martin Marietta has cloaked its decision-making process in privilege, some objective facts regarding it are obvious. That includes the important fact that the disclosure decisions were heavily guided and influenced by public relations advisors, who advised Martin Marietta to portray Vulcan's decisions for not proceeding with a deal in a bad light. Martin Marietta has one of the most respected law firms in the world as its legal advisor. I am bold enough to find that that firm did not need the Kekst and Company or Joele Frank, Wilkinson Brimmer Katcher public relations firms to tell them what the bare legal minimum was that had to be disclosed.

In that vein, Nye admitted that Martin Marietta's approach to disclosure of Transaction Information and Evaluation Material was not based on the minimum legal requirement. Rather, it was influenced by the strategic consideration of what would best help Martin Marietta prevail in a hostile bid for Vulcan.[265]

By failing to comply with the Notice and Vetting Process set forth in ¶ 4, Martin Marietta of course made its disclosure decisions obscure to Vulcan. But the S–4 itself reveals that Martin Marietta did not make any rigorous, item-by-item review of what it should disclose. Rather, it dumped in whatever information (including its own subjective impressions of Vulcan's motives and beliefs) would help its case with the Vulcan electorate. For example, as Vulcan correctly points out, "[n]othing in the text of Item 1011(a)(3) required [Martin Marietta] to reveal *Vulcan's* opinions concerning antitrust risk."[266] Yet Martin Marietta went ahead and disclosed that coming out of their May 2010 antitrust meetings, the parties' "legal teams did not identify any significant impediments to a business combination transaction."[267]

Likewise, nothing in the text of the securities rules required Martin Marietta to disclose Evaluation Material such as the fact that James told Nye that in June 2010 "that [James] believed a combination of the two companies would result in approximately $100 million in synergies,"[268] and that "he did not believe that the combination would result in synergies at the $175 million to $200 million levels that Mr. Nye believed were achievable,"[269] or James' view of alternative deal structures designed to minimize tax leakage.[270]

And the fact that SEC's comment letters asked for additional information in response to Martin Marietta's preliminary S–4 does not aid Martin Marietta's argument. The SEC was responding to a highly opinionated S–4 that provided a stark struggle between champions of stockholder value—Martin Marietta's management and board—and entrenchment-motivated abettors of plush corporate payrolls—Vulcan's management and board. That the SEC was asking for balance or further context about topics and information that Martin Marietta intended to discuss and disclose reveals little about whether Martin Marietta had any obligation to address them in the first instance.

Martin Marietta's approach to disclosure of the specifics is not characteristic of a party seeking to comply with legal minimums. Vulcan proposes that a "flat and

265. *See* Tr. at 555–56(Nye).

266. Vulcan Post–Tr. Op. Br. at 59.

267. JX 508 at 30.

268. *Id.*

269. *Id.* at 32.

270. *Id.* at 29.

simple disclosure that there were two confidentiality agreements entered into by [Vulcan and Martin Marietta]" would have sufficed to satisfy Item 6 of Form S–4, and that a disclosure saying that between April 22, 2010 and June 27, 2011, Vulcan and Martin Marietta had nonpublic negotiations to see whether there was a basis for a friendly business combination, but did not agree on material terms and terminated the negotiations, would have satisfied the requirements of Regulation M–A.[271]

I agree that something like that would have been a fair starting point, and that something close to it was all that was required by the SEC's rules. Furthermore, it is apparent that Martin Marietta took a one-sided view of what was legally required to be disclosed, and did not feel the need to disclose Transaction Information and Evaluation Material that cast its own management's motives in a bad light. For example, it seems clear that Zelnak's and then Nye's desire to maintain their managerial positions had played a key role in stymieing talks between the companies before 2010. That was not disclosed. Nor was the fact that Martin Marietta wished to count as synergies cost-saving initiatives that Vulcan was planning to undertake regardless of a merger. The fact that Nye was willing to embrace a no-premium deal with Vulcan if he became CEO but wanted a 20% premium if he did not somehow did not make its way into the S–4, despite Martin Marietta's supposed desire to give the Vulcan stockholders, and I assume its own stockholders, all the material facts. A 20% premium was worth around $805 million in early 2011—a lot of bankable value for Martin Marietta stockholders to place

on Nye being immediately the CEO rather than transitioning into that role.[272]

In my view, the NDA operates to put the burden on a party disclosing Transaction Information or Evaluation Material to show that each and every disclosure of Transaction Information and Evaluation Material was legally required. That goes not only to the subject of the disclosure but to the specificity. That is, the disclosing party not only would have to show that a party's relative position on something like synergies or antitrust had to be disclosed (*e.g.*, that Vulcan had a lower estimate of synergies), but that the precise position had to be disclosed (*e.g.*, Vulcan's specific estimate of synergies at a specific time). Martin Marietta has done neither. And even if the burden of persuasion was on Vulcan on this issue, which it is not as a result of the contractual requirements, Vulcan has demonstrated that Martin Marietta disclosed far more than was legally required, in a plain attempt to cast Vulcan in a bad light through a debatable and selective disclosure of Transaction Information and Evaluation Material.

E. *Martin Marietta's Disclosures Outside Of Communications To The SEC Violated The Confidentiality Agreements*

Martin Marietta's view of the SEC Rules as a license to disclose Transaction Information and Evaluation Material also extended to its view that if it put Transaction Information and Evaluation Material in an SEC disclosure document, it could then put it in push pieces to investors, off the record and on the record communications to the media, and investor conference

---

271. *See* Post–Tr. Tr. at 286–88.

272. According to Martin Marietta's 10–K filed on February 24, 2011, it had 45,496,606 shares of stock outstanding. The average closing price of Martin Marietta's stock over that month was $88.48. A 20% premium on

that average closing price would have been about $17.69 per share. So, by my calculations, a 20% premium for Martin Marietta based on its average closing stock price in February 2011 would have been worth approximately $805 million.

calls. So long, Martin Marietta argues, that it had originally disclosed the Transaction Information and Evaluation Material in a formal SEC filing as a result of a legal requirement, Martin Marietta was then free to use that information as advocacy ammunition.

But that argument finds no contractual support. Even if the SEC requirements related to Martin Marietta's Exchange Offer and Proxy Contest *were* legally required under the Confidentiality Agreements, nothing in the JDA or NDA suggests that once Martin Marietta disclosed one thing, the floodgates could open and all of Vulcan's confidential information could come pouring out. The NDA allows for disclosure of Transaction Information and Evaluation Material only when legally required. Martin Marietta has repeatedly used the Transaction Information and Evaluation Material in communications that Martin Marietta itself admits were not legally required. Martin Marietta was bound to respect Vulcan's contractual confidentiality rights except to the narrow extent that the positive law demanded disclosure.

Martin Marietta has breached that obligation by broadly using Transaction Information and Evaluation Material to sell its hostile bid. That is an independent breach, and the very fact of those disclosures belies Martin Marietta's protestations that these additional communications could not have any impact because the investing world is presumed to know what was in Martin Marietta's SEC documents.

Of course, if Martin Marietta believed that, it would not have bothered to make

the non-SEC communications that are at issue. Clearly, it believed that those communications were valuable in the sense that they imparted that information more vividly or drove the import of that information home more effectively than the SEC filings. Martin Marietta's own behavior and belief thus demonstrates why its own conduct deprived Vulcan of its contractual rights.[273]

### F. A Coda On The Value Of Confidentiality Agreements To M & A Activity

In some of its arguments, Martin Marietta has tried to assert that this case has large implications for the ability of American investors to receive premium-generating offers for their shares. Martin Marietta implies that, if it is enjoined from pursuing its Exchange Offer and Proxy Contest because it violated the Confidentiality Agreements, a chill on M & A activity will result, harming stockholders and lowering share values. In its starkest form, Martin Marietta's argument is that a loss for Martin Marietta in this litigation will turn every confidentiality agreement into a standstill, even though standstills are a common contractual provision.

To the extent that Martin Marietta argues that confidentiality agreements should be read carefully and courts should not lightly imply limitations on a party's ability to make an unsolicited acquisition offer, I embrace its position and have done my best to read the Confidentiality Agreements in this case closely and to enforce them only to the extent I am convinced that they were intended to preclude certain action.[274] But to the extent that Mar-

**273.** Compare defamation law, where each new publication is "intended to and does reach a new group." *Restatement (Second) of Torts* § 577A cmt. d (1977); *see also Lehman v. Discovery Commc'ns, Inc.,* 332 F.Supp.2d 534, 538–39 (E.D.N.Y.2004) (rebroadcast of

defamatory television program provides a new cause of action).

**274.** *See United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810, 834 (Del.Ch.2007) ("[T]he Court's goal when interpreting a contract is to

tin Marietta suggests that courts should not enforce confidentiality agreements as they do other contracts on the ground that to do so is necessary to protect stockholders, I see no warrant in our law for such adventurism and no empirical basis to move our common law of contracts in that direction.

To do so might well disadvantage investors in a material way. The American M & A markets are extremely vibrant and generate a high volume of premium-generating transactions, even in comparison to the U.K. system beloved by certain of my favorite academics in corporate law.[275] One of the reasons for this vibrancy is the freedom given to corporations to use contracts to limit the very real business risks attendant to exploring M & A transactions. By respecting contract rights, our courts give parties in commerce the confidence that they can rely upon the contracts they execute to reduce risks and transaction costs. In the context I now address, that translates into a willingness on the part of wary day-to-day competitors to share information in aid of determining whether a mutually beneficial business combination might make sense.[276] If the message is sent that the confidentiality and other agreements that control the downside risks of such engagement will not be respected, then one can rationally expect such competitors not to be as prone to considering such transactions.[277]

The costs to investors in deals that never got done because of the lack of engagement that might result if confidentiality agreements are unreliable might be very large, given that a great deal of the M & A activity that provides premiums to investors results from friendly engagement in the first instance. In fact, it is well known that one of the contexts in which investors are most likely to benefit from an unsolicited bid is when an interloper comes in to make a higher offer after another suitor has validated the value of the target by signing a merger agreement.[278]

ascertain the shared intention of the parties.") (citation omitted).

275. *See, e.g.,* John C. Coates, IV, *M & A Break Fees: US Litigation vs. UK Regulation* 23–24 (Harvard Law Sch. Public Law & Legal Theory Working Paper No. 09–57, 2009) (showing that from 1989 to 2008, the incidence of premium-generating bids was higher in the United States than in the United Kingdom on a statistically significant basis).

276. *See* Kling & Nugent, *supra* note 132, § 9.03, at 9–9 ("A seller's concern in not harming a business being sold is heightened if the potential buyer ... is a competitor."); Bruce Alan Mann & David M. Schwartzbaum, *Negotiating Confidentiality Agreements: Issues for the Bidder's Counsel,* 6 Insights 18, 19 (1992) (indicating that "a seller will normally attempt to limit a bidder's use of Evaluation Material in a broad, sweeping manner, particularly in situations where a potential bidder is a direct competitor and could use such confidential information to compete against the target company.").

277. *See Gen. Portland, Inc. v. LaFarge Coppee S.A.,* 1981 WL 1408, at *3 (N.D.Tex. Aug. 28, 1981) (noting that if "confidentiality agreements could not be used and relied upon by the investment banking industry and the business community generally, it could substantially disrupt the present process of negotiating and consummating business acquisitions and mergers.").

278. *See* Robert E. Spatt & Peter Martelli, *The Four Ring Circus—Round Sixteen; A Further Updated View of the Mating Dance Among Announced Merger Partners and an Unsolicited Second or Third Bidder* 1–4 (Simpson Thacher & Bartlett LLP, Feb. 2012) (citing the numerous times stockholders benefited because an unsolicited deal jumper paid a higher premium than the original acquirer in the friendly merger agreement and was able to acquire the target instead of that original contractual partner).

The best way to address Martin Marietta's legitimate concerns is not for courts to fail to enforce confidentiality agreements as written. It is for the parties who enter into them to be clear about their terms, and for a party unwilling to honor a contractual promise to not make it in the first place. An examination of all the evidence here convinces me that Martin Marietta is not being held to any promise it did not make. Rather, it is being held to exactly the bargain it successfully sought to impose on Vulcan as a condition to sharing information and having merger talks. Martin Marietta insisted that it was not for sale and that it would only discuss a negotiated merger agreement, and that the talks were to be only for that purpose. Martin Marietta insisted that the fact of and substance of negotiations, and of a broadly defined class of Evaluation Material not be made public, and that the NDA itself be kept confidential. Martin Marietta insisted that any right of disclosure in ¶ 3 of the NDA be subject to the provisions of ¶ 4. Martin Marietta insisted that even the legally required disclosure permitted by ¶ 4 be limited to only the bare legal minimum. Martin Marietta then undertook conduct of precisely those kinds from which it demanded Vulcan refrain, breaching its own reciprocal obligations to Vulcan.

It is of course common for a party to a contract who has received the benefits flowing from the contract to wish to forsake the burdens it accepted to obtain them. But the refusal of American contract law to indulge that natural human desire is critical to the important economic and social value generated by voluntary contracts. Unless both parties to a contract have their reasonable expectations respected by the courts, then contracts will not serve their intended purpose. Ultimately, disrespecting contracts seems to threaten far more harm to investors in a capitalist economy than it does good.

\* \* \*

For all these reasons, I conclude that Martin Marietta breached the NDA and JDA by: (i) impermissibly using Evaluation Material under the NDA and Confidential Materials under the JDA for purposes not permitted by those Agreements; and (ii) disclosing Evaluation Material and Transaction Information under the NDA and Confidential Materials under the JDA under circumstances not permitted by those Agreements.[279]

### G. Should An Injunction Be Granted?

 To obtain injunctive relief, Vulcan must not only prove "actual success on the merits," but also "irreparable harm" and that "the harm resulting from a failure to issue an injunction outweighs the harm to [Martin Marietta] if the court issues the injunction."[280] In the NDA, Martin Marietta and Vulcan agreed that "money damages would not be sufficient remedy for any breach ... by either party" and that "the non-breaching party shall be entitled to equitable relief, including injunction and specific performance, as remedy for any such breach."[281] The JDA contains a sim-

---

**279.** Martin Marietta has tried to excuse its conduct on the ground that Vulcan responded to Martin Marietta's public pressure campaign by itself disclosing information that fell within the broad definitions of Evaluation Material and Transaction Information. Vulcan had no realistic choice but to do so, and Martin Marietta's prior, pervasive, material breaches excused any response by Vulcan. See BioLife Solutions, Inc. v. Endocare, Inc., 838 A.2d 268, 278 (Del.Ch.2003) ("A party is excused from performance under a contract if the other party is in material breach thereof.").

**280.** COPI of Del. v. Kelly, 1996 WL 633302, at \*4 (Del.Ch. Oct. 25, 1996) (citing Draper Commc'ns v. Del. Valley Broadcasters, L.P., 505 A.2d 1283, 1288 (Del.Ch.1985)).

**281.** NDA ¶ 9.

ilar provision.[282] In Delaware, parties can agree contractually on the existence of requisite elements of a compulsory remedy, such as the existence of irreparable harm in the event of a party's breach, and, in keeping with the contractarian nature of Delaware corporate law[283] this court has held that such a stipulation is typically sufficient to demonstrate irreparable harm.[284]

As important, Martin Marietta's own management's motivations for insisting on the NDA and JDA as a protection demonstrate why parties would agree that a breach of a Confidentiality Agreement would give rise to irreparable injury. Martin Marietta's CEO Nye wanted the NDA to protect Martin Marietta from being subject to an unsolicited acquisition offer in a down market when it was not a good time to sell. He did not wish any

disclosure to put his company in play involuntarily at a time not of its own choosing.[285] He also did not want to have to address the investor relations consequences of selective, one-sided disclosures of his company's nonpublic information.

Vulcan is now suffering from exactly the same kind of harm Nye demanded the Confidentiality Agreements shield Martin Marietta from. It comes with little grace for Martin Marietta to claim that these circumstances are not harmful to others when it causes the harm, but injurious to Martin Marietta when it feared enduring them. The very fact that measuring the precise loss to Vulcan in terms of negotiating leverage, customer relations, and productivity loss from Martin Marietta's misconduct is difficult to impossible is a reason why the parties' voluntary agreement that any breach would give rise to

---

**282.** JDA ¶ 10 ("In the event of a breach of this Agreement, the Parties hereto agree that the only remedies available for such breach are a separate civil action for equitable or injunctive relief. . . .").

**283.** *See, e.g., Nemec v. Shrader,* 991 A.2d 1120, 1125 (Del.2010) ("[W]e must . . . not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both."); *Libeau v. Fox,* 880 A.2d 1049, 1056–57 (Del.Ch.2005), *aff'd in relevant part,* 892 A.2d 1068 (Del. 2006) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."); *Asten, Inc. v. Wangner Sys. Corp.,* 1999 WL 803965, at *6 (Del.Ch. Sept. 23, 1999) ("Equity respects the freedom to contract. . . .").

**284.** *See, e.g., Kansas City S. v. Grupo TMM, S.A.,* 2003 WL 22659332, at *5 (Del.Ch. Nov. 4, 2003) (holding that an irreparable harm stipulation "allow[s] the Court to make a finding of irreparable harm provided the agreement containing the stipulation is otherwise enforceable"); *Cirrus Holding Co. v. Cirrus Indus., Inc.,* 794 A.2d 1191, 1209 (Del.Ch. 2001) ("This Court has repeatedly held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing preliminary injunctive relief."); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.,* 1997 WL 458494, at *9 (Del. Ch. Aug. 7, 1997) (holding that contractual stipulation of "substantial and irreparable harm . . . alone suffices to establish the element of irreparable harm"); *see also Gildor v. Optical Solutions, Inc.,* 2006 WL 4782348, at *11 (Del.Ch. June 5, 2006) (addressing a contractual stipulation to the remedy of specific performance, and noting that "in the analogous context of a party seeking a preliminary injunction, this court has held that a contractual stipulation of irreparable harm is sufficient to demonstrate irreparable harm").

**285.** *See* JX 33 at MM0051096.033 ("[T]his company is not for sale").

injunctive relief should be respected and honored,[286] not gutted by a judge, particularly of a state whose public policy is procontractarian.[287] Vulcan finds itself responding to an unsolicited bid on the basis of improperly used and improperly disclosed confidential information, at a time when the economies in its key markets are still in a slump. The distraction to pushing forward with its day-to-day business plans when its employees cannot help but be preoccupied by Martin Marietta's Exchange Offer and Proxy Contest and its contractually improper selective revelation of nonpublic Vulcan information is also something hard to measure, but difficult for any objective mind to deny as real.

The harder question is whether this irreparable injury would work more harm than good. Martin Marietta claims that the only thing an injunction would do is to deprive Vulcan's own stockholders of the chance to decide for themselves.

That is, of course, another thing that Martin Marietta confidently says now that is entirely inconsistent with its own bargaining position when the Confidentiality Agreements were signed. It was Nye who was most scared of disclosure and facing an unsolicited bid. He and Martin Marietta's board were not content to just let their stockholders decide. They insisted on broadening the very confidentiality protections that Martin Marietta has now thoroughly breached.

Nor can Martin Marietta try to position this case as one about the access that investors have to premium offers. Although professors can debate the empirical evidence, there is a sound basis for believing that failing to enforce confidentiality agreements in the M & A context will reduce, not increase, value-enhancing combinations. If managers of corporations come to understand that confidentiality agreements will not be enforced as written, that will likely diminish their willingness to explore M & A transactions. By nature, most CEOs are like Nye himself. They like to be in control and are reluctant to put themselves and their companies in a vulnerable situation. If the cost of sharing information is to be at the mercy of the other party, who is usually an industry rival with an everyday incentive to eat your lunch, you will, if you are a typical

---

**286.** *See, e.g., Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1341 (Del. Ch.1987) (noting that "injunctive relief is appropriate in cases where damages would be difficult to assess."); *In re Anderson, Clayton S'holders' Litig.*, 519 A.2d 669, 676 (Del.Ch. 1986) (injunctive relief appropriate where damages "would be exceedingly difficult to demonstrate."); *see also Hough Associates, Inc. v. Hill*, 2007 WL 148751, at *3 (Del.Ch. Jan. 17, 2007) (finding threat of irreparable harm to support an entry of injunctive relief where "after-the-fact attempts to quantify the damages . . . involve costly exercises in imprecision."). Moreover, under Delaware law, the improper use and disclosure of information that was subject to a confidentiality agreement has been held to constitute irreparable harm. *E.g., Stirling Inv. Holdings, Inc. v. Glenoit Universal, Ltd.*, 1997 WL 74659, at *2 (Del. Ch. Feb. 12, 1997) (where loss of "a contractual right to maintain the confidential-

ity of the terms of the Agreement . . . could not be adequately remedied by an award of damages," and "[o]n that basis, [the plaintiff] has demonstrated that it would be irreparably harmed by the disclosure of the contractually prohibited information."); *Horizon Pers. Communications, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *20 (Del.Ch. Aug. 4, 2006) ("Damages would not adequately compensate Plaintiffs for a breach of the confidentiality provisions because the purpose of such provisions is to prevent harm and misuse before it occurs.").

**287.** *See Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1029–30 (Del.Ch. 2006) (Delaware courts "will not distort or twist contract language" because "[b]y such judicial action, the reliability of written contracts is undermined, thus diminishing the wealth-creating potential of voluntary agreements.").

CEO, tend not to risk sharing. The overall cost to investors if the law does not enforce confidentiality agreements might turn out to be quite large in terms of transactions that are not done.

Neither is this a case about whether the Vulcan board is using the company's contractual rights in a manner consistent with its fiduciary duties. This is a purely contractual case, and cannot be confused with cases where a board has faced a claim that its fiduciary duties require it to waive contractual rights so as to further the best interests of the company's stockholders.[288] That would be a matter for the New Jersey courts to decide. Vulcan is a New Jersey corporation and this case raises only Delaware contract law claims.

In view of these realities, it strikes me as plain that the equities favor enforcing the Confidentiality Agreements as written and vindicating Vulcan's reasonable expectations. Vulcan has been measured in its request for injunctive relief, asking for an injunction against Martin Marietta's hostile bid of four months. Such an injunction would preclude Martin Marietta from running its slate of directors for election at Vulcan's June 1, 2012 annual meeting. The four month period is a responsible period that Vulcan selected by reference to the date on which Martin Marietta launched the Exchange Offer, which was on December 12, 2011, and the expiration date of the NDA, which occurred on May 3, 2012. Vulcan simply seeks the minimum period of repose during which its Evaluation Material and the Transaction Information could not be used against it to forcibly effect a transaction. This is a minimum period because an argument can be made that a longer injunction would be justified by the pervasiveness of Martin Marietta's breaches, and also because the JDA was also breached, and has no expiration date at all.

Although this injunction will cause Martin Marietta delay, that delay is one that is the result of its own conduct. Martin Marietta's breaches prevented Vulcan from seeking injunctive relief before the confidential information was made public, a denial of a right Vulcan had under ¶ 4 that underscores the propriety of injunctive relief now. Rewarding a breaching party like Martin Marietta would encourage other parties to end-run contractual pre-disclosure procedures like the Notice and Vetting Process in ¶ 4 and underscore the unreliability of confidentiality agreements as a risk-reducing device that enables parties to more readily consider voluntary, value-maximizing M & A transactions.

## IV. *Conclusion*

For all these reasons, I find in favor of Vulcan on its counterclaims for breach of the NDA (Count I) and the JDA (Count II), and against Martin Marietta on its claim that it did not breach the NDA (Count I). Martin Marietta shall be enjoined for a period of four months from prosecuting a proxy contest, making an exchange or tender offer, or otherwise taking steps to acquire control of Vulcan shares or assets. During that period, it is also enjoined from any further violations of the NDA and JDA. Vulcan shall submit a conforming final judgment within five days, upon approval as to form by Martin Marietta.

---

**288.** *Compare In re Topps Co. S'holders Litig.,* 926 A.2d 58, 92 (Del.Ch.2007).